EXHIBIT A



## STARRS MIHM & CASCHETTE LLP

### TRIAL LAWYERS

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Jan 19 2007 7:53PM MST
Filing ID: 13530211
Review Clerk: Ruth Daphney Teemo

Michael T. Mihm
mmihm@starrslaw.com

*Admitted in Colorado and California*

January 19, 2007

Paul Gordon, Esq.
Cherry Creek Plaza II
650 South Cherry Street, Suite 835
Denver, CO 80246

> Re:    *Denise McNeil, et al., v. Leeds, Morelli & Brown, P.C., et al.*
> Case No. 2003-CV-893, District Court, City and County of Denver, Colorado

Dear Mr. Gordon:

You have requested that I evaluate the professional liability claims brought against the law firm of Leeds, Morelli & Brown, P.C., and certain of its lawyers (collectively, "LM&B"). The purpose of this letter is to discuss my preliminary expert opinions.

### I. OVERVIEW

This case is an object lesson on how lawyers ignore conflicts of interest at their peril, and how unresolved conflicts can quickly destroy the client-lawyer relationship. It is also an object lesson on how the promise of substantial money can blind lawyers to their duties of loyalty to their clients and can cause them to enter into transactions where, had they been seeing clearly, they would never had gone.

It is my opinion that the LM&B defendants breached the standard of care required of lawyers, *i.e.*, were professionally negligent, and breached the standard of conduct required of lawyers, *i.e*, breached their fiduciary duty of loyalty to their clients and violated the Rules of Professional Conduct. These breaches weren't merely technical or trivial. It is my opinion that the breaches significantly and adversely affected LM&B's representation of their clients, Denise McNeil and Alencia Ashton-Moore ("the plaintiffs"), and the other Nextel clients, and the breaches caused harm to the plaintiffs and other Nextel clients.

My preliminary opinions, in summary, are that: 1) LM&B was negligent in negotiating and entering into Dispute Resolution and Settlement Agreement ("DRSA") and amendments in the first instance, and in advising their clients to enter into the agreement, 2) LM&B had

Paul Gordon, Esq.
January 19, 2007
Page 2

significant actual and mostly undisclosed conflicts of interest arising from the DRSA, 3) by entering into (and advising their clients to enter into) the DRSA, by the amendments and by the subsequent administration of the DRSA, LM&B violated a number of the Colorado Rules of Professional Conduct, 4) LM&B's disclosures about the conflicts of interest to their clients, including the plaintiffs, were wholly inadequate, 5) LM&B's conflicts of interests were such that they could not be effectively waived by the clients, 6) LM&B breached their fiduciary duties to the plaintiffs as well as to the other 585 clients, and 7) LM&B's negligence, conflicts of interest and breaches of fiduciary duty adversely affected and caused harm to their clients' cases, and destroyed the trust that the plaintiffs placed in them.[1]

## II. INFORMATION REQUIRED BY FED.R.CIV.P. 26(B)(2)

I have based my opinions on the deposition exhibits, deposition transcripts and other documents that you have provided to me to date, as well as supplemental documents that I, or my staff retrieved from the Denver District Court case file through Lexis-Nexis File & Serve. A complete list of those materials is attached as Addendum A.

A copy of my resume is attached as Addendum B. I have not testified as an expert witness either in deposition or in trial in the past four years.

## III. FACTS

My understanding of the facts material to my opinions is as follows:[2]

### A.    McNeil and Ashton-Moore's employment with Nextel

Sometime in 1998, Denise McNeil was employed by Nextel as a supervisor of "Customer Care Representatives" in a Denver-area Nextel call center. She earned $43,000 per year, plus benefits. *Exh. 60.* She had many years experience in the operations and management of a telephone call center. *Exhs. 14; 59; 60.* In January 1998, Nextel hired Ms. Ashton-Moore as a Customer Care Representative. *Exh. 57.* She, too, had substantial experience working in call

---

[1] I do not opine about whether LM&B breached a standard of care required of employment lawyers; my understanding is that you have retained other expert witnesses for that purpose. Rather, my opinions are to the standards of care that apply to litigation lawyers, in general.

[2] Where the documents or testimony provided to me show that facts material to my opinions are in dispute, I note the dispute. It is not my purpose, however, to resolve disputed issues of fact. The exhibit numbers refer to deposition exhibits provided to me.

Paul Gordon, Esq.
January 19, 2007
Page 3

centers. She earned $24,000 per year, plus benefits. *Exhs. 14; 57; 58.* Based upon my review of the deposition transcripts, neither Ms. McNeil nor Ms. Ashton-Moore appear to be particularly sophisticated in legal matters.

Ms. McNeil and Ms. Ashton-Moore are both African-American. Ms. Ashton-Moore was assigned to Ms. McNeil's team within the Nextel call center. Soon after both women arrived, they began experiencing problems that they attributed to racial bias. *Exhs. 57; 60.* There was apparently a racially hostile work environment. They both felt that they were receiving disparate treatment because of their race.

In October 1999, Nextel terminated both Ms. McNeil and Ms. Ashton-Moore. Feeling aggrieved, they sought out an attorney. Eventually, Ms. Ashton-Moore was referred to LM&B (then, known as Leeds & Morelli), a small and, apparently, very successful plaintiffs' firm in Long Island, New York, specializing in employment and civil rights litigation. LM&B held itself out as "elite" and "one of the foremost authorities in the area of employment law, particularly in the area of Civil Rights and Discrimination Law" and as a law firm with the capability of taking on major employment and civil rights litigation. *See, e.g., Exh. 9 (RICH06117 - 06120).*

At some point in the fall of 1999 or early 2000, Ms. McNeil and Ms. Ashton-Moore came to New York and met with lawyers from LM&B. *Deposition of Lenard Leeds, pg. 27:7-23; Exh. 5, Affidavit of Steven Morelli ("Morelli Aff."), ¶ 6; Deposition of Denise McNeil, pgs. 24:16 - 25:20.*

B.    Formation of the Client-Lawyer Relationship with McNeil and Ashton-Moore

LM&B had numerous meetings with Ms. McNeil and Ms. Ashton-Moore. *Exh. 5, Morelli Aff., ¶6.* The firm agreed to represent the two women. Ms. McNeil and Ms. Ashton-Moore each signed an undated "Retainer" hiring LM&B to represent them on a one-third contingent fee basis. *Exh. 7.*

LM&B seems to have perceived the plaintiffs as having influence among Nextel's other African-American employees. *Morelli Depo., pgs. 34:6 - 36:11.* In about September 2000, they hired Ms. McNeil and Ms. Ashton-Moore as employees of LM&B. They agreed to pay the plaintiffs each $1,000 per week, or $52,000 per year, somewhat more than Ms. McNeil had earned at Nextel and more than double what Ms. Ashton-Moore had earned at Nextel.

