Paul Gordon, Esq.
January 19, 2007
Page 21

> confidences and to disclose any material matters infringing upon these
> obligations.

R. Mallen & J. Smith, *Legal Malpractice* (2006 ed.), §14.1, p. 599. See, also, *Smith v. Mehaffy*,
30 P.3d 727, 733 (Colo. App. 2000).

The Restatement (Third) of the Law Governing Lawyers (hereafter, sometimes, "the
Restatement") defines a lawyer's fiduciary duties to the client as the duty to "(3) comply with
obligations concerning the client's confidences and property, avoid impermissible conflicting
interests, deal honestly with the client, and not employ advantages arising from the client-lawyer
relationship in a manner adverse to the client; ...." *Restatement*, § 16(3). The fiduciary
obligations set a standard of *conduct*, as distinguished from a standard of *care*. *Legal
Malpractice, supra*, § 14.2, pgs. 605-606. A breach of a lawyer's duty of undivided loyalty
occurs when the lawyer "obtains a personal advantage in dealing with a client" or when the
lawyer "creates circumstances that adversely affect a client's interests." *Smith*, 30 P.3d at 733.

### E.    LM&B's Conflict of Interest Problems

"[A] lawyer is civilly liable to a client if a lawyer breaches a fiduciary duty owed to a
client . . . ." *Restatement*, § 49. Implicit in the lawyer's fiduciary duty of loyalty is a duty to
remain free of conflicts of interest. *See, e.g., Boyd v. Garvert*, 9 P.3d 1161 (Colo. App. 2000);
*Smith*, 30 P.3d at 733. It is my opinion that LM&B had significant unwaivable conflicts of
interest, which it did not thoroughly analyze or properly disclose, and, thus, it breached its
fiduciary duty to its clients when it undertook to represent its clients in the Dispute Resolution
Process against Nextel. It is my opinion that the LM&B lawyers did not seem to have a good
grasp on the conflict of interest issues.

### 1.    Conflicts of Interest-Generally

The conflict of interest rules arise out of several policy concerns. The first is the belief
that a client has a right to a lawyer who will be loyal to the client and in whom the client can
trust. Cmt. a, *Restatement*, § 121, pg. 245; *Restatement* § 128, pg. 338 (2002). The conflict of
interest rules seek to promote trust between the client and the lawyer. *Id.*

The second, closely related, policy concern is the interest in enhancing effective legal
representation. Cmt. a, *Restatement* § 121, pg. 245. Conflicts of interest undermine a lawyer's
independence and professional judgment. *Id.* If a lawyer's professional judgment is influenced
by competing personal, financial, or professional concerns, the lawyer may, consciously or
unconsciously, fail to provide the client with accurate or complete legal advice.

Paul Gordon, Esq.
January 19, 2007
Page 22

The third policy concern is that a lawyer be a client's protector and vigorous advocate. A conflict of interest may deter a lawyer from representing a client with the appropriate vigor. *Id.*

Colorado's general conflicts of interest rule is set out in Rule 1.7 of the Colorado Rules of Professional Conduct:

RULE 1.7    CONFLICT OF INTEREST:  GENERAL RULE

(a)    A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

   (1)    the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

   (2)    each client consents after consultation.

(b)    A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

   (1)    the lawyer reasonably believes the representation will not be adversely affected; and

   (2)    the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(c)    For the purposes of this Rule, a client's consent cannot be validly obtained in those instances in which a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances of the particular situation. Colo. RPC 1.7. Paragraph (a) of Colo. RPC 1.7 pertains to a lawyer representing clients with *directly* conflicting or adverse interests, such as representing opposing parties in litigation, negotiations, or business transactions.  Cmt. 3, "loyalty to a Client," and Cmts. 8 and 9, "Conflicts in Litigation," Colo. RPC 1.7.

Paragraph (b) of Colo. RPC 1.7 pertains to a lawyer simultaneously representing parties who, while perhaps on the same side of a matter, may have conflicting or divergent interests.  Paragraph (b) also refers to possible conflicts with the lawyer's own

Paul Gordon, Esq.
January 19, 2007
Page 23

interests or the interests of third parties. Paragraph (b) differs from paragraph (a) in that the *quality* of the lawyer's representation is likely to be limited by competing interests, either other clients' interests or the lawyer's personal interests. Cmt. 17, ABA Model Rule 1.7.

Colo. RPC 1.7(b) applies to conflicts between a lawyer's joint clients in litigation. Cmt. 8, "Conflicts in Litigation," Colo. RPC 1.7. In each case, the question raised by Colo. RPC 1.7(b) is, "Can the lawyer *adequately* represent each client without adversely affecting the material interests of the other clients or the lawyer's interests?"

The *Restatement* tracks the Colo. RPC 1.7(b) and states that a conflict of interest arises when

> . . . there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.

*Restatement* § 121, pg. 244-45. Thus, much of conflict of interest analysis involves considering (1) what interest is at stake; (2) what is a "substantial risk;" and (3) what does "materially and adversely affected" mean under the circumstances.

The Comment to the *Restatement* states that "[u]nless there is a risk that the lawyer's representation would be affected 'adversely,' there is no conflict of interest." Cmt. c(I), *Restatement* § 121, pp. 247-48. The standard does not consider an adverse effect *on the client* as determinative of whether there was a prohibited conflict of interest. Rather, the standard addresses an adverse effect *on the lawyer's representation of the client*. The conflict of interest rules do not examine the *result* of the representation, but the *quality* of the representation, regardless of the result. *E.g., In re Cimino*, 3 P.3d 398, 401 (Colo. 2000) ("The absence of injury does not negate the violations of Colo. RPC 1.7(b) or 1.8(a)").

The core principle of all conflict of interest rules is loyalty to the client. The Colorado Supreme Court has stated that a lawyer is required to "maintain a *paramount* duty of loyalty to the client." *People ex rel. Peters v. District Court*, 951 P.2d 926, 929-30 (Colo. 1999) (emphasis added). *See, also,* Cmt. Colo. RPC 1.7; Syllabus, CBA Ethics Comm., Formal Op. No. 57 (March 21, 1981).

Colo. RPC 1.7(b) requires that the lawyer decline a representation that conflicts with the lawyer's personal interest unless (1) the lawyer *reasonably* believes that he or

Paul Gordon, Esq.
January 19, 2007
Page 24

she can adequately represent the client, and (2) the client consents after full disclosure. Paragraph (c) adds the "disinterested lawyer" requirement to the client's informed consent.

In summary, conflicts of interest undermine a client's *expectation* of effective legal representation and undermine a lawyer's *ability to provide* effective legal representation. *See Restatement* § 16, p. 146. In this case, LM&B's conflicts of interest undermined, in striking fashion, both their clients' expectations of effective legal representation and LM&B's ability to provide such representation.

### 2.     Potential conflicts vs. actual conflicts

Several of the LM&B lawyers testified that the conflicts of interest were "potential conflicts," not actual conflicts. I disagree. In my opinion the conflicts were actual, not prospective, conflicts that existed at the time LM&B entered into the DRSA with Nextel. The fact that the lawyers viewed the conflicts as "potential" suggests, in my opinion, that they simply didn't understand the conflict of interest issues.

### 3.     Review of some of the conflicting interests

LM&B's lawyers found themselves ensnared in a number of intractable conflicts of interest arising from the DRSA and their conduct during the representation. At least some of the conflicting interests were the following:

#### a.     Conflict with directly adverse clients in litigation

The most obvious conflict of interest is that LM&B was representing one set of clients, the unhappy Nextel employees, in litigation with another client, or, at least, prospective client, Nextel. This problem – caused by the "consultancy" agreement – was a direct conflict of such significance and degree that it could not be waived. Colo. RPC 1.7(c).

It is axiomatic in Colorado that a lawyer may not represent two sets of clients who are directly adverse to each other. *Colo. RPC 1.7(a)*. Each client has an "institutional interest" in the lawyer vigorously representing his or her position when directly aligned against each other. *Cmt 17, ABA Model Rule 1.7; see also, Cmt. 6, ABA Model Rule 1.7*. In Colorado, it has long been the law that lawyers may not represent parties directly aligned against each other in litigation or a transaction. *People v. McDowell*, 718 P.2d 541, 545 (Colo. 1986). In my opinion, LM&B did exactly that.

Paul Gordon, Esq.
January 19, 2007
Page 25

Moreover, because of the infirmities in the DRSA discussed on pages 17-18, *supra*, it was not a conflict that a disinterested lawyer would conclude that the client should agree to the representation under the circumstances. And, because LM&B continued the representation despite the rather obvious conflict, it breached its fiduciary duty to its clients and it violated Colo. RPC 1.7(a).