The plaintiffs' duties at LM&B are unclear. They seemed to have functioned as paralegals or administrative staff in a Colorado office established by LM&B, *Morelli Depo., pgs 34:6 - 35:13,* but they appear to have had minimal or no training for those positions. They also

Paul Gordon, Esq.
January 19, 2007
Page 4

were LM&B's front-line staff for communications with other Colorado Nextel African-American employees who signed on as LM&B clients.

However, there is also some evidence that they were acting as "runners" for the law firm to recruit as clients for the firm other people with grievances against their employers. *Deposition of Jeffrey Brown, pg. 99:2-17; see also, id., pg. 101:6 - 102:10; Deposition of Alencia Ashton-Moore, Vol. I, pg. 143:15-19.* There is a dispute about whether LM&B promised the plaintiffs a "bonus" for recruiting employees from other companies to the firm; the plaintiffs maintain that LM&B promised them a bonus of $150,000 for each employee group that they brought to LM&B as a client. LM&B denies ever making any such promises.

C.    <u>Negotiations for the Dispute Resolution and Settlement Agreement</u>

By August or September 2000, LM&B had amassed as clients nearly 600 unhappy employees of Nextel. They had filed numerous complaints with the EEOC claiming various types of discrimination. *See, e.g., Exh. 24.* With that mass of clients behind them, they contacted Nextel and asked Nextel if it wanted to "talk." *Leeds Depo, pg. 28:12-25.*

Nextel assigned the matter to a large New York firm, Simpson, Thatcher & Bartlett, and a New York labor and employment lawyer, Gregory Rasin, known for his aggressive negotiating tactics. *Morelli Aff., ¶ 27;* Mr. Rasin had at least one prior experience with LM&B on a similar claim. *Deposition of Gregory Rasin, pg. 13:23 - 14:13.*

Someone proposed that all of the Nextel employees represented by LM&B resolve their claims through a dispute resolution process. (It is unclear to me who proposed the dispute resolution process; Mr. Rasin claims that LM&B proposed a dispute resolution process to Nextel, *Rasin Depo., pg. 12:25 - 13:15,* however, LM&B claims Nextel proposed the dispute resolution process. *Morelli Aff., ¶¶ 11-12.*) LM&B had negotiated similar agreements with other employer-defendants, *Leeds Depo., pg. 30:20-25,* so it was familiar with such an agreement.

Lenard Leeds, Steven Morelli and Jeffrey Brown all had responsibility for negotiating the dispute resolution process, *Deposition of Steven Morelli, pgs. 17:22 - 18:14,* however, Jeffrey Brown did the actual line-by-line negotiation. *Leeds Depo., pg. 28:21-23; Brown Depo., pg. 137:16 - 23.*

According, to LM&B, as part of the negotiations, Nextel's counsel, Simpson, Thatcher & Bartlett, proposed a "consultancy arrangement" in which LM&B would provide legal advice to Nextel about Nextel's anti-discrimination programs and other matters, in exchange for a payment of a monthly fee after concluding the litigation against Nextel. *Morelli Aff., ¶ 13.* The firm agreed to the proposal. *Id.*

Paul Gordon, Esq.
January 19, 2007
Page 5

LM&B consulted with a Hofstra University Law School ethics professor, Roy Simon, about the ethics of such a "consultancy" proposal. *Leeds Depo, pg. 47:2- 48:3.* LM&B requested that Professor Simon review the draft DRSA. *Morelli Depo., pgs. 44:20 - 46:2.* Professor Simon's recollection is that most of his review centered on the "consultancy arrangement." *See, generally, Deposition of Roy Simon, pgs. 9:3 - 13:6.* LM&B claims that, in addition to consulting with Professor Simon, it thoroughly analyzed the conflict of interest issues. *Vagnani Depo., pgs. 7:18 - 9:3.* LM&B lawyer James Vagnani testified that Ms. McNeil and Ms. Ashton-Moore were intimately involved in the discussions about the conflict of interest issues for months prior to signing the DRSA. *Vagnani Depo., pgs. 7:18 - 9:24.*

On September 22, 2000, James Vagnani, of LM&B, sent at least Ms. Ashton-Moore an unsigned copy of the DRSA with the instructions that it was "a highly confidential agreement and is meant for only you." *Exh. 25.* Ms. Ashton-Moore denies that she received the draft of the DRSA.

**D.    Terms of Dispute Resolution and Settlement Agreement**

The DRSA was signed on September 28, 2000. An "Amendment No. 1" (pertaining to Notices to the EEOC) was signed on the same day.

**1.    Representations in the DRSA.**

In the DRSA, LM&B made a number of "representations" on behalf of itself and its clients (who, at this point, had not seen nor signed the agreement):

- LM&B represented that the Nextel employees identified on Schedule 1 to the DRSA were the complete universe of its clients. *DRSA, ¶1(a).*

- LM&B represented that the various EEOC, administrative and court filings identified on Schedule 2 of the DRSA were the complete universe of the various actions filed by its clients. *DRSA, ¶1(b).*

- LM&B represented that it had not been retained to sue Nextel by any person not listed on Schedule 1. *DRSA, ¶1(c).*

- LM&B represented that "it does not have the resources to represent any additional person not on Schedule 1" through the Dispute Resolution Process "within the time frames provided by this Agreement." *DRSA, ¶1(c).*

Paul Gordon, Esq.
January 19, 2007
Page 6

- LM&B represented that it understood that Nextel wished "all persons represented by LM&B currently and through the conclusion of DRP [the Dispute Resolution Process] to have their claims processed and resolved through DRP, and that time is of the essence with respect to the conclusion of DRP for all Claimants listed on Schedule 1 and commencement of the consultancy arrangement between LM&B and Nextel described in paragraph 12 herein so that LM&B must be in a position to complete the processing of the claims of all Claimants through DRP . . . and commence such consultancy immediately upon completion of the process and resolution of all claims presented by all Claimants listed and Schedule 1 hereto." *DRSA, ¶1(c).*