> **b.**     Conflict regarding LM&B's future expectations with Nextel

Assuming that there was no client-lawyer relationship between Nextel and LM&B immediately upon signing of the DRSA, there was still a very real conflict of interest for LM&B created by the agreement. The conflict was inherent in the fact that (i) Nextel was going to pay LM&B $7.5 million in the following three years or so, and (ii) it was contemplated that LM&B would, in the near future, be Nextel's lawyers if it was not then Nextel's lawyer. As such, the DRSA also created a conflict of interest under Colo. RPC 1.7(b), *i.e.*, a conflict regarding a conflict between LM&B's interests and its claimant-clients' interests in vigorously pursuing Nextel. Rule 1.7(b) provides, in pertinent part:

> (b)     A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, <u>or by the lawyer's own interests</u> . . . . (Emphasis added.)

This situation falls squarely within the prohibitions on conflicts discussed in Rule 1.7(b) and *Restatement* Section 121. Here, LM&B had an interest in keeping Nextel happy; it was due to receive millions of dollars from Nextel. As such, there was an actual conflict of interest between the clients' interest in LM&B's undivided loyalty and LM&B's interests in fostering its relationship with Nextel. It is my opinion that because LM&B continued the representation despite the conflict, it breached its fiduciary duty to its clients and it violated Colo. RPC 1.7(b). And, again, the conflict was not such that a disinterested lawyer would conclude that the clients should agree to the representation under the circumstances. *See, e.g., McCafferty v. Musat*, 817 P.2d 1039, 1044 (Colo. App. 1990).

> **c.**     Conflict with the clients' interest in maximizing their recovery

LM&B's clients each had an interest in maximizing their money damages from Nextel and maximizing whatever noneconomic relief to which they were entitled.

Paul Gordon, Esq.
January 19, 2007
Page 26


This interest directly conflicted with Nextel's interest in minimizing the money damages paid in settlement or judgments to individual clients and collectively to the group. LM&B appears to have recognized Nextel's goals. *Morelli Depo, pgs. 53:16 - 54:9.* ("One of the things that Nextel hoped to achieve, I guess, is to reduce their exposure somehow.") Thus, to the extent LM&B entered into any agreement with Nextel that limited the clients' ability to maximize their recovery, the clients needed to be fully informed of the benefits, detriments and risks of such an agreement, and have a clear understanding of what they were getting and what they were giving up by such an agreement.

And, indeed, Nextel seems to have masterfully engineered a dispute resolution system that would make it very difficult for individual clients to maximize their recovery. See the discussion on pages 17-18, *supra.*

It may be that it was appropriate for the clients to enter into such an agreement and to give up the right to sue and/or the right to recover punitive damages, etc., in exchange for an expedited and cheaper mediation and arbitration procedure and an increased likelihood of some recovery or other noneconomic relief. While the conflict could be waived, with full disclosure and informed consent, in my opinion, that did not happen here. The disclosures to the clients should have included, at a minimum, disclosures about the following:

- The likely impact on the amount of each client's recovery by using the Dispute Resolution Process instead of litigation;

- The likelihood of recovery on individual claims and remedies, such as punitive damages if the clients chose litigation instead of the Dispute Resolution Process;

- The likely costs and attorneys' fees that each client will incur if they elect to proceed to litigation instead of the Dispute Resolution Process;

- The impact of such an agreement on LM&B's ability to adequately represent hundreds of people in a limited amount of time; and

- The risk to the clients if Nextel did not proceed in good faith and "played hardball" with the clients.

While LM&B may have adequately disclosed this information to their clients in group or individual meetings – there is no written or recorded record of what was

Paul Gordon, Esq.
January 19, 2007
Page 27

disclosed – given the complexity of the issues, in my opinion, the standard of care in 2000 would have been to make the disclosures in detail and in writing. In my opinion, LM&B was negligent for not making the disclosures in writing. However, even if a writing was not required, what is clear from the testimony of the LM&B lawyers – as I will discuss below – is that they themselves did not understand the conflict of interest issues. And, as they did not understand the issues, they could not adequately explain the issues to their clients.

Because LM&B didn't adequately disclose the conflict of interest, and did not seem to understand the implications of the DRSA on the representation, it is my opinion that LM&B breached its fiduciary duty by proceeding to represent the Nextel clients against Nextel.

Moreover, it is my opinion that Mr. Leeds and Mr. Morelli were negligent in that they did not step in and ensure that (i) they had fully analyzed and understood the subtle conflict issues and (ii) made sure that their young lawyers fully understood the issues and were able to explain the issues to the clients. I note that the most experienced lawyer handling the Nextel matter, other than Mr. Leeds and Mr. Morelli, was Jeffrey Brown, then about 28 years old with 4 years of practice experience. Mr. Brown apparently took the lead in negotiating with Nextel's lawyers, who were extremely experienced and sophisticated. The young LM&B lawyers were no match.

As such, because Mr. Leeds and Mr. Morelli were not fully engaged in the case and understanding of the conflict issues, they allowed their young lawyers to become ensnared in a process that seems to have been overwhelming, in which they did not fully understand the conflict issues and in which the clients became trapped.

### d.    Clients' interest in LM&B's zealous advocacy

LM&B's clients each had in interest in putting on as strong of a case as possible against Nextel, given the particular facts of their cases. To that end, they each had an interest in their lawyers spending the time necessary to properly investigate and prepare their case for settlement, mediation or arbitration and they each had an interest in the individual attention and undivided loyalty of their lawyer.

The DRSA imposed a $50,000 per month *penalty* on LM&B for every month the Dispute Resolution Process exceeded the 45 week time limit for resolving the clients' claims. Thus, the penalty itself created a conflict between LM&B's interest in not having $50,000 per month deducted from its negotiated fee and the clients' interest in having LM&B spend the time necessary to properly prepare the cases. It is my opinion that the

Paul Gordon, Esq.
January 19, 2007
Page 28

penalty provision violated Colo. RPC 1.7(b) because it necessarily affected the quality of
the representation that LM&B would be able to provide; it created a conflict between the
clients' interest in adequate preparation and zealous advocacy and LM&B's interest in
avoiding $50,000 per month financial penalty and receiving the $2 million "consultancy"
fee. Indeed, the lack of adequate preparation seems to have been a theme in the
complaints of Ms. McNeil and Ms. Ashton-Moore, as well as other clients. *See, also,
Morelli Aff., ¶¶18-31.* It also likely caused LM&B to violate Colo. RPC 1.1 Competence.
I note that there seems to have been no disclosure, in writing or otherwise, of the $50,000
per month penalty or of its implications to the clients, and certainly no informed consent
by the clients.

To the extent that LM&B owed (or in the future would owe) duties to Nextel by
virtue of the "consultancy," LM&B was placed firmly in a conflict between its Nextel
employee clients, on the one hand, and its future Nextel corporate client, on the other
hand, and its own interests *vis-a-vis* Nextel.

It is my opinion that LM&B's decision to represent the claimants against Nextel
despite this conflict caused it to breach its fiduciary duties to the plaintiffs and other
clients. Again, in my opinion, this conflict could not be waived.

e.    LM&B's interest in having Nextel pay its attorney fees
      and costs

The clients had an interest in having their attorneys fees paid by Nextel; LM&B
had the same interest. If the client filed suit in federal court, asserted federal civil rights
claims, and prevailed at trial or through a class-action settlement, they likely would have
had their individual attorney fees paid. If they each entered into a contingent fee
agreement with LM&B -- as did Ms. McNeil and Ms. Ashton-Moore -- they would pay
their attorney fees through whatever they recovered through settlement or judgment, and
would pay no attorney fees if they did not recover.

The central problem is that it appears that Nextel treated the litigation as a zero
sum problem. Cf. *Morelli Aff., ¶ 12.* Nextel appears to have either budgeted an amount
of money to resolve the problem with its unhappy employees, or put in place a system
where the costs could be controlled. As a practical matter, then, Nextel did not really care
who received the money; it could be the employees or their lawyers, and it would not
matter to Nextel as long as the costs did not exceed Nextel's budget. And, Nextel's
counsel seems to have done a masterful job of forcing this budget upon LM&B and its
clients. *See* discussion on pages 17-18, *supra.*

Paul Gordon, Esq.
January 19, 2007
Page 29

Nextel's success in manipulating the DRSA to its advantage became apparent in the Amendment No. 2. LM&B was unable to "deliver" 14 clients to Nextel under the Dispute Resolution Process and, so, Nextel felt that it deserved "some type of credit for the expenses and time that would be allocated to them." *Brown Depo., pgs.177:2 - 178:11.* When LM&B could not "deliver" 14 people, Nextel immediately assessed — and LM&B immediately agreed to — a penalty that shifted the expense and exposure of litigation by 14 clients from Nextel to LM&B. The agreement reflected by Amendment No. 2 — for which there was no disclosure or consent by the clients — deducted $280,000, *i.e.*, $20,000 per client — from LM&B's initial $2 million fee to be paid immediately by Nextel to LM&B, placed the $280,000 in an escrow account, and used that escrow account to fund Nextel's costs of defending against claims that might be brought by the 14 clients, and to pay any settlement or judgment to those clients from those funds (with a cap of $20,000 per client). In effect, then, Nextel shifted to LM&B its costs of defending litigation and compensating its employees for harm caused by Nextel, and LM&B subsidized the costs of litigating against its own clients.