- LM&B represented that it "believes that it is in the best interest of its clients that it devote its resources on this matter to the representation solely of the Claimants listed on Schedule 1 hereto and that it not undertake the representation of any additional person who believes that he/she may have a claim against any of the Companies." *DRSA, ¶1(c).*

- LM&B represented that "it does not intend to undertake any such representation between the time that this Agreement is executed by LM&B and Nextel's counsel and the conclusion of the consultancy period . . . although Nextel recognizes that LM&B has the right to do so." *DRSA, ¶1(c).*

Thus, LM&B's future representation of Nextel was tied directly to expeditiously concluding its other clients' litigation against Nextel. By these provisions, moreover, Nextel effectively precluded LM&B from representing any additional clients against Nextel through the period of the Dispute Resolution Process and thereafter. Because LM&B would have then represented Nextel for two years, as a practical matter it would be disqualified from asserting any similar claims against Nextel thereafter, as such claims would likely be substantially related to the matters for which LM&B had consulted with Nextel for two years. *See Rule 1.9, Colorado Rules of Professional Conduct* (hereafter, "Colo. RPC").

## 2.    Termination of Other Litigation.

The DRSA provided, in Section 2, for termination of the various EEOC and other proceedings that LM&B had brought against Nextel. *DRSA, ¶ 2(a).* It also prohibited the claimants from participating in any class action or other litigation. *DRSA, ¶ 2(c).* And, it prohibited LM&B from signing up any new clients or, even, referring clients to other law firms. *DRSA, ¶ 2(c).*

## 3.    Confidentiality.

Paul Gordon, Esq.
January 19, 2007
Page 7

Nextel also negotiated a very strict confidentiality agreement in the DRSA for both LM&B and its clients, including a provision for liquidated damages if the clients or LM&B violated the confidentiality agreement:

- LM&B agreed, on behalf of itself and its clients, that the <u>terms</u> of the agreement would remain confidential, as well as the <u>facts</u> and <u>evidence</u> pertaining to any individual client's claims. *DRSA, ¶4(a)*.

- LM&B agreed, on behalf of itself and its clients, that if any client breached the confidentiality provisions of the agreement, the client would not receive <u>any</u> of the relief afforded by the Dispute Resolution Process, but would remain bound by all other terms of the DRSA. *DRSA, ¶4(c)*. Moreover, the client would be required to forfeit the funds paid by Nextel through the Dispute Resolution Process. *Id.* If LM&B or its experts breached the confidentiality provisions, then LM&B was required to pay $25,000 for each breach of confidentiality. *Id.*

There were also very strict restrictions on access to documents and return of all documents to Nextel after the dispute resolution process was concluded. *DRSA, ¶ 6*.

4.     <u>Three-Phase Dispute Resolution Process</u>

The DRSA sets forth extensive procedures for the Dispute Resolution Process that contained three phases:

- The first phase consisted of an interview and direct negotiation. *DRSA, ¶7(a)*.

- The second phase consisted of non-binding mediation of outstanding claims. *Id.*

- The third phase consisted of binding arbitration of all unresolved claims. *Id.*

The Dispute Resolution Process was to be conducted on a rolling basis, with the first phase triggered by Nextel's delivery of discovery. *Id.* If a client satisfactorily resolved his or her claims at any point, the client would sign a General Release and need go no further in the process. *Id.* The claims of each client were to be resolved individually. *DRSA, ¶7(c)*. The process was to be conducted "so as to address the resolution of Claimants' claims by region." *DRSA, ¶7(d)*.

5.     <u>Limitations on the Employees' Right to Recovery</u>.

Paul Gordon, Esq.
January 19, 2007
Page 8

Section 7 of the DRSA provided for some effective limitations on Nextel's exposure and the clients' rights to recovery:

- Each client waived entitlement to punitive damages. *DRSA, ¶7(e)*.

- Each client waived entitlement to non-monetary relief "unless expressly agreed to by the Companies as part of a mutually agreeable resolution of that Clamant's claims, . . . ." *DRSA, ¶7(e)*.

- Each client waived the right to be awarded non-monetary relief in Phase 3 (binding arbitration), although the clients were entitled to *argue* to the arbitrator that non-monetary relief was appropriate. *DRSA, ¶7(e)*.

- The arbitrator was permitted to award relief of up to one year of front pay in the binding arbitration phase and, as part of the analysis, could consider whether non-monetary relief "would have been appropriate." *DRSA, ¶7(e)*.

- Nextel had the option, if it chose, of skipping Phase 2 (non-binding mediation) if a client's claims were not resolved in Phase 1 and proceeding directly to the binding arbitration of Phase 3. *DRSA, ¶7(f)*. Nextel would then provide written notice with a settlement offer. *Id.* If the client still wished to proceed with the Phase 2 non-binding mediation, and the case did not settle, and if the arbitrator awarded less that the amount offered by Nextel in its offer, the client was obligated to pay Nextel twice the administrative fees incurred in phase 2 and the mediator's fees and expenses. *Id.*

- Each client was required to cooperate in good faith during each phase of the Dispute Resolution Process, including adhering to deadlines. *DRSA, ¶7(g)*. There were penalties if they did not do so. *Id.* There were no corresponding obligations of good faith by Nextel.

The DRSA contained very strict deadlines for beginning and completing the dispute resolution process:

- The Phase 1 direct negotiation and interview was to be completed for each client within 6 weeks after LM&B provided Nextel with the client's written demand. *DRSA, ¶7(h)(i)(a)*.

- The Phase 2 non-binding mediation was to be conducted regionally, and no sooner that 4 weeks and no later than 9 weeks after each client's Phase 1 interview.