To the extent that LM&B continued to represent the 14 individuals, it had a conflict of interest because, to the extent it zealously advocated for the 14 people to maximize their recovery, LM&B would work directly against its own financial interests. As the DRSA prohibited LM&B from referring these 14 clients to other counsel or sharing information with them, LM&B was put in the position of abandoning the clients or working directly against LM&B's own interests.

Similarly, in Amendment No. 3, LM&B agreed to reduce its monthly fee for consulting fee from Nextel by $20,000 per month. *DRSA, Amendment No. 3, ¶6.* The specific reason cited by Nextel for imposing the reduction in the monthly consulting fee was that "[i]n the event that any Claimant brings any proceeding against the Companies, the Companies will have to defend such action." *Id.* The $20,000 per month reduction was to be retained by Nextel to "defend, settle or satisfy any judgment by a Claimant in any proceeding, . . ." with a cap of $12,500 per claimant. *Id.* Then, the amendment provides that "[a]t the end of the twenty-four (24) month consultancy period, *to the extent the monies retained have not been used by the Companies to pay the cost to defend, settle or satisfy any judgment by a Claimant* in any action outside of the DRP, *said monies will be paid to LM&B in a lump sum.*" *Id.* Again, the effect was to take monies to which LM&B was contractually entitled and use those funds to defend and pay claims brought by LM&B's clients, and to cause LM&B to finance its clients' opponent. That is a conflict of interest. Colo. RPC 1.7(b). It is not a conflict of interest that a disinterested lawyer would advise a client to waive, even had there been full disclosure.

Paul Gordon, Esq.
January 19, 2007
Page 30

In my opinion, because LM&B agreed to terms in and amendments to the DRSA that placed it in direct conflict with at least some of its clients for a limited fund of money, and then continued to represent those clients, LM&B breached its fiduciary duty to its clients, including Ms. McNeil and Ms. Ashton-Moore. The conflict of interest had the effect of adversely affecting LM&B's clients in a way that far outweighed the clients' interest in an expeditious resolution of their claims or minimizing their personal out-of-pocket litigation expenses and attorneys' fees.

      f.    <u>Conflicts created by the practice restriction provisions of the DRSA.</u>

It is clear that Nextel's lawyers were attempting to impose restrictions upon LM&B's ability to bring any other claims against the company. *DRSA,* ¶¶ *1(c), 4, 6.* It is also clear that they were attempting to avoid ABA Model Rule 5.6's and Colo. RPC 5.6's prohibition on attempts to restrict plaintiffs' lawyers' practices in a settlement agreement. In my opinion, the efforts failed, and the result was that the restriction on practice provisions of the DRSA violated Rule 5.6 (b) and created impermissible conflicts of interest.

The restriction on a lawyer's right to practice creates conflicts between the lawyer and the settling client, the lawyer and non-settling clients, and between the lawyer's current client and any future clients. Yvette Golan, *Restrictive Settlement Agreements: A Critique of Model Rule 5.6(b)*, 33 Sw. U. L. Rev. 1, 14 (2003).

Over the years, there have been any number of creative attempts to "buy off" plaintiffs' counsel and prevent them from again suing the defendant. ABA Formal Ethics Opinion 93-371 (1993). One ploy sometimes used to avoid the prohibitions of Rule 5.6 is for the defendant to hire the plaintiff's lawyer as a "consultant," as happened in this case. *See, e.g.,* Golan, *supra,* note 4, at 5 (2003). *See, also,* Marcy Glenn, Settlement Ethics, 30 Colo. Law. 53, 54 (2001); Patrick Longan, 52 Mercer Law. Rev. 807, 820 (2001). In the Oregon case referred to by Professor Simon, *In re Conduct of Brandt,* 10 P.3d 906 (Or. 2000), the Oregon Supreme Court found that while the Code of Professional Responsibility DR 2-108(B) does not prohibit all agreements that restrict the practice of law, it does prohibit such agreements made in connection with settling a case. 10 P.3d, at 918.

The combination of factors in the DRSA, including prohibitions on taking on new clients, referring clients to other lawyers, the requirement that documents be destroyed and the consultancy agreement combined to violate Colo. RPC 5.6 and create conflicts of interest for LM&B.

Paul Gordon, Esq.
January 19, 2007
Page 31

Moreover, the DRSA has the added flaw of prohibiting a client from discharging his or her lawyer. *Individual Agreement,* ¶1 ("I agree that LM&B shall be my legal representative <u>throughout</u> the dispute resolution process."). The Colorado Supreme Court has clearly held that any agreement that limits a client's ability to discharge the lawyer is contrary to public policy and unenforceable. *Olsen and Brown v City of Englewood,* 889 P.2d 673, 676-77 (Colo. 1995).

While I do not think that the practice restrictions directly caused the plaintiffs harm, the restrictions were part of an overall effort by Nextel to co-opt and control the plaintiffs' lawyers and to minimize its exposure in the litigation; it was that control caused the plaintiffs harm. In my opinion, LM&B was negligent for agreeing to such restrictions. In my opinion, LM&B also violated Colo. RPC 5.6(b).

g.    <u>Clients' interest in maximizing their share of a finite resource</u>

In September 2001, LM&B entered Amendment No. 3. Apparently, by late August 2001, it was clear that the parties were having difficulty processing the claims in the time allotted: only 200 of LM&B's clients had completed the Dispute Resolution Process, and 369 remained to go through the process. *Exhibit I, Amendment No. 3., pgs. 1-2; Morrelli Aff.,* ¶¶18-31. The Amendment No. 3 provided for a finite fund of $3,690,000, *i.e.,* $10,000 per remaining client, for settlement of all remaining claims. *Exhibit I, Amendment No. 3.* LM&B was to approach each of its clients, see what amount it could persuade the clients to take, fill in the number – with a cap of $25,000 for any single client – and then send the signed release to Nextel, who would deduct the settlement amount from the $3,690,000 fund and send the money to the client. For each client that chose to continue through the Dispute Resolution Process, the settlement fund would be reduced by $10,000. If LM&B was unable to muster 354 clients for this process, then Nextel, at its option, could reject the releases that were completed and signed and those clients would have to return to the Dispute Resolution Process. *Id.*

This Amendment created significant unwaivable conflict of interests for LM&B. LM&B was placed in a position of then advocating to its individual clients that the client abandon the Dispute Resolution Process, but accept something less than $25,000. Thus, rather than advocating to *maximize* each client's recovery, LM&B was arguing with their individual clients to *minimize* each client's recovery. The more one client received, the less money there would be for the others. Moreover, any client who refused to participate in the alternative process would reduce the total settlement fund by $10,000, thus, further decreasing the fund for other clients. *See* Colo. RPC 1.8(g).

Paul Gordon, Esq.
January 19, 2007
Page 32

    While the alternative process would have likely speeded up processing clients'
claims, it was at the expense of zealous advocacy and a forum in which the clients'
complaints about racial discrimination could be heard. The main beneficiaries of the
process appear to have been Nextel – the process, if LM&B could persuade most or all of
its clients to participate, would effectively cap Nextel's exposure – and LM&B, which
appears to have been overwhelmed by the work of preparing each of the clients' cases and
was facing a $50,000 per month penalty if it exceeded the 45 week deadline for
processing all of the clients' cases.

    Apparently, there was no prior disclosure to the clients of *any* nature about
Amendment No. 3 and, thus, certainly no informed consent. In my opinion, the
Amendment No. 3, by its terms, was an egregious betrayal of trust by LM&B.

    LM&B seemed to be taking the position in depositions that Amendment No. 3
didn't matter because LM&B could not muster the minimum 354 clients willing to use
the alternative deadlines. *Morrelli Aff., 31.* Whether or not LM&B had a prohibited
conflict of interest is not determined by the *result* of the representation, but the *quality* of
the representation, regardless of the result. *E.g., In re Cimino*, 3 P.3d 398, 401 (Colo.
2000). Moreover, my understanding is that LM&B made a effort to obtain the necessary
signatures.

    Again, these were not conflicts that a disinterested lawyer would advise a client to
waive. Colo. RPC 1.7(c); 1.8(a). While I do not have facts to determine whether any
direct harm flowed to the plaintiffs from the particular conflict, it is my opinion that
LM&B breached its fiduciary duty of loyalty to the plaintiffs by agreeing to and
attempting to implement Amendment No. 3.