Paul Gordon, Esq.
January 19, 2007
Page 9

> *DRSA, ¶7(h)(ii).*  Nextel agreed pay the administrative fees and the mediators' fees for Phase 2, but not the fees and expenses of the client, LM&B or the client's expert witnesses. *DRSA, ¶7(h)(ii)(f).*

- The Phase 3 binding arbitration was to be conducted for each client between 8 and 12 weeks after conclusion of the Phase 2 mediation. *DRSA, ¶7(h)(iii)(a).*  The arbitrations were to be conducted regionally. *DRSA, ¶7(h)(iii)(b).*

6.    <u>Nextel's Payment of LM&B's Attorneys' Fees and Costs</u>

The DRSA provided that Nextel would pay LM&B's attorneys' fees and costs incurred in providing legal services to the clients.  Paragraph 11 of the DRSA specified what and how LM&B's attorney fees and costs would be paid.  Significantly, LM&B was not to "in any way retain, directly or indirectly, (i) any lawyer who is not associated with LM&B, or (ii) any other law firm to represent any of the Claimants or to assist LM&B in its representation of the Claimants, either as local counsel, co-counsel or otherwise." *DRSA, ¶11(a).*  In other words, LM&B could not associate with counsel to assist it in properly developing and zealously advocating its clients' claims within the time constraints permitted by the DRSA.

For accepting these limitations, LM&B was to be handsomely rewarded, for Nextel then agreed to pay $5.5 million to LM&B to cover attorneys' fees and expenses (other than expert witness fees) in installments. *DRSA, ¶11(a).*  The first installment of $2 million was due within 3 business dates of the effective date of the DRSA. *DRSA, ¶11(a).*  The second installment of $1.5 million was due upon completion the Dispute Resolution Process of one-half of the claims of the clients listed on Schedule 1. *DRSA, ¶11(a).*  Nextel was to pay the final installment of $2 million on completion of the Dispute Resolution Process of all remaining clients. *DRSA, ¶11(a).*

Significantly, the DRSA also provided that LM&B would be subject to a penalty of $50,000 per month if the claims of all Claimants were not through the Dispute Resolution Process and fully submitted to the arbitrators within 45 weeks of the effective date of the DRSA. *DRSA, ¶11(b).*  The DRSA allowed some flexibility in the penalty provision under two circumstances: (i) for "extraordinary circumstances beyond the control of LM&B and the Claimants," and (ii) if a client was barred from recovery due to his or failure to appear when scheduled, provided that the failure was outside the control of LM&B.

7.    <u>LM&B's Agreement to Provide Consulting Services to Nextel</u>

The DRSA provided that after the Dispute Resolution Process was completed, and after resolution of <u>all</u> of the claims presented by LM&B's clients, Nextel would hire LM&B to provide

Paul Gordon, Esq.
January 19, 2007
Page 10

two years of legal consulting services, which could include, but were not necessarily limited to, Nextel's anti-discrimination and diversity policies and programs. *DRSA, ¶12.*

    The agreement also stated that: (i) time was of the essence, *Id.*, and (ii) LM&B was to certify in writing thirty weeks after the effective date of the DRSA that LM&B "will be available to commence the Consultancy immediately upon completion of the processing and resolution of all claims presented by all Claimants, and is aware of no impediment or potential impediment to such availability." *Id.* The effect of Paragraph 12 was that LM&B was required to make the certification of its availability to provide legal advice *to* Nextel while it was still representing its clients in the litigation *against* Nextel. *Id.*

    For providing these legal services to Nextel, Nextel was to pay LM&B a "consultancy fee" of $83,333 per month for 24 months, that is, $2 million. *Id.*

    E.    <u>Disclosure of the terms of the Dispute Resolution and Settlement Agreement to LM&B's Clients</u>

    1.    <u>LM&B's position on disclosures</u>

    LM&B maintains that it fully disclosed and discussed the contents of the DRSA to its clients, including Ms. McNeil and Ms. Ashton-Moore. The plaintiffs disagree. LM&B prepared a document titled "Highlights of Settlement Agreement with Nextel" ("Highlights"). *Exh. 8.* The Highlights summarized the terms of the DRSA in about 4½ pages. *Id.* LM&B distributed a copy of the Highlights to its Nextel clients as it held meetings around the country.

    LM&B lawyers testified that they were told "to discuss completely with the clients, and with respect to the conflict of interest, it was the concern, I guess, that Nextel was paying legal fees, was to make sure that the client understood that, that they were aware of it, and that they consented to it." *Deposition of Susan Fitzgerald, pg.* 23:17- 24:4. LM&B maintains that the lawyer went through the DRSA line-by-line with each of the clients, both in group meetings and individually. *Morelli Depo., pg. 38:10-22; Vagnani Depo., pgs. 6:25 - 7:17; 55:4 - 61:21.* The LM&B lawyers told the Colorado clients the following regarding the conflicts of interest:

> "We explained the fact that Nextel was paying the law fees. We explained that this was taking place. While that was taking place, it didn't affect, and it wouldn't affect, my ability to professionally represent them. It wouldn't impair my judgment whatsoever. That – I mean, personally, it was something that I saw as a benefit to them."

Paul Gordon, Esq.
January 19, 2007
Page 11

*Fitzgerald Depo., pg. 26:16 - 27:3. Exh. 8, ¶30.* LM&B lawyers claim that they also explained to their clients that the firm had an agreement to provide consulting services to Nextel after the Dispute Resolution Process was completed. *Fitzgerald Depo., pgs. 54:10 - 55:7.*

LM&B lawyers testified that while they allowed their clients to review the DSRA in their one-on-one meetings, they conceded that they didn't let the clients take the document out of the meetings unless special arrangements were made with the client's other lawyers and unless the client sign a non-disclosure agreement. *Fitzgerald Depo., pg. 13:7 - 14:19; 20:21 - 22:21; see also, Non-Disclosure Agreement (unsigned), RICH05778-80.* LM&B states that one of the reasons that it kept such tight control over access to the DRSA was because of concern about confidentiality vis-a-vis the attorney fee provisions: ". . .certainly Nextel had expressed to us a genuine concern about the type of information, including the DRSA and the terms of the DRSA getting out publicly, but certainly the fees were a component that dealt with heavy, heavy confidentiality restrictions." *Vagnani Depo., pgs. 81:23 - 82:19.*

The Highlights contains the following disclosures about LM&B's attorneys' fees and the "consultancy arrangement":

29.   Nextel is paying each Claimant's attorneys' fees and expenses (other than expert witness fees) in consideration for each Claimant participating in the DRP.