### 6.    Interests of Ms. McNeil and Ms. Ashton-Moore

    In addition to the interests outlined above, Ms. McNeil and Ms. Ashton-Moore
had an interest in their lawyers' adequate representation and adequate compensation from
Nextel, as discussed above. If they were, in fact, promised bonuses for recruiting groups
of employees from other large companies to LM&B, then they had an interest in receiving
those bonuses from LM&B. To the extent that Ms. McNeil developed a mental illness,
she had an interest in having her lawyers understand and accommodate her condition.

    It is not my opinion that a lawyer should never represent his or her employee.
But, the representation does create some risks. The effect of hiring two clients and
paying their salary to work on their case created conflicts of interest that, eventually,
negatively affected both Ms. McNeil and Ms. Ashton-Moore, on the one hand, and

Paul Gordon, Esq.
January 19, 2007
Page 33

LM&B on the other. *Morelli Depo., pgs. 31:23 - 34:5.* LM&B had an interest in disciplining and maintaining the quality of their employees' work product. *Morelli Depo., pgs. 26:6 -28:7; 29:7 - 30:4.* Hiring the two lead clients as employees made it more difficult for LM&B to achieve that discipline and quality. It may also have inhibited LM&B's professional independence and ability to provide objective advice, and it created the possibility that members of the firm might become witnesses in the case. *Morelli Depo., pgs 31:23 - 34:5.*

And as if LM&B now appears to claim, Ms. McNeil and Ms. Ashton-Moore disclosed confidential information to third parties or generally did not do their jobs, then other clients' interests might have been compromised as well. (I have no opinion about whether or not Ms. McNeil or Ms. Ashton-Moore breached any confidentiality obligations or negatively affected any other client's case).

> 7.     **Prohibited Transactions**

In my opinion, LM&B violated Colo.RPC 1.8 (a) and (f). It entered into a transaction with clients the DRSA the terms to which were not fair and reasonable to, at least, the claimants. Colo. RCP 1.8(a)(1). LM&B also violated Rule 1.8(f) because it accepted compensation from a person other than the claimants –Nextel– but did so in a manner that interfered with their independence of professional judgment and with the client-lawyer relationship. Colo. RCP 1.8(f)(2). The resulting conflicts caused LM&B to breach its fiduciary duty.

> F.     **Adequacy of the Disclosures of the Conflicts of Interest**

>> 1.     **Law and ethics requirements of disclosure of conflicts of interest**

Colo. RPC 1.7 generally permits clients to consent to a lawyer's representation with conflicts of interest when "each client consents after consultation." Colo. RPC 1.7(a)(2); *see also* Colo. RPC 1.7(b)(2); Colo. RPC 1.8(a), (f). This exception raises the issue of what constitutes "consent" and what constitutes "consultation"?

The Comment to Colo. RPC 1.7 describes "consultation" as "consultation which involves full disclosure of the possible effect of such dual representation on the exercises of the lawyer's independent professional judgment on behalf of each client." Cmt. 6, "Consultation and Consent," Colo. RPC 1.7. Thus, the current Colorado rule requires the lawyer to consider the following when consulting with the client about the conflict of interest: (1) the possible effect of the conflict of interest on the lawyer's independent

Paul Gordon, Esq.
January 19, 2007
Page 34

professional judgment; (2) the possible effect on <u>each</u> affected client; and (3) full disclosure to each effected client. *Id. See also,* the new ABA Model Rules (effective 2002), Rule 1.0(e) (defining "informed consent").

The *Restatement* also discusses the nature of the disclosures necessary to obtain an informed consent from the client as "reasonably adequate information about the material risks of such representation to that client or former client." *Restatement* § 122. *See also,* Cmt. c(i), *Restatement* § 122, pp. 266-68. The lawyer is responsible for ensuring that each client has the necessary information to make a fully informed consent to a conflict of interest. *Id.* A lawyer who does not personally inform the client assumes the risk that the client is inadequately informed and that the consent is invalid. *Id.*

    2.    <u>Was there adequate disclosure of the conflicts of interests and the consequences of the conflicts in this case?</u>

It is my opinion that there was woefully inadequate disclosure of the conflicts of interests in this case and of the material risks that the conflicts posed to the client because of LM&B's negotiation and participation in the DRSA.

Assuming the truth of everything that LM&B lawyers have stated about their disclosures to their clients, including Ms. McNeil and Ms. Ashton-Moore, about the conflicts of interest and the payments to be received from Nextel, it is my opinion that the disclosures were woefully inadequate and did not remotely comply with their fiduciary obligations to their clients.

First, the disclosures of the $5.5 million dollar fee and the $2 million dollar consultancy fee should have been made in writing in, at least, the Highlights.

Second, the DRSA is a 29 page legal document, not including amendments and schedules. If the document was provided to clients in groups or private meetings (and my understanding is that LM&B lawyers were extremely busy and pushed for time in conducting the meetings), it was unrealistic to expect the clients – most of whom were likely legally unsophisticated – to read and comprehend a complex document and ask appropriate questions and understand the implications.

Third, I have seen little evidence that the LM&B lawyers themselves really comprehended the extent of their conflicts of interest and the extent to which the conflicts of interest could adversely affect their representation of the clients. *See, e.g., Vagnani Depo., pg. 10:5 - 15:5.* They seemed to strongly believe that the conflicts were "potential conflicts" rather than actual conflicts. *Fitzgerald Depo., pg. 23:3-8; See, e.g., Vagnani*

Paul Gordon, Esq.
January 19, 2007
Page 35

*Depo., pg. 11:7 - 13:2; 55:4 - 61:21.* They seemed to have convinced themselves that, for example, the consultancy arrangement "had no bearing on the representation that [the clients] would be given or professional ability to render judgment in their case." *Fitzgerald Depo., pg. 27:4-18; Vagnani Depo., pg. 58:17 - 59:20.* They could not possibly adequately disclose advise their clients about their conflicts of interest when they themselves did not understand the conflicting interests and the potential harm to their clients. And, discussed *above*, the young lawyers seemed to have been given little guidance from Mr. Leeds and Mr. Morelli.

Finally, other than the footnotes in the October 5, 2001, letter, *Exh. 69*, as discussed above, LM&B appears to have made <u>no</u> disclosure to the clients of the Amendment No. 2 and Amendment No. 3, which exacerbated the firm's significant conflict of interest problems.

### G.   <u>Could the Conflicts of Interest Be Waived?</u>

It is my opinion that LM&B's conflicts of interest were such that they could not be waived and the attempted waiver was ineffective.

#### 1.   <u>Rules regarding waiver of conflicts of interest</u>

A lawyer may obtain an effective consent to a conflict of interest only if *each* affected client is fully informed of the possible adverse consequences of the conflict, and *each* client agrees. Even then, under some circumstances the client's consent may be ineffective.

Both Colo. RPC 1.7(a) and (b) provide exceptions to the general rule prohibiting a lawyer from representing clients with conflicting interests. The exceptions have nearly identical requirements. Colo. RPC 1.7(a) provides an exception as follows:

> (a)   A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> > (1)   <u>the lawyer reasonably believes the representation will not adversely affect the relationship with the other client</u>; and
>
> > (2)   <u>each client consents after consultation.</u>   (emphasis added).

Colo. RPC 1.7(a). There are three elements to the exception: first, the lawyer must "reasonably believe" that the representation will not "adversely affect" the relationship with the

Paul Gordon, Esq.
January 19, 2007
Page 36

other client; second, each affected client must be consulted about the conflict; and third, each affected client must consent to the conflict. Colo. RPC 1.7(b) has a similar exception.

Although it might appear, then, that any conflict might be properly waived, Colorado's Rule 1.7 also includes a provision that was part of the comment to the former ABA Model Rule. This provision is now section (c) of Colorado's Rule 1.7:

> (c)     For purposes of this Rule, <u>a client's consent cannot be validly obtained in those instances in which a disinterested lawyer would conclude that the client should not agree to the representation under circumstances of the particular situation</u>.  (Emphasis added.)

Colo. RPC 1.7(c).  *See, also  Restatement, § 122(2)(c).*

There are some conflicts that simply cannot be waived.  Under the circumstances in this case, LM&B could not "reasonably believe" that the DRSA, as structured, and the payment from Nextel would not adversely affect their representation of their clients.  And, a disinterested lawyer would not advise his or her clients to waive the conflicts.

## V.  REVIEW OF DEFENDANTS' EXPERT OPINIONS

After substantially completing my written opinion, above, I reviewed the summaries of the opinions and supplemental opinions of Professor Roy Simon, Professor Bruce Green, Jean Dubofsky, and Sheila Meer.  I do not have an opinion on the matters discussed in Ms. Meer's letter.  As to the opinions of the other expert witnesses, I respectfully disagree for the reasons discussed above.

## VI.  CONCLUSION

These are my preliminary opinions based upon the documents provided to me to date.  I hold my opinions within a reasonable degree of probability.  I reserve the right to modify or supplement my opinions as additional information becomes available.  Please let me know if you would like me to elaborate or supplement any of the opinions I have discussed above.

I have charged my standard hourly rate of $335 per hour, and my associates and staff who provided assistance have billed at their standard hourly rates.