30.   After the processing and resolution of all of the claims in the DRP, LM&B will be hired by Nextel to serve as a consultant to its companies for a two (2) year period, to provide assistance and legal advice to the companies as they may request regarding their anti-discrimination and diversity policies and programs ("the consultancy"). Claimant further acknowledges and understands that such consultancy presents a conflict of interest for LM&B, and Claimant hereby knowingly and voluntarily waive [sic] any objection to such conflict.

*Exh. 8, ¶29.* The Highlights did <u>not</u> disclose that Nextel would pay LM&B a total of $7.5 million under the DRSA, the timing of the payments, the $50,000 per month penalty on the implications of the timing, or the penalty on the client's case. The Highlights did not disclose <u>any</u> conflicts of interest other than the consultancy, and there was no written explanation of why the consultancy created a conflict of interest, or how the conflicts might adversely affect LM&B's representation of individual clients.

LM&B claims that it "absolutely" told Ms. McNeil and Ms. Ashton-Moore, as well as all of the other clients, that Nextel would pay the firm $5.5 million for representation and $2 million

Paul Gordon, Esq.
January 19, 2007
Page 12

for the consulting arrangement, and told them about the $50,000 per month penalty. *Vagnani Depo., pgs. 65:20 - 66:9.* But, then, there is nothing in writing that documents exactly what LM&B lawyers said or disclosed.

The DRSA also required each claimant to sign an "Individual Agreement" containing the following clauses:

- The client agreed that "I have reviewed the Dispute Resolution and Settlement Agreement; had the opportunity to discuss that Agreement with LM&B or any other counsel of my choosing; and agree to comply fully with the terms of that Agreement." *Individual Agmt, ¶ 1.*

- The client agreed that "While I may consult other counsel of my choosing with respect to the Dispute Resolution and Settlement Agreement, I agree that LM&B shall be my legal representative throughout the Dispute Resolution Process." *Id.* (Emphasis added.)

- The client acknowledged that ". . . Nextel has agreed to pay an amount of money to LM&B to cover the attorneys' fees and expenses, other than expert fees, that Claimants might otherwise pay to LM&B . . .." *Individual Agmt, ¶ 3.* "I hereby knowingly and voluntarily consent to this payment arrangement."

- The client acknowledged that ". . . after the processing and resolution of my claims and all other Claimants' claims against the Companies, LM&B will be hired by Nextel to serve as a consultant to the Companies for a two-year period, to provide such assistance and legal advice to the Companies as they may request regarding their anti-discrimination and diversity policies and programs (the "Consultancy"). I further acknowledge and understand that such Consultancy presents a conflict of interest for LM&B, and hereby knowingly and voluntarily waive any objection to such conflict." *Individual Agmt, ¶ 4.*

Again, there is no disclosure or analysis of any conflicts of interest or explanation of why the "consultancy" with Nextel posed a conflict of interest.

     2.    <u>Ms. McNeil's and Ms. Ashton-Moore's Position on the Disclosures</u>.

It is my understanding that Ms. McNeil and Ms. Ashton-Moore both signed "Individual Agreements" in which they agreed to the terms outlined above. Ms. McNeil and Ms. Ashton-Moore insist, however, that while they were aware that LM&B would be consulting with Nextel after the litigation was completed, they were *unaware* that LM&B was being paid $5.5 million

Paul Gordon, Esq.
January 19, 2007
Page 13

for representing the claimants or that LM&B would receive $2 million for consulting with Nextel. *McNeil Depo. Vol. I, pgs. 92:19 - 95:2; Ashton-Moore Depo. Vol. I, pg. 71:7 - 23*. They testified that they did not read or have access to the DRSA until October 2001, even though they were hired to explain the highlights to the other clients. They testified that LM&B refused to give anyone a copy of the DRSA. They seem to have believed that by acting as consultants for Nextel, LM&B would continue to be the claimants' advocate with Nextel, so as to ensure that race discrimination problems did not arise again. *See, e.g., Ashton-Moore Depo., Vol. I, pgs. 75:3 - 76:20; 77:16 - 80:16*.

Ms. McNeil and Ms. Ashton-Moore have testified that they did not see an actual copy of the DRSA before October 2001, when Ms. McNeil or Ms. Ashton-Moore found a copy of the "book" containing the agreement and amendments in the Highlands Ranch offices of LM&B. *Ashton-Moore Depo. Vol. I, pgs. 107:14-22*. However, Mr. Vagnani sent a letter to Ms. McNeil on September 22, 2000, containing a copy of the "Settlement Agreement," presumably a copy of the unsigned DRSA. Ms. Ashton-Moore denies that she saw the letter. *Ashton-Moore Depo. Vol. I, pg. 65:1-24*. Ms. Fitzgerald testified that she met with Ms. Ashton-Moore in Colorado to discuss the DRSA. *Fitzgerald Depo., pg. 11:13-18*.

A number of LM&B's clients from Colorado and elsewhere submitted affidavits stating that they were unaware of the conflicts of interest or that LM&B was being paid $7.5 million by Nextel. *See, generally, Exh. 21*.

Ms. Fitzgerald and Mr. Brown maintain that the plaintiffs had to have seen and known of the contents of the DRSA because (a) a copy was sent to them, and (b) part of their job as LM&B employees was to assist the lawyers as the lawyers explained, line-by-line, the DRSA to the other clients. *Vagnani Depo., pgs. 65:20 - 66:9*. For purposes of my opinion, I will assume that one or both of the plaintiffs received the draft.

F.    The Second Amendment to the Dispute Resolution and Settlement Agreement.

In early February 2001, LM&B and Nextel again amended the DRSA. Apparently, 14 of LM&B's clients listed on Schedule 2 had refused to participate in the process. *Morelli Aff., ¶18*. In Amendment No. 2, LM&B agreed to reduce by $280,000, *i.e.,* $20,000 per client, from the final $2 million installment of fees to be paid by Nextel to LM&B after the conclusion of Phase 3 for all clients. *DRSA, RICH05762-63*. The $280,000 was to be deposited in an interest-bearing escrow account and was to be paid to LM&B at the conclusion of the 24 month consultancy period. However, Nextel was entitled to reduce the $280,000 paid to LM&B by actual costs it incurred in defending any claim or paying any judgment to LM&B's 14 uncooperative clients, up to $20,000 per client.