Paul Gordon, Esq.
January 19, 2007
Page 37

Very truly yours,

STARRS MIHM & CASCHETTE LLP

Michael T. Mihm

MTM/mtm

ADDENDUM A

INDEX
EXPERT REPORT

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Jan 19 2007 7:53PM MST
Filing ID: 13530211
...ath Daphney Teena

*Denise McNeil, et al., v. Leeds, Morelli & Brown, P.C., et al.*
Case No. 2003-CV-893, District Court, City and County of Denver, Colorado

| DATE | DOCUMENT | EXHIBIT / BATES |
|---|---|---|
| 09/30/03 | Affidavit of Steven Morelli, Esq. | Plaintiff's Exhibit 5; RICH 06091-06099 |
| 04/09/01 | Letter from Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman to Jeffrey K. Brown of Leeds Morelli & Brown, P.C. regarding Nextel Claimant: Denise McNeil, State: Colorado | Plaintiff's Exhibit 89; RICH 03849-03851; 345-3580-345-3582 |
| 03/24/00 | Letter from Lisa M. Calvacca of Leeds Morelli & Brown, P.C. to "Nextel Client" | Plaintiff's Exhibit 88; RICH 06829 |
| 10/11/02 | Letter from R. Daniel Scheid of Bostrom Sands Sander & Scheid to Andrew W. Loewi of Brownstein Hyatt & Farber, P.C. and Michael T. McConnell of McConnell Siderius Fleischner Houghtaling & Craigmile, LLC | Plaintiff's Exhibit 20; RICH 06847-06865 |
| Undated | Highlights of Settlement Agreement with Nextel | Plaintiff's Exhibit 8; RICH 05262-05263-C; 020-2264-020-2268 |
| 02/20/01 | Letter from Susan M. Fitzgerald of Leeds Morelli & Brown, P.C. to "Nextel Client" regarding Nextel Dispute Resolution Process | Plaintiff's Exhibit 66; RICH 06165-06167 |
| 10/05/01 | Letter from Susan M. Fitzgerald of Leeds Morelli & Brown, P.C. to Alencia Ashton Moore regarding Nextel Dispute Resolution Process | Plaintiff's Exhibit 69; RICH 05265-052671 PL 0430-0432 |
| 07/13/00 | Letter from James A. Vagnini of Leeds Morelli & Brown, P.C. to "Nextel Client" | Plaintiff's Exhibit 24; RICH 04675-04677; PL 0076-0078 |
| 04/09/01 | Letter from Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman to Jeffrey K. Brown of Leeds Morelli & Brown, P.C. regarding Nextel Claimant: Alencia Ashton-Moore, State: Colorado | Plaintiff's Exhibit 90; RICH 03841-03845; 020-0430-020-0434 |
| 09/14/01 | Dispute Resolution And Settlement Agreement - Amendment No. 3 signed by Jeffrey K. Brown of Leeds Morelli & Brown, P.C. and Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman, with attachments | DN-000081-000124 |

| | | |
|---|---|---|
| 09/28/00 | Amendment No. 1 to the Dispute Resolution and Settlement Agreement signed by Lenard Leeds of Leeds Morelli & Brown, P.C., Mary Elizabeth McGarry of Simpson Thacher & Bartlett, and Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman | DN-000061 |
| Undated | Draft Letters from James A. Vagnini of Leeds Morelli & Brown, P.C. to Ellie Miller of the Equal Employment Opportunity Commission regarding Nextel | DN-000062-000077 |
| 02/07/01 | Amendment No. 2 to the Dispute Resolution and Settlement Agreement signed by Jeffrey K. Brown of Leeds Morelli & Brown, P.C. and [indecipherable] of Jackson Lewis Schnitzler & Krupman | CN 000078-000079 |
| 09/28/00 | Dispute Resolution and Settlement Agreement signed by Lenard Leeds of Leeds Morelli & Brown, P.C., Mary Elizabeth McGarry of Simpson Thacher & Bartlett, and Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman, with attachments | DN000001-000060 |
| 11/28/05 | Lawyer Defendants' Rule 26(a)(2) Expert Disclosures | |
| 11/28/05 | Defendants Leeds, Morelli & Brown, P.C., Lenard Leeds, Steven Morelli, Jeffrey Brown, James Vagnini and Bryan Mazzola's Expert Endorsement Pursuant to C.R.C.P. 26(a)(2)(b) | |
| 11/28/05 | Defendants Leeds, Morelli & Brown, P.C., Lenard Leeds, Steven Morelli, Jeffrey Brown, James Vagnini and Bryan Mazzola's Supplemental Summary of Expert Opinions Served Pursuant to C.R.C.P. 26(a)(2)(b) | |
| 11/28/05 | Exhibit 4 - Resume of Sheila H. Meer | |
| 11/28/05 | Exhibit 1 - Memorandum from Sheila H. Meer to Leeds, Morelli & Brown, P.C. regarding Opening Memo | |
| 11/28/05 | Exhibit 1-A - Curriculum Vitae of Roy Simon | |
| 11/28/05 | Exhibit 1-B - Testimony in the Last Four Years by Roy Simon | |
| 11/28/05 | Exhibit 2-A - Curriculum Vitae of Bruce A. Green | |
| 11/28/05 | Exhibit 2-B - Testimony in the Last Four Years by Bruce Green | |
| 11/28/05 | Exhibit 3-A - Resume of Jean E. Dubofsky | |
| 11/28/05 | Exhibit 3-B - Testimony in the Last Four Years by Jean Dubofsky | |

| 11/23/05 | Defendant Nextel Communications, Inc.'s C.R.C.P. 26(a)(2)(B)(I) and (II) Expert Witness Disclosures | |
|---|---|---|
| Undated | Unsigned Non-Disclosure Agreement (Denise McNeil) | RICH 05781-05783; 345-3761-345-3763 |
| Undated | Unsigned Demand for Resolution of Claims for Settlement Purposes - Alencia Ashton-Moore v. Nextel Communications, Inc. | Plaintiff's Exhibit B; RICH 02631-02632; 201326-201327 |
| Undated | Unsigned Non-Disclosure Agreement (Alencia Ashton-Moore) | RICH 05778-05779; 020-0165-020-0167 |
| Undated | Unsigned Non-Disclosure Agreement (Gary Brewer | RICH 05775; 102392 |
| Undated | Page 1 of unsigned Non-Disclosure Agreement between Leeds Morelli & Brown, P.C. and Alencia Ashton-Moore | |
| 02/13/02 | General Release - Alencia V. Ashton-Moore | RICH 05770-05773; 201475-201478 |
| 02/13/02 | Statement from Alencia Ashton-Moore on Leeds Morelli & Brown, P.C. stationary | RICH 05774; 201479 |
| Undated | Highlights of Settlement Agreement with Nextel | RICH 05262-05263-C; 020-2264-020-2268 |
| Undated | Unsigned Demand for Resolution fo Claims for Settlement Purposes - Denise McNeil v. Nextel Communications, Inc. | RICH 02640-02641; 202153-202154 |
| Undated | Unsigned Demand for Resolution fo Claims for Settlement Purposes - Denise McNeil v. Nextel Communications, Inc. | Plaintiff's Exhibit 14; RICH 02642-02643; 202155-202156 |
| Undated | First page of Dispute Resolution and Settlement Agreement | Plaintiff's Exhibit 1; RICH 06782 |
| Undated | Page 2, possibly to Dispute Resolution and Settlement Agreement | Plaintiff's Exhibit 3; RICH 05732 |
| Undated | Page 3 through 29, possibly to Dispute Resolution and Settlement Agreement, with attachments | RICH 06784-06820 |
| | Miscellaneous notes, copies of correspondence regarding claims of discrimination | Plaintiff's Exhibit 2; RICH 04154-04377; other bates out-of-sequence |
| | Miscellaneous notes, draft letter regarding Nextel v. Holland & Hart employees | Plaintiff's Exhibit 4; JV001-027 |