Paul Gordon, Esq.
January 19, 2007
Page 14

In essence, Nextel was using LM&B's money to pay any judgment, attorney fees and costs incurred in defending claims brought by the 14 uncooperative clients. This amendment strongly suggests that Nextel had budgeted a certain amount for resolution of the case, and it did not much matter where the money went – it could be paid to the clients or it could be paid to LM&B.

### G.    Nextel Plays Hardball

Once Nextel had LM&B and their 587 clients locked into the dispute resolution process, Nextel and Mr. Rasin appear to have played hardball with LM&B. *Exh. 5, Morelli, ¶¶23-28*. Nextel hired Holland & Hart to handle the Colorado litigation, *Morrelli Aff., ¶25*, but Mr. Rasin maintained significant control of the cases. *Morrelli Aff., ¶27.* Nextel rejected almost every one of the statements submitted by LM&B's clients. *See, e.g., Exh. 27 (re Alencia Ashton-Moore); Exh. 28; see also Morrelli Aff., ¶24.* Nextel served substantial written discovery on most of the clients. *Morrelli Aff., ¶23.* Mr. Rasin was a very strident and aggressive negotiator. *Morrelli Aff., ¶27.* In Phases 1 and 2, Nextel made a number of "outrageously low and insulting" offers to LM&B's clients. *Exh. 69, pg. 2; Morrelli Aff., ¶27.* Nextel's approach caused considerable frustration among both the LM&B lawyers and their clients, *Morrelli Aff., ¶¶27*, and considerable anxiety among the clients. *Morrelli Aff., ¶¶28.* By August 2001, only 218 of the claims had been processed, and the firm was facing 369 arbitrations. *Morrelli Aff., ¶¶28.* Moreover, time was running out before the $50,000 per month penalty phase of the DRSA was to begin.

### H.    The Third Amendment to the Dispute Resolution and Settlement Agreement

On August 29, 2001, Nextel's lead lawyer, Gregory Rasin, wrote a letter to the lead LM&B lawyer, Jeffrey Brown, stating that of the 587 LM&B clients identified on Schedule 1 of the DRSA, 218 had completed the Dispute Resolution Process or were no longer eligible or were barred from completing the process, and 369 clients remained eligible to continue the process. In early September 2001, LM&B and Nextel negotiated an Amendment No. 3 to the DRSA. *Morelli Aff., ¶29-31.* LM&B and Nextel agreed that Nextel could create a settlement fund of $3,690,000, *i.e.,* an average of $10,000 for each of the remaining eligible clients, defined as the "Net Settlement Fund." *Morelli Aff., ¶31.*

Amendment No. 3 to the DRSA provided that, in the aggregate, the remaining 369 clients could not recover any more than the Net Settlement Fund, with a cap of $25,000 on each individual client. *DRSA, Amendment 3, ¶1.* LM&B was, by September 30, 2001, to deliver to Nextel a signed and notarized general release from each remaining client, with LM&B to insert the amount that each client would receive in settlement. *DRSA, Amendment 3, ¶2.* The Net

Paul Gordon, Esq.
January 19, 2007
Page 15

Settlement Fund was to be reduced by the amount of the settlement for the client. *DRSA, Amendment 3, ¶3.*

If more than 15 of the 369 of LM&B's remaining eligible clients elected to continue with the Dispute Resolution Process, then Nextel had the right to opt out of the new procedure and continue to process claims through the Dispute Resolution Process. *DRSA, Amendment 3, ¶4, 5.*

The Amendment 3 to the DRSA also reduced the consultancy fee to be paid to LM&B by $20,000 per month, from $83,333.34 to $63,333.34, for a total reduction of $480,000. The $20,000 per month reduction was to be retained by Nextel "to pay the cost to defend, settle or satisfy any judgment by a Clamant in any such proceeding, . . ." Of the $480,000 held back, Nextel could attribute no more than $12,500 per client to defend cases or pay judgments or settlements. If, at the end of the 24 month consultancy period, there were any funds left in the $480,000, Nextel was to pay the remaining funds to LM&B.

According to Mr. Morrelli and Mr. Rasin, while Amendment No. 3 was agreed upon and signed, it was never implemented because LM&B couldn't come up with at least 354 clients to participate in the alternative process, and Nextel opted-out of the new procedure. *Rasin Depo., pg. 28:21 - 29:20, Morelli Aff., ¶ 31.*

I.     **Disclosure of the Amendments**

The only written notice that I could find of Amendment Nos. 2 and 3 to the DRSA were included in an October 5, 2001, letter to claimants from Ms. Fitzgerald. *Exh. 69.* The letter, written 10 months after Amendment No. 2 became effective, disclosed the existence of the amendments in the body of the letter, and then provided brief explanations in a footnote. *Exh. 69, pg. 2, fn.1.* The letter does not disclose or discuss the conflicts of interests for LM&B raised by Amendment Nos. 2 or 3.

J.     **Disintegration of Relationship between LM&B and their clients**

A number of LM&B's Nextel clients became unhappy with the firm's representation. Ms. McNeil testified that she began hearing complaints about LM&B from other clients in July or August 2001. *McNeil Depo., pgs. 46:14 - 47:8.* At about the same time, Ms. McNeil and Ms. Ashton-Moore began telling other clients who complained not to accept Nextel's low-ball offers. *McNeil Depo., pgs. 52:8 - 53:12.* They perceived that LM&B was angry at them, as result. *Id.*

By October 2001, a number of LM&B's clients were extremely unhappy with LM&B, Nextel and the Dispute Resolution Process. *See, e.g., Morelli Aff., ¶ 28; Exh. 15, E-mail from Carl and Lisa Smith, (RICH06170); Exh. 2, PL0240-41; see, generally, Frederick Charles*

Paul Gordon, Esq.
January 19, 2007
Page 16

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Jan 19 2007  7:53PM MST
Filing ID: 13530211

*Foster, et. al v. Leeds Morrelli & Brown, P.C., et. al*, Case Number 02-CV-1484, District Court, County of Arapahoe, Colorado. *See, Affidavit of Steven Morelli, Esq., Exh. 5.* According to numerous affidavits filed in a subsequent class action against LM&B, the clients in the Nextel litigation (a) were not told by LM&B that it had conflicts of interest, (b) were unaware that LM&B had or were to receive payment of $7.5 million from Nextel, and (c) were unhappy with LM&B's representation. *See, generally, Exh. 21.*