3

| | | |
|---|---|---|
| Undated | Portion of Preliminary Statement | Plaintiff's Exhibit 6; RICH 06681-06690 |
| Undated | Retainer of Leeds & Morelli - Alencia Ashton-Moore (Client), and Retainer - Denise McNeil (Client) | Plaintiff's Exhibit 7; RICH 03371-03372 |
| 11/99 | Overview of Leeds & Morelli | Plaintiff's Exhibit 9; RICH 06117-06120 |
| 01/19/00 | Letter from Lenard Leeds of Leeds Morelli & Brown, P.C. regarding Jeffrey K. Brown | Plaintiff's Exhibit 10; RICH 06122 |
| Undated | Announcement of Lenard Leeds and Steven A. Morelli regarding Jeffrey K. Brown | Plaintiff's Exhibit 11; RICH 06125 |
| 09/25/00 | Email from Carl Smith to Leeds Morelli & Brown regarding "Can we get on the same page regarding Nextel?" | Plaintiff's Exhibit 12; RICH 06145-06146 |
| 10/03/01 | Email from Carl Smith to Leeds Morelli & Brown regarding "Disappointment" | Plaintiff's Exhibit 15; RICH 06170 |
| 12/28/01 | MCI Newsletter of Leeds Morelli & Brown | Plaintiff's Exhibit 16; RICH 06211-06212 |
| Undated | Press Release of Leeds Morelli & Brown - "Over 100 Employees Accusing MCI of Discrimination" | Plaintiff's Exhibit 17; RICH 06680 |
| Undated | MCI Newsletter of Leeds Morelli & Brown | Plaintiff's Exhibit 18; RICH 06534 |
| 03/01/02 | Letter from James Vagnini of Leeds Morelli & Brown, P.C. to "MCI Employee" | Plaintiff's Exhibit 19; RICH 06675-06679 |
| | Affidavits of ████████████████████████████████████████████████████████ | Plaintiff's Exhibit 21; RICH 03052-03264; 102605-102819 |

| 02/07/02 | Email from Dave Powell to Susan Fitzgerald | Plaintiff's Exhibit 22; RICH 04125; 345-3390 |
|---|---|---|
|  | Draft Statement of Claims | Plaintiff's Exhibit 23; RICH 04660-04662; 101174-101172 |
| 09/22/00 | Letter from James A. Vagnini of Leeds Morelli & Brown, P.C. to Alencia Ashton Moore regarding Nextel | Plaintiff's Exhibit 25; RICH 05290; 020-2312 |
| 10/01/00 | Fax Cover Sheet from Denise McNeil to James Vagnini regarding Schedule | Plaintiff's Exhibit 26; RICH 03503; 101194 |
| 04/24/01 | Unsigned letter from James A. Vagnini to Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman regarding Nextel Claimant: Alencia Ashton-Moore, State: Colorado | Plaintiff's Exhibit 27; RICH 04762-04766; PL0211-0215 |
| 05/07/01 | Letter from James A. Vagnini to Elise M. Bloom of Jackson Lewis Schnitzler & Krupman regarding Nextel Claimant: ▆▆▆▆▆▆▆ State: Virginia | Plaintiff's Exhibit 28; RICH 04779-04781; PL0217-0219 |
| 10/03/01 | Email from Denise L. McNeil to Leeds Morelli & Brown regarding "Unprofessional Voice Mail Message" | Plaintiff's Exhibit 29; RICH 04090; 2001162 |
| 10/04/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 30; RICH 05247-05248; 020-0110-020-0111 |
| 10/04/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding Nextel DRP | Plaintiff's Exhibit 31; RICH 04805-04806; 345-3539-345-3540 |
| 10/16/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding Mediation | Plaintiff's Exhibit 33; RICH 04812-04813; 345-3727-345-3728 |
| 10/16/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 32; RICH 05240-05241; 020-0112-020-0113 |
| 12/11/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 34; RICH 05281-05282; 020-0121-020-0122 |
| 12/21/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding Nextel DRP | Plaintiff's Exhibit 35; RICH 06197-06198 |
| 12/21/01 | Letter from James A. Vagnini of Leeds Morelli & Brown to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 36; RICH 05237-05238; 020-0136-020-0137 |

| 02/01/02 | Respondent's Witness and Exhibit Lists in *Denise McNeil v. Nextel West Corporation*, CRP Institute for Dispute Resolution filed by Holland & Hart LLP and Jackson Lewis Schnitzler & Krupman | Plaintiff's Exhibit 37; RJCH 0645706459 |
|---|---|---|
| 02/08/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Alencia Ashton Moore regarding Ashton-Moore v. Nextel West Corporation | Plaintiff's Exhibit 38; RICH 05221-05222; 020-0202-020-0206 |
| 02/20/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation | Plaintiff's Exhibit 39; RICH 05078-05080 |
| 02/20/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation enclosing Subpoena Duces Tecum and Order | Plaintiff's Exhibit 30; RICH 06498-06504 |
| 03/04/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation regarding Order from the Arbitrator | Plaintiff's Exhibit 41; RICH 05123-05124; 345-3835-345-3836 |
| 03/06/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation regarding settlement | Plaintiff's Exhibit 42; RICH 06545-06546 |
| 03/06/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation regarding settlement | Plaintiff's Exhibit 43; RICH 05141-05145; 345-2826-345-2830 |
| 03/07/02 | Email from Letter from James A. Vagnini to Denise McNeil regarding Settlement Conference | Plaintiff's Exhibit 44; RICH 04141-04142; 201551-201552 |
| 03/07/02 | Letter from Denise L. McNeil to James A. Vagnini of Leeds Morelli & Brown regarding McNeil v. Nextel West Corporation regarding settlement and payroll | Plaintiff's Exhibit 45; RICH 03532-03534; PL0618-0619; 201542 |
| 03/08/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Gregory I. Rasin of Jackson Lewis Schnitzler & Krupman regarding Affidavit in support of Denise McNeil | Plaintiff's Exhibit 46; RICH 05152; 345-3958 |
| 03/15/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding McNeil v. Nextel West Corporation regarding Thomas Hickey | Plaintiff's Exhibit 37; RICH 05159 |
| 03/17/02 | Email from Denise L. McNeil to James A. Vagnini regarding "1099 Request" | Plaintiff's Exhibit 48; RICH 04147-04150 |
| 03/18/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to Denise McNeil regarding Settlement with Nextel | Plaintiff's Exhibit 49; RICH 05161-05162; 345-3324-345-3325 |

| | | |
|---|---|---|
| 04/08/02 | Email from Jeffrey Brown to Denise L. McNeil regarding "Employment" | Plaintiff's Exhibit 50; RICH 04151; 201565 |
| 07/08/02 | Memorandum from James to Jeff regarding Denise McNeil | Plaintiff's Exhibit 51; RICH 05168; 345-3951 |
| 08/16/02 | Letter from James A. Vagnini of Leeds Morelli & Brown to "Past or Present Worldcom Employee" regarding Worldcom Update | Plaintiff's Exhibit 52; RICH 05169-05170 |
| 02/05/03 | Email from Denise McNeil to James A. Vagnini regarding Taxes | Plaintiff's Exhibit 53; RICH 04152 |
| 02/10/03 | Email from Denise McNeil to Jeffrey Brown regarding Requesting Documents for Nextel Case | Plaintiff's Exhibit 54; RICH 04153 |
| Undated | Draft Demand for Resolution of Claims for Settlement Purposes - Denise McNeil v. Nextel Communications, Inc. | Plaintiff's Exhibit 55; RICH 02638; 345-2907 |
| Undated | Draft Demand for Resolution of Claims for Settlement Purposes - Alencia Ashton-Moore v. Nextel Communications, Inc. | Plaintiff's Exhibit 56; RICH 02628-02630; 020-0483-020-0485 |
| Undated | Alencia Ashton-Moore - Claims | Plaintiff's Exhibit 57; RICH 02678-02681; 020-0535-020-0538 |
| Undated | Work Product Prepared in Contemplation of Litigation - Alencia Ashton-Moore | Plaintiff's Exhibit 58; RICH 02710-A - 02710-G; 020-1258-020-1264 |
| Undated | Work Product Prepared in Contemplation of Litigation - Denise McNeil | Plaintiff's Exhibit 59; RICH 02856-02865 |
| Undated | Denise McNeil - Claims | Plaintiff's Exhibit 60; RICH 02672-02677 |
| Undated | Email from Bryan Mazzola to M. Bertron regarding Ashton-Moore Depositions | Plaintiff's Exhibit 61; RICH 04121; 020-0240 |
| Undated | Memorandum from Bryan to Susan regarding Unauthorized Practice of Law in Various Jurisdictions | Plaintiff's Exhibit 62; RICH 04648-A - 04648-C |
| 11/21/00 | Memorandum from Susan Fitzgerald to Alencia Ashton-Moore and Denise McNeil regarding Statement of Claims | Plaintiff's Exhibit 63; RICH 04710-04711; 101233-101234 |
| 11/24/00 | Letter from Denise to Susan regarding claimant statements | Plaintiff's Exhibit 64; RICH 04713; PL0126 |