After Ms. McNeil and Ms. Ashton-Moore discovered and read the DRSA, their relationship with LM&B disintegrated quickly. The plaintiffs were particularly incensed by what they read in Amendment No. 2 and Amendment No. 3 (which clearly were not disclosed to LM&B's clients). *Ashton-Moore Depo. Vol. I, pgs. 127:3 - 128:8.* They were also upset that they hadn't been told what LM&B was to be paid. *Ashton-Moore Depo. Vol. I, pgs. 124:21 - 125:12.* They felt, after reading the DRSA and the amendments, that "[b]asically, that the contract was they [LM&B] were being employed by Nextel." *Ashton-Moore Depo. Vol. I, pg. 118: 14-24; 129:4-16.* When Ms. Ashton-Moore discovered that LM&B was to be paid millions of dollars she "knew at that point we had been sold out." *Ashton-Moore Depo. Vol. I, pgs. 118:3-5.*

Thereafter, Ms. McNeil and Ms. Ashton-Moore had no trust in LM&B. *Ashton-Moore Depo. Vol. I, pgs. 128:9-25.* The plaintiffs' mistrust of LM&B ran so deep that they began taping telephone calls with LM&B lawyers. *McNeil Depo., Vol. I, pgs. 16 - 18.* By late 2001, Ms. McNeil and Ms. Ashton-Moore were not being particularly cooperative with LM&B. *Exhs. 30, 31, 32; see, also, Vagnani Depo., pgs. 16:20 - 27:16; Brown Depo., pgs. 58:13 - 65:17.* They seemed to have lost faith in the Dispute Resolution Process. *Vaganani Depo., pgs. 47:23 -48:1.* The relationship between the plaintiffs and LM&B deteriorated into open hostility. *Brown Depo., pgs. 109:12 - 113:4; 129:12 - 131:12; 132:9 - 133:10. See, also, Exhs. 30, 31.*

On December 6, 2001, Mr. Vagnini and other LM&B lawyers met with the plaintiffs. *Exh. 34.* At that time, plaintiffs were allowed to review a copy of the entire DRSA and the amendments, except that the names and settlement figures for other claimants had been redacted. Mr. Vagnani warned Ms. Ashton-Moore that "the Agreement itself is a confidential document and any disclosure of the information contained in the Agreement is a direct breach of the confidentiality provisions you acknowledged upon executing an Individual Agreement with Nextel." *Exh. 34.*

Ms. McNeil began experiencing severe depression, and began missing appointments and scheduled meetings in her case. Her depression caused significant disruption in the mediation and arbitration process for her case, to the extent that there was significant concern about whether she was mentally competent to proceed and whether she required a guardian *ad litem.*

Paul Gordon, Esq.
January 19, 2007
Page 17

*See, generally, Exhs. 2, RICH04214 - 04220; 84; 85; 86.* Ms. McNeil claimed that her treatment by her lawyers contributed to her problems. *Exh. 2 (RICH04214).*

In February 2002, Ms. Ashton-Moore gave up. She settled her claims against Nextel for $15,000. *Exh. 81.* In early March 2002, Ms. McNeil settled her claims for $15,000. *Exh. 87.*

Apparently, of LM&B's 587 clients, Ms. Ashton-Moore and Ms. McNeil were among the last of LM&B's clients to resolve their claims against Nextel. On March 11, 2002, Jeffrey Brown wrote a letter to Rasin stating that McNeil had settled her claims against Nextel and provided release. He then requested Nextel pay the remaining funds due to LM&B:

> As such, the only outstanding issue between the parties with respect to the dispute resolution process is [redacted]. However, you previously advised us that [redacted] would not prevent final payment to Leeds Morelli & Brown under the Agreement. Therefore, we have fulfilled all obligations under the DRP and payment is due by Friday, March 15, 2002.

*Exh. 92.*

After the Dispute Resolution Process was completed, LM&B began consulting with Nextel, and performed legal work for Nextel on a regular basis. *Morelli Aff., ¶ 34.* To date, LM&B and Nextel refuse to disclose exactly what legal services LM&B provided to Nextel as part of the consultancy, citing the attorney-client privilege. *Id.*

## IV. ANALYSIS AND OPINIONS

### A.    Overview

Ms. Ashton-Moore testified that after she reviewed the DRSA, she realized that "they [LM&B] weren't working for us; they were working for Nextel." *Ashton-Moore Depo., Vol. I, pgs. 124:11 - 20.* She was right. LMB's conduct in this case is appalling.

It is my opinion that LM&B breached the standard of care required of lawyers handling litigation matters by negotiating, agreeing to and advising their clients to agree to the DRSA, as written. It is my opinion that LM&B also breached its fiduciary duties and violated the Colorado Rule of Professional Conduct.

My reasons are these: it is my opinion that, when faced with the financial exposure and negative publicity of a massive race discrimination lawsuit, Nextel set a trap. It baited the trap by dangling millions of dollars before the claimants' lawyers. The LM&B lawyers took the bait,

Paul Gordon, Esq.
January 19, 2007
Page 18

and walked with their clients into the trap. Nextel ensnared the claimants in an onerous and one-sided process that (i) required mandatory mediation and arbitration, (ii) included a very strict confidentiality agreement with significant penalties or liquidated damages if the clients or LM&B breached confidentiality, (iii) restricted LM&B's ability to take or refer other potential clients to other lawyers, (iv) limited LM&B's ability to associate with other counsel who might help them, (v) truncated the litigation schedule to a 45-week time likely (and, probably, calculated) to overwhelm LM&B and limit their ability to properly prepare their clients' cases, (vi) imposed a procedure and discovery process that allowed Nextel to overwhelm the claimants and LM&B with discovery, (vii) imposed a mediation process that allowed Nextel to negotiate in bad faith or not at all, (viii) imposed a $50,000 per month financial penalty on LM&B if it did not the meet the deadlines and schedule, and (ix) contained an agreement that effectively tied LM&B to Nextel for at least two years. In short, Nextel co-opted and bought the claimants' lawyers.