| 01/09/01 | Email from Alencia Ashton-Moore to Susan Fitzpatrick regarding backup of work | Plaintiff's Exhibit 65; RICH 04069; PL0160 |
|---|---|---|
| 05/08/01 | Email from Susan Fitzpatrick to Denise McNeil regarding Missing Claimants | Plaintiff's Exhibit 67; RICH 04081; PL0221 |
| 08/16/01 | Letter from ▒▒▒▒▒▒ to James A. Vagnini and Susan M. Fitzgerald regarding Nextel Dispute Process | Plaintiff's Exhibit 68; RICH 01661; PL0404 |
| 01/14/02 | Letter from Doris and Gary Brewer to Susan Fitzgerald regarding Clarification of January 9th and 10th Talks (Response to January 11th Letter) | Plaintiff's Exhibit 70; RICH 06310-06311 |
| 01/15/02 | Letter from Susan Fitzgerald to Denise McNeil regarding Nextel DRP | Plaintiff's Exhibit 71; RICH 06314-06315 |
| 01/24/02 | Unsigned letter from Susan Fitzgerald to Denise McNeil regarding McNeil v. Nextel West Corporation | Plaintiff's Exhibit 72; RICH 04981-04983; 345-3813-345-3815 |
| 01/25/02 | Letter from Susan Fitzgerald to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 73; RICH 04991; 020-0192 |
| 01/25/02 | Letter from Susan Fitzgerald to Alencia Ashton Moore regarding McNeil v. Nextel West Corporation | Plaintiff's Exhibit 74; RICH 04988-04989; 102431-102432 |
| 01/31/02 | Unsigned Preliminary Statement in *Alencia Ashton-Moore v. Nextel West Corporation*, CPR Institute for Dispute Resolution | Plaintiff's Exhibit 75; RICH 05583-05604; 201376-201397 |
| 01/31/02 | Letter from Susan Fitzgerald to Ruth L. Fuller of the University of Colorado Health Sciences Center regarding Denise McNeil | Plaintiff's Exhibit 76; RICH 06380-06381 |
| 02/05/02 | Letter from Susan Fitzgerald to Alencia Ashton-Moore regarding Ashton-Moore v. Nextel West Corporation | Plaintiff's Exhibit 77; RICH 05225; 020-0195 |
| 02/05/02 | Email from Susan Fitzgerald to Arbitrator Williams regarding Discovery of Medical Records | Plaintiff's Exhibit 78; RICH 04123-04124; 345-3845-345-3846 |
| 02/08/02 | Letter from Susan Fitzgerald to Denise McNeil regarding McNeil v. Nextel West Corporation - Arbitrator's Order | Plaintiff's Exhibit 79; RICH 06464-06468 |
| 02/20/02 | Page 1 of an Email from James Vagnini to Denise McNeil attaching Susan Fitzgerald's letter to Denise McNeil - Arbitrator's Order | Plaintiff's Exhibit 80; RICH 04126; 345-3375 |

| | | |
|---|---|---|
| 02/22/02 | Letter from Susan Fitzgerald to Alencia Ashton-Moore regarding Nextel Communications, Inc. regarding settlement check | Plaintiff's Exhibit 81; RICH 06515-06516 |
| 02/22/02 | Letter from Susan Fitzgerald to Arbitrator Williams regarding a guardian ad litem for Denise McNeil | Plaintiff's Exhibit 82; RICH 06512-06514 |
| 02/27/02 | Letter from Denise McNeil to Susan Fitzgerald regarding Fitzgerald's Letter to Mike Williams | Plaintiff's Exhibit 83; RICH 03530-03531; 345-3364-378-3365 |
| 02/28/02 | Letter from Susan Fitzgerald to Denise McNeil regarding McNeil v. Nextel West Corporation and conference with Arbitrator Williams | Plaintiff's Exhibit 84; RICH 06530-06533 |
| 03/01/02 | Letter from Susan Fitzgerald to Arbitrator Williams regarding McNeil v. Nextel West Corporation and Denise McNeil's competency | Plaintiff's Exhibit 85; RICH 05120-05122 |
| 03/01/02 | Letter from Susan Fitzgerald to Ruth L. Fuller of the University of Colorado Health Sciences Center regarding Denise McNeil and Dr. Fuller's Summary Report | Plaintiff's Exhibit 86; RICH 005110-005119 |
| 03/27/02 | Letter from Susan Fitzgerald to Denise McNeil regarding Nextel Communications, Inc. and settlement check | Plaintiff's Exhibit 87; RICH 06572-06574 |
| 02/13/02 | Letter from Gregory I. Rasin to Jeffrey Brown regarding Alencia Ashton Moore | Plaintiff's Exhibit 91; RICH 03856-03857; 020-0227-020-0228 |
| 03/11/02 | Letter from Jeffrey Brown to Gregory I. Rasin regarding Completion of DRP | Plaintiff's Exhibit 92; RICH 05154; 345-3953 |
| 08/07/01 | Unsigned letter from Bryan J. Mazzola of Leeds Morelli & Brown to Gregory I. Rasin regarding Nextel DRP | Plaintiff's Exhibit 93; RICH 04797; 102898 |
| 01/07/02 | Letter from Bryan J. Mazzola to Victor Deverous regarding Alencia Ashton-Moore and Denise McNeil | Plaintiff's Exhibit 94; RICH 04926; 345-3757 |
| 01/04/02 | Letter from Bryan J. Mazzola to Denise McNeil regarding McNeil v. Nextel Corporation | Plaintiff's Exhibit 95; RICH 04866-04869; 201210-201213 |
| 01/09/02 | Letter from Bryan J. Mazzola to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 96; RICH 04933; 020-0175 |
| 01/16/02 | Email from Megan Bertron to Bryan Mazzola regarding Ashton-Moore Depositions | Plaintiff's Exhibit 97; RICH 04120; 020-0236 |
| 01/17/02 | Letter from Bryan J. Mazzola to Denise McNeil regarding McNeil v. Nextel West Corporation | Plaintiff's Exhibit 98; RICH 06316-06317 |

| 01/17/02 | Letter from Bryan J. Mazzola to James Hinga at JAMS regarding McNeil and Ashton-Moore Mediations | Plaintiff's Exhibit 99; RICH 04954; 345-3512 |
|----------|---|---|
| 01/17/02 | Letter from Bryan J. Mazzola to Ruth L. Fuller regarding Denise McNeil | Plaintiff's Exhibit 100; RICH 06326 |
| 01/22/02 | Letter from Bryan J. Mazzola to David D. Powell, Jr. at Holland and Hart LLP regarding Denise McNeil Interrogatories | Plaintiff's Exhibit 101; RICH 04972; 345-3448 |
| 01/22/02 | Letter from Bryan J. Mazzola to Alencia Ashton Moore regarding Nextel DRP | Plaintiff's Exhibit 102; RICH 06329 |
| 01/23/02 | Letter from Bryan J. Mazzola to Denise McNeil regarding McNeil v. Nextel West Corporation | Plaintiff's Exhibit 103; RICH 06360-06361 |
| 01/31/02 | Letter from Bryan J. Mazzola to David D. Powell, Jr. regarding Nextel DRP | Plaintiff's Exhibit 104; RICH 04996; 020-0270 |
| 02/07/02 | Letter from Bryan J. Mazzola to Alencia Ashton Moore Ashton-Moore v. Nextel West Corporation | Plaintiff's Exhibit 105; RICH 05012-05013 |
| 02/13/02 | Deposition of Alencia Ashton Moore | Plaintiff's Exhibit 106; RICH 05268-05274; 102543-102549 |
| 11/22/05 | Deposition of Alencia Ashton-Moore, Volume II | |
| 09/20/06 | Deposition of James Vagnini | |
| 09/15/06 | Deposition of Susan Fitzgerald | |
| 09/15/06 | Deposition of Jeffrey K. Brown | |
| 10/17/06 | Deposition of Bryan Mazzola | |
| 10/19/06 | Deposition of Roy Simon | |
| 11/16/05 | Deposition of Alencia V. Ashton-Moore, Volume I | |
| 09/19/06 | Deposition of Rick Ostrove | |
| 02/18/06 | Deposition of Steven A. Morelli | |
| 10/16/06 | Deposition of Gregory Raisin | |
| 09/19/06 | Deposition of Lenard Leeds | |
| 10/19/06 | Deposition of John Buck | |
| 09/15/06 | Deposition of Lisa Marcus | |
| 07/07/06 | Deposition of Alencia Ashton-Moore | |

| | | |
|---|---|---|
| 09/05/06 | Deposition of Kathleen Steffe | |
| 09/05/06 | Deposition of Dimitri Karpouzos | |
| 09/06/06 | Deposition of Nancy Nowell | |
| 07/07/06 | Deposition of Denise L. McNeil, Vol. II | |
| 07/06/06 | Deposition of Denise L. McNeil, Vol. I | |
| 11/28/05 | Defendants Leeds, Morelli & Brown, P.C., Lenard Leeds, Steven Morelli, Jeffrey Brown, James Vagnini and Bryan Mazzola's Expert Endorsement Pursuant to C.R.C.P. 26(a)(2)(b) | |
| 06/12/06 | Fourth Amended Complaint | |
| 07/10/06 | Answer of Defendant Nextel Communications, Inc. to Plaintiffs' Fourth Amended Complaint | |
| 07/14/06 | Lawyer Defendants' Answer to Fourth Amended Complaint | |
| 07/10/06 | Answer and Counterclaim | |

11

## ADDENDUM B

### MICHAEL T. MIHM
Attorney at Law
STARRS MIHM & CASCHETTE LLP
707 Seventeenth Street, Suite 2600
Denver, Colorado 80202
Phone: (303) 592-5900
E-mail: michael.mihm@starrslaw.com

EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Jan 19 2007 7:53PM MST
Filing ID: 13530211
Review Clerk: Ruth Daphney Teeuw

## EMPLOYMENT

Partner, STARRS MIHM & CASCHETTE LLP, October 2003 to present. Civil trial practice including business and corporate litigation, fraud and business torts, legal malpractice, and personal injury and wrongful death.