Once the claimants were trapped in the system that their lawyers negotiated for them, Nextel ruthlessly exploited its advantage. *See, e.g., Affidavit of Steven Morelli; Amendment No. 2; Amendment No. 3.*

A reasonable lawyer would not have agreed to or advised his or her clients to agree to the DRSA. "A lawyer owes his client the duty to employ that degree of knowledge, skill and judgment ordinarily possessed by members of the legal community in carrying out services for his client." *Stone v. Satriana*, 41 P.3d 705, 712 (Colo. 2002). It is my opinion that LM&B did not use that degree of knowledge, skill and judgment ordinarily possessed by lawyers in Colorado. The LM&B lawyers were outmaneuvered at every turn. They unnecessarily gave up their clients' strategic advantage for an agreement that provided significant dollars to themselves, but did little for their clients.

In my opinion, the fact that Nextel agreed to pay LM&B's fees and expenses is not, by itself, negligent, evidence of a conflict of interest or breach of a fiduciary duty, nor does it by itself violate the Rules of Professional Conduct. *Colo. RPC 1.8.* Indeed, it is generally to the advantage of the client if a lawyer advocating for the client can force or persuade the opponent to pay the client's attorney fees and costs. My understanding is that if the claimants had prevailed in a lawsuit in U.S. District Court, Nextel could have been ordered to pay the claimants' attorneys' fees and costs. Rather, my criticisms of the DRSA are based upon how <u>this</u> agreement was negotiated, structured and administered in <u>this</u> case, the conflicts of interest that arose in <u>this</u> case, and the disclosures that were made or not made in <u>this</u> case.

B.    <u>Assumptions</u>

For purposes of my opinion, I assume that the concerns expressed by LM&B lawyers about expeditiously resolving clients' grievances with Nextel in an alternative dispute forum are

Paul Gordon, Esq.
January 19, 2007
Page 19

legitimate concerns and that, in large employment cases, setting up a dispute resolution process to efficiently and inexpensively resolve clients' claims is a laudable goal. *See, generally, Leeds Depo, pg. 32 - 37; Morelli Depo., pgs. 22:11 - 23:23; 42:4 - 45:15.*

For purposes of my opinion, I will also assume that insofar as LM&B was (i) representing Colorado clients in a dispute resolution process conducted in Colorado, (ii) was asserting Colorado state law claims on behalf of their Colorado clients, and (iii) maintained an office in Colorado, it was practicing law in Colorado and Colorado law, standards of care, standards of conduct, and Rules of Professional Conduct apply to LM&B's conduct.

## C.   Who were LM&B's clients?

There is no dispute that the 587 claimants represented by LM&B in the Dispute Resolution Process were LM&B's clients. These clients included Ms. McNeil and Ms. Ashton-Moore. In my opinion, however, LM&B also had a client-lawyer relationship with Nextel that began on or near September 28, 2000, when LM&B entered into the DRSA with Nextel.

### 1.   Formation of a Client-Lawyer Relationship in Colorado

In Colorado, client-lawyer relationships are based upon contract, whether express or implied. *People v. Ratos*, 636 P.2d 666, 671 (Colo. 1981).[3] The parties must agree on all essential contractual terms. *Schmidt v. Frankewich*, 819 P.2d 1074, 1077 (Colo. App. 1991).

The Restatement (Third) of the Law Governing Lawyers states that the client-lawyer relationship begins at the time "A person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and . . . (a) the lawyer manifests to the person consent to do so; . . .." *Restatement (Third) of the Law Governing Lawyers* §14. *See, also,* R. Nemirow, Chapter 2, "The Client-Lawyer Relationship," *Lawyers' Professional Liability in Colorado,* Second Ed. (CLE in Colo., Inc. 2005).

### 2.   Did the "Consultancy" agreement create an immediate client-lawyer relationship with Nextel?

The DRSA did not immediately obligate LM&B to provide legal advice to Nextel. But it clearly contemplated that LM&B would provide such advice to Nextel in the future, *i.e.*, within

---

[3]As a general rule, it is for the court, not an expert witness, to inform the trier of fact of the law, *Grogan v. Taylor*, 877 P.2d 1374, 1384 (Colo. App. 1993), *rev'd in part on other grounds* 900 P.2d 60 (Colo. 1995), and it is not my purpose to do so here. To the extent I cite to legal authority in this letter, it for the purpose of providing a context for my opinions.

Paul Gordon, Esq.
January 19, 2007
Page 20

months or a year. The "consultancy" agreement probably can most appropriately be described as a retainer agreement to provide legal services in the future. The consultancy agreement has all of the indicia of a client-lawyer relationship under current Colorado law:

- It was an express agreement to provide legal services;

- The putative client, Nextel, consented to the representation; and

- The lawyers, LM&B, consented to the representation.

Moreover, the agreement defined, generally, the scope of the representation and legal advice, and the agreement specified how LM&B would be paid. *DRSA*, ¶*12*. In short, it had all of the essential terms of a contract to provide legal services. *Schmidt v. Frankewich*, 819 P.2d 1074, 1077 (Colo. App. 1991). Given the emphasis on the confidential nature of the DRSA and information to be provided to LM&B by Nextel, it may also have satisfied the Tenth Circuit's suggestion that the prospective client also submit confidential information to the lawyer to form the relationship. *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1383 (10th Cir. 1994) (applying New Mexico law).

As such, it is my opinion that, under the facts of this case, the DRSA created a client-lawyer relationship between Nextel and LM&B when the agreement was signed (or, at least, when it became effective). There are some immediate conflict of interest problems that arise from LM&B's dual representation of the claimants and Nextel. But, my opinions do not depend on the existence of such an immediate client-lawyer relationship. Assuming, *arguendo*, that there was not an immediate client-lawyer relationship, the DRSA still created enormous ethical problems for LM&B.

D.    **LM&B's Fiduciary Duties – Generally**

LM&B had a fiduciary duty of undivided loyalty and confidentiality to their clients that arose as a matter of law from that relationship, *Olsen & Brown v. City of Englewood*, 889 P.2d 673, 675 (Colo. 1995), whether to the plaintiffs, Ms. McNeil and Ms. Ashton-Moore, the other Nextel employees, or to Nextel:

Trust and confidentiality are basic to the attorney-client relationship. The client, whether a wiseman or a fool, is entitled to believe the attorney who says, "I am your lawyer, why not trust me . . . I would not do anything that is wrong." The fiduciary obligations, the premise of trust, may be simply stated. The attorney is under a duty to represent the client with undivided loyalty, to preserve the client's