Adjunct Faculty, University of Denver, Sturm College of Law, 2004 - 2006.

Lawyer, KENNEDY & CHRISTOPHER, P.C. f/k/a COOPER & KELLEY, P.C., Shareholder, January 1989 through September 2003; Associate, March 1985 through December 1988. Practice limited to civil litigation and trials, including business litigation, insurance litigation, legal malpractice, medical malpractice and wrongful death.

Associate, FRANDZEL & SHARE, Beverly Hills, California, December 1983 through February 1985. Banking litigation.

## EDUCATION

University of Southern California Law School, Los Angeles, California, J.D., 1983.

Notes and Articles Editor, University of Southern California Major Tax Planning Journal, 1981-1983.
Member, Computer Law Journal, 1981-1983.

Walla Walla College, College Place, Washington, B.A., Religion (*cum laude*), 1980.

Trial Academy, International Association of Defense Counsel, Boulder, Colorado, July 1986.

## ADMISSIONS

State Bar of California - 1983
U.S. District Court for the Northern and Central Districts of California - 1983
U.S. Court of Appeals, Ninth Circuit - 1983
State Bar of Colorado - 1985

-1-

U.S. District Court for the District of Colorado - 1985
U.S. Court of Appeals, Tenth Circuit - 1985
U.S. Court of Appeals, Eleventh Circuit - 2003
U.S. District Court for the Southern District of California - 2006

## PUBLICATIONS

1. Managing Editor, LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

2. Author, Chapter 5, "Conflicts of Interest," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

3. Co-Author, with Blankenship, J., Chapter 28, "Common Law Legal Malpractice Claims by Clients," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

4. Co-Author, with Hyatt, E., Chapter 29, "Statutory Legal Malpractice Claims by Clients," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

5. Co-Author, with Blankenship, J., Chapter 30, "Liability to Third Parties," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

6. Co-Author, with Hyatt, E., Chapter 31, "Damages for Injuries or Losses Caused by Legal Malpractice," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

7. Co-Author, with Blankenship, J., Chapter 32, "Defenses to Legal Malpractice Claims," in LAWYER'S PROFESSIONAL LIABILITY HANDBOOK, Second Ed. (CLE in Colorado, Inc. 2005)

8. Author, "Finding Insurance for Your Professional Negligence Claim," in Finding Insurance for Your Personal Injury Claim, Colorado Trial Lawyers Association (2005)

9. Author, "Practice Management Software" in OVERCOMING YOUR FEARS: USING TECHNOLOGY IN LIGATION, National Business Institute, Inc., Denver, Colorado (2005)

10. Author, "Electronic Discovery" in OVERCOMING YOUR FEARS: USING TECHNOLOGY IN LIGATION, National Business Institute, Inc., Denver, Colorado (2005)

11. Co-author, with Ewing, M., "Advanced Trial Advocacy," National Business Institute, Inc. (2004)

12. Co-author, with Brown, D., "Damages in Colorado Civil Trial Practice," National Business Institute, Inc. (2002)

13. Author, "Successfully Presenting the Complex Case to a Colorado Jury," National Business Institute, Inc. (2001)

14. Co-author, with Dolan, L., Chapter 6, "Legal Bases for Lawyers' Liability for Malpractice," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

15. Co-author, with Dolan, L., Chapter 7, "Common Law Legal Malpractice Claims," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

16. Co-author, with Dolan, L., Chapter 8, "Statutory Legal Malpractice Claims," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

17. Co-author, with Dolan, L., Chapter 9, "Liability to Third Parties," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

18. Co-author, with Dolan, L., Chapter 10, "Conflicts of Interest," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

19. Co-author, with Dolan, L., Chapter 11, "Damages for Injuries or Losses Caused by Legal Malpractice," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., CLE in Colorado, Inc.,1999)

20. Co-author, with Dolan, L., Chapter 12, "Defenses to Legal Malpractice Claims," COLORADO ATTORNEY'S PROFESSIONAL LIABILITY HANDBOOK (Robin L. Beatty, ed., Colorado Bar Association/CLE in Colorado, Inc.,1999)

21. Author, "Risks of Multi-State Practice of Law," WHOOPS: COLORADO BAR ASSOCIATION MALPRACTICE PREVENTION NEWS, April, 1999

22. Author, "Software Piracy and the Personal Computer: Is the 1980 Software Copyright Act Effective?," IV COMPUTER LAW JOURNAL 1971 (1983)

## MODERATOR OR SPEAKER

1. Co-Chair and Moderator, 2006 Preventing Legal Malpractice Seminars, Colorado Bar Association (January - February 2006)

2. Speaker, "Finding Insurance for Your Professional Negligence Claim," in Finding Insurance for Your Personal Injury Seminar, Colorado Trial Lawyers Association, Denver, Colorado (April 2005)

3. Speaker, "Practice Management Software" and "Electronic Discovery" in "Overcoming Your Fears: Using Technology in Ligation Seminar," National Business Institute, Inc., Denver, Colorado (March 2005)

4. Speaker and Moderator, "Advanced Trial Advocacy Seminar," with Ewing, M., National Business Institute, Inc., Denver, Colorado (July 2004)

5. Speaker and Moderator, "Damages in Colorado Civil Trial Practice," with Brown, D., National Business Institute, Inc., Denver, Colorado (March 2003)

6. Speaker and Moderator, "Damages in Colorado Civil Trial Practice," with Brown, D., National Business Institute, Inc., Lakewood, Colorado (January 2002)

7. Speaker, "Hiring and Firing Clients," Tuesdays at the Bar, Colorado Bar Association (February 2001)

8. Speaker, "Successfully Presenting the Complex Case to a Colorado Jury," with Burg, M., National Business Institute, Inc., Denver, Colorado (January 2001)

9. Speaker, "Restatement (Third) of Law Governing Lawyers: Malpractice Highlights and New Directions," Colorado Bar Association Convention, Vail Colorado, (September 1999)

10. Speaker, "Recent Developments in Professional Liability Cases," 1999 Legal Malpractice Seminars, Colorado Bar Association and CBA/CLE in Colorado, Inc., (Jan-Feb, 1999)

11. Speaker, "Preventing Legal Malpractice," Boulder County Bar Association (December 1997)

12. Speaker, "Fee Agreements and Client Communication," 1997 Legal Malpractice Seminars, Colorado Bar Association and CBA/CLE in Colorado, Inc., (January 1997)

13. Speaker, "Legal Malpractice: Trends and Prevention," Weld County Bar Association (November 1996)

14. Speaker, with Breakstone, D., "Lawyer Liability Under the Restatement (Third) of Law Governing Lawyers," Colorado Bar Association Convention, Vail, Colorado (September 1996)

15. Program Chair and Moderator, 1996 Legal Malpractice Prevention Seminars, Colorado Bar Association and CBA/CLE in Colorado, Inc., (January-February 1996)

16. Speaker, "How to Terminate the Attorney-Client Relationship Without Getting Sued." 1995 Legal Malpractice Prevention Seminars, Colorado Bar Association and CBA/CLE in Colorado, Inc., Fort Collins, Colorado (February 1995)

17.   Program Chair and Speaker, "Malpractice Prevention: Detecting and Handling Conflicts of Interest Issues in a General Practice." Colorado Bar Association Convention, Keystone, Colorado (September 1994)

18.   Speaker, with Tucker, H., "Malpractice Prevention Tips for Elder Law Attorneys," 1994 Elder Law Seminar, CBA/CLE in Colorado, Inc., (June 1994)

**ORGANIZATIONS**

American Bar Association, 1983 to present
  Litigation Section:
    Business Torts Committee (Co-Editor, Committee Website, 2005-present)
  Torts and Insurance Practice Section:
  Intellectual Property Section
  Law Practice Management Section

Colorado Bar Association, 1985 to present
  Professional Liability Committee, Chair, 1997-1999
  Litigation Section

California Bar Association, 1983 to present
  Litigation Section

Denver Bar Association

Los Angeles County Bar Association

American Association for Justice (formerly Association of Trial Lawyers of America)
  Business Torts Section
  Professional Negligence Section

Colorado Trial Lawyers Association
  Commercial Litigation Committee

**PERSONAL**

Born 1956 in Paw Paw, Michigan. Married; two children.

Updated: January 19, 2007