# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

MICHAEL S. JOHNSON, DONNA
DYMKOWSKI, PATRICIA LONG-
CORREA, ANTONIO SAMUEL, VINCENT
HALL, ANGELETTE WATERS, Individually,
and on behalf of the Class,

Plaintiffs,

-against-

NEXTEL COMMUNICATIONS, INC., a
Delaware Corporation; LEEDS, MORELLI &
BROWN, P.C.; LENARD LEEDS,
STEVEN A. MORELLI; JEFFREY K.
BROWN; BRYAN MAZZOLA; and JOHN
and JANE DOES 1-9, (a fictitious designation
for presently unknown Defendants),

Defendants.

-------------------------------------------------------

C.A. No. 07 CIV 8473 (GBD) (KNF)

ECF CASE

**ORAL ARGUMENT REQUESTED**

# PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF THEIR MOTION FOR CERTIFICATION OF COMMON ISSUES

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ..................................................................................2

    A.   LMB Admitted That There Was Systemic Discrimination at Nextel .....................2

    B.   Soon After Learning that Nextel Had Company-Wide Problems with
        Discrimination, LMB Began Attempting to Negotiate a Settlement with
        Nextel .......................................................................................................................3

    C.   After Settlement Negotiations Stalled, LMB Started a Media Blitz and
        Threatened to File a Class Action against Nextel Seeking Billions of
        Dollars in Damages .................................................................................................3

    D.   Nextel Knew that LMB Wanted "Exorbitant" Attorneys' Fees ..............................4

    E.   Nextel Returned to the Settlement Table and Took Over the Role of
        Drafting the Terms of the Proposed Settlement ......................................................5

    F.   Nextel Knew That Entering into "Alternative Dispute Agreements" Like
        the DRSA Was LMB's *Modus Operandi* ...............................................................6

    G.   Nextel Knew the DRSA Contained Conflicts of Interest between LMB
        and Its Clients .........................................................................................................6

    H.   On September 22, 2000, Nextel and LMB signed the DRSA ..................................7

    I.   The Parties Subsequently Signed Amendments to the DRSA That
        Further Ensured That LMB Had to Process Its Clients' Claims As
        Quickly as Possible .................................................................................................9

    J.   LMB Recovered Less Than $4 Million for Its Clients, But Received
        $7.5 Million in Attorneys' Fees ...........................................................................10

    K.   LMB Agreed to Represent All of the Named Plaintiffs on a Contingency
        Basis ......................................................................................................................10

III. PROCEDURAL HISTORY .................................................................................11

    A.   Second Circuit opinion .........................................................................................11

    B.   Bifurcation of Discovery .......................................................................................12

010305-11  556850 V1

IV.     ARGUMENT ..........................................................................................................13

        A.      The Proposed Class Is Not Only Ascertainable, But Is Defined by the
                Very Conduct Plaintiffs Challenge in This Litigation ...........................................14

        B.      Rule 23(a)(4) Authorizes Certification of Issues Common to the Class
                and, Because All Class Members Had Discrimination Claims Against
                Nextel Resolved by the DRSA, There Are Many Common Issues ......................15

        C.      Plaintiffs Satisfy Rule 23 Factors for the Issues Sought to be Certified ...............17

                1.      The DRSA resolved the discrimination claims of 587 LMB clients;
                        therefore, both the Class and the Subclass are sufficiently numerous. .......17

                2.      The issues Plaintiffs seek to certify relate to the DRSA that applied
                        to all Class members and are therefore common to all Class members .....18

                3.      The named plaintiffs have claims that are typical of the Class as
                        a whole. ....................................................................................................18

                4.      Plaintiffs are adequate representatives of the Class. .................................19

        D.      Plaintiffs Meet the Requirements of Rule 23(b) for the Issues Sought to
                be Certified .........................................................................................................20

                1.      Because Defendants treated all Class members identically, the
                        issues sought to be certified predominate over individual ones. ..............20

                2.      An issue certification is superior to individualized determinations
                        of the issues sought to be certified. ..........................................................22

        E.      This Court Should Appoint Hagens Berman Sobol Shapiro LLP and
                Roper & Twardowsky LLC as Class Counsel ......................................................23

V.      CONCLUSION ......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)..................................................................................22

*Charrons v. Pinnacle Grp. NY LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010) ...........................................................16

*Flores v. Anjost Corp.*,
    2012 U.S. Dist. LEXIS 85171 (S.D.N.Y. June 19, 2012) ................13, 14

*Haus v. City of New York*,
    2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. Aug. 31, 2011)....................17

*In re Flag Telecom Holdings, Ltd.*,
    574 F.3d 29 (2d Cir. 2009)......................................................................19

*In re Initial Public Offering Secs. Litig.*,
    471 F.3d 24 (2d Cir. 2006)......................................................................14

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)..............................................................17, 20

*Johnson v. Nextel Commnc'ns, Inc.*,
    660 F.3d 131 (2d Cir. 2011)..............................................11, 12, 19, 21

*Maneely v. City of Newburgh*,
    208 F.R.D. 69 (S.D.N.Y. 2002) ........................................................19, 23

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)...............................................................17, 18

*Robinson v. Metro-North Commuter R. R.*,
    267 F.3d 147 (2d Cir. 2001)....................................................................16

*Simon v. Philip Morris, Inc.*,
    200 F.R.D. 21 (E.D.N.Y. 2001)..............................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
    __ U.S. __, 131 S. Ct. 2541 (2011)........................................................18

### OTHER AUTHORITIES

Fed. R. Civ. P. 23.................................................................................... *passim*

Fed. R. Civ. P. 42.....................................................................................2,16

James L. Stengel, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.24 (2009) ................16, 23

William B. Rubenstein, Alba Conte and Herbert B. Newberg, 3 NEWBERG ON CLASS
    ACTIONS §§ 9.61 & 18:7 (4th ed. 2012) ......................................................................16, 17

010305-11  556850 V1

## I.      INTRODUCTION

Turnabout is fair play.

In early 2000, Nextel learned that the law firm of Leeds, Morelli & Brown, P.C. ("LMB") had been retained by hundreds of Nextel employees to prosecute claims of discrimination against the company.  LMB orchestrated a media blitz that threatened to file a class action lawsuit against Nextel seeking billions of dollars of damages and millions in attorneys' fees.  However, Nextel also knew from the demands it had privately received from LMB that the firm was primarily interested in a large attorneys' fee recovery.  And the lead lawyer on Nextel's defense team also knew that LMB had a history of negotiating "dispute resolution agreements" with employers pursuant to which claims of discrimination could be resolved quietly, without the judicial scrutiny required in a class action settlement.

Nextel thereafter hired two of the best employment law defense firms in the country, and it set out to bribe LMB to sell out its own clients.  At the beginning of the parties' settlement negotiations, LMB sent Nextel drafts of a settlement agreement under which its clients' claims would be resolved through a private alternative dispute resolution process.  Once Nextel took over the drafting, Nextel inserted provisions that required LMB to resolve all 587 of its clients' claims in less than a year.  In exchange, Nextel paid LMB a total of $7.5 million in attorneys' fees.  And Nextel got what it paid for:  though LMB initially claimed that its clients' cases were worth billions, in the end it resolved *all* of those claims for less than $4 million.

Plaintiffs file this Motion asking the Court to certify, under Fed. R. Civ. P. 23(c)(4), issues of fact related to the negotiation, drafting, and performance of the Dispute Resolution Settlement Agreement ("DRSA") that resolved the discrimination claims of LMB's clients.  Plaintiffs also seek certification of their entitlement to punitive damages based on those issues of fact.  Plaintiffs' motion is apt:  by getting LMB to enter into the DRSA, Nextel created a class –

the 587 people who resolved their discrimination claims against Nextel through the DRSA.

Defendants cannot credibly claim that there are individual issues precluding certification because

they signed the DRSA for the very purpose of collectively processing all of LMB clients' claims.

Nextel bought LMB's willingness to compromise its duty to vigorously advocate on behalf of its

individual clients.  Having bought LMB's loyalty, it is appropriate that Nextel have to answer for

its conduct in a class action brought by the 587 clients Nextel paid LMB to treat as one.

In cases such as these, the Second Circuit has explicitly encouraged trial courts to use

issue certification combined with the Court's ability to bifurcate under Fed. R. Civ. P. 42(b) to

try issues that are common to the class first, reserving issues related to damages for individual

proceedings later.  This Court should do so here because it is the most efficient way to resolve

the claims of all of LMB's former clients and would avoid the waste of litigating Plaintiffs'

proposed Common Issues 587 separate times.  As set forth below, Plaintiffs' request is well-

supported by Second Circuit law and by a detailed trial plan. The Motion should be granted.

## II.   FACTUAL BACKGROUND

### A.   LMB Admitted That There Was Systemic Discrimination at Nextel

Beginning in early 2000, Nextel employees from around the country complained that they

were subject to discrimination and harassment at Nextel.  *See* Ex. 1.[1]  LMB agreed to represent

them.  As it spoke to more Nextel employees, LMB came to believe that Nextel had a company-

wide problem with discrimination and, accordingly, began filing hundreds of Charges of

Discrimination with EEOC offices across the country.  Ex. 2 (LMB client letter saying it has

discovered "a pattern of practice of systematic discrimination that has reaped [*sic*] havoc on the

lives of Nextel employees"); Ex. 3 (LMB letter to Nextel alleging "there is a pattern and practice

---

[1] All Exhibits are attached to the Declaration of Jennifer Fountain Connolly in Support of Plaintiffs' Motion for Certification of Common Issues ("Connolly Decl.").

of blatant systematic and continuous racism, sexism and retaliation within Nextel
Communications, Inc.") (emphasis in original); Ex.4 at 16076 (LMB client letter:  ""Once you
put all the pieces in place the picture becomes clear – Nextel is a company that systematically
suppresses and depresses minorities both financially and emotionally."); Ex. 5 ¶ 5 ("The Firm's
lawyers ultimately concluded there were widespread problems . . .").  In a well-publicized article,
LMB partner Jeffrey K. Brown was quoted as saying "The company is run like a plantation.  The
problem is so pervasive that this [filing hundreds of complaints with the EEOC] is the only thing
that can be done."  Ex. 6; *see also* Ex. 7, at 15:4-23 (Morelli:  "I felt at some point it seemed
pretty much prevalent throughout the companies because we were hearing stories from almost
every state in the United States.").  Mr. Brown was also quoted as saying "[t]he problem here is
the most severe I've ever seen."  Ex. 8.

**B.**     **Soon After Learning that Nextel Had Company-Wide Problems with
          Discrimination, LMB Began Attempting to Negotiate a Settlement with Nextel**

       Almost immediately, LMB began attempting to negotiate a settlement with Nextel.  Ex. 9
¶ 7 (describing January 2000 as LMB's first contact with Nextel).  And one of LMB's initial
goals was to prepare a settlement that would help "insulate Nextel from outside litigation."
Ex. 10.  Accordingly, LMB sent a proposal to Nextel that contemplated having its clients' claims
resolved in a three-step alternative dispute process consisting of an interview, non-binding
mediation and then mediation.  *See* Ex. 11 (Proposed Dispute Resolution Agreement).  The
initial draft did not have a date by which LMB would have to process its client's claims and
provided that attorneys' fees were to be negotiated at a later date.  *Id.* ¶¶ 8, 10(b).

**C.**     **After Settlement Negotiations Stalled, LMB Started a Media Blitz and Threatened
          to File a Class Action against Nextel Seeking Billions of Dollars in Damages**

       When settlement negotiations on LMB's terms stalled, LMB initiated a media blitz
against Nextel.  Ex. 9 ¶ 8 ("After some initial dialogue between the Firm's lawyers and counsel

for Nextel, the negotiations stalled.  In order to pressure Nextel into coming back to negotiations, LM&B held a press conference.").  LMB threatened to file a class action against Nextel.  *See* Ex. 12 ("Our clients have directed us to commence litigation and to seek class action status. . ."); Ex. 13 (quoting LMB lawyer James Vagnini as saying "a class-action suit is a possibility"). LMB made statements that it was seeking $2 billion to settle the cases, a figure it called "a bargain" for Nextel considering the company's size.  *See* Ex. 13A; Ex. 14 (clients have directed LMB to file a civil lawsuit "seeking billions of dollars in compensatory and punitive damages"); *see also* Ex. 15 (Jeffrey K. Brown:  "Clearly we're seeking more money than the landmark Texaco class-action settlement"); Ex. 15A (Brown:  "This company shouldn't be making a nickel with what they're doing to minorities.").  LMB told its clients that "there is no amount of money in the entire world that could compensate some of the claims that I have heard over the past twelve and a half months."  Ex. 4, at J-016076.

**D.    Nextel Knew that LMB Wanted "Exorbitant" Attorneys' Fees**

From early on in the negotiations, Nextel knew that LMB wanted high attorneys' fees. *See* Ex. 16 (Nextel "would be willing to agree to pay your reasonable attorneys' fees, based on time actually and reasonably expended" but "current payment demands" "cannot be considered reasonable."); Ex. 17 (noting that LMB has refused to disclose identities of clients until Nextel agrees to dispute resolution procedure "including payment to your law firm of $15,000,000 as attorneys' fees"); Ex. 18 (LMB's attorneys' fees and expenses could approximate $15 million). Indeed, on June 20, 2000, Nextel issued a press release responding to the public pressure caused by LMB's media campaign.  *See* Ex. 19.  In addition to denying the claims of discrimination and claiming that it was investigating those claims, Nextel said:

> We strongly believe that Leeds Morelli & Brown has done a
> disservice to those it claims to represent by attempting to try these
> allegations in the media.  These tactics are a direct result of Nextel's

> refusal to pay the outrageous legal fees demanded by Leeds Morelli
> & Brown to resolve claims, meritorious or not, in a non-public
> forum.  Nextel has repeatedly expressed its willingness to discuss
> the merits of their clients' claims with Leeds Morelli & Brown.
> However, Nextel does not regard capitulation to exorbitant fee
> demands as a condition for learning the details of all but a few
> claims and as a condition to avoiding publicity.  That course would
> not be in the best interest of our employees or of our stockholders.

**E.     Nextel Returned to the Settlement Table and Took Over the Role of Drafting the Terms of the Proposed Settlement**

After LMB's media blitz, Nextel decided to resume settlement discussions with LMB.

Ex. 20 at 15:1-6.  At that time Nextel also retained Simpson Thacher & Bartlett and Jackson

Lewis Schnitzler & Krupman, two of the largest and most aggressive employment law defense

firms in the country, and assumed the role of drafting the proposed settlement agreement and

began to dictate the terms under which settlement would occur.  *See* Ex. 21 (advising LMB that

Nextel retained outside counsel); Ex. 9 ¶ 11 ("Nextel pitched the ADR process to LM&B.");

Ex. 22 (enclosing "this firm's initial attempt to put on paper the elements that we have discussed

to date of a possible agreement that would establish mechanisms for the prompt resolution of

your clients' claims against Nextel") (draft not produced with letter).

Nextel also approached LMB with the idea of paying LMB's attorneys' fees and costs.

Ex. 9 ¶ 12.  In order to limit its overall exposure, Nextel wanted to pay LMB a flat fee.  *Id.*

"During the negotiation of the fee, the overall settlement value of the 587 claims was not

discussed."  *Id.  See also* Ex. 5 ¶ 12 (attorneys' fee payment "was a negotiated figure reached

before either Nextel or the Firm knew what would ultimately be paid out by Nextel through the

DRP").  Instead, Nextel wanted to pay LMB "for taking its clients through the resolution

processes."  Ex. 23, at 15691.

Ultimately, Nextel proposed to pay LMB a flat attorneys' fee for two things.  First, as the

DRSA provides, Nextel wanted to pay LMB for processing its clients' claims on an expeditious

basis. *Id*. § 1(c) (stating that time is of the essence). Second, Nextel proposed that it pay LMB

to enter into "a consulting arrangement so that the Firm could advise Nextel on its employment

practices and other matters." Ex. 9 ¶ 13; Ex. 5 ¶ 13; Ex. 23 ("Nextel wishes to retain for a fixed

fee the law firm of Leeds Morelli as a consultant to provide advice on the company's anti-

discrimination and diversity policies and programs and human resources department.").

**F.    Nextel Knew That Entering into "Alternative Dispute Agreements" Like the DRSA Was LMB's *Modus Operandi***

Prior to negotiating the DRSA, LMB had negotiated similar "dispute resolution

agreements" with other employers. *See* Ex. 27, at 30:20-25; Ex. 7, at 40:25-41:9 (LMB had

negotiated between five to ten similar agreements before settling with Nextel); Ex. 9 ¶ 3; Ex. 5

¶ 3. At least one attorney at Nextel, Gregory Raisin at Jackson Lewis, knew that LMB had

negotiated similar agreements before. *See* Ex. 32, at 13:23-14:13.

**G.    Nextel Knew the DRSA Contained Conflicts of Interest between LMB and Its Clients**

As early as July 2000, Nextel's lawyers recognized that the settlement structure it was

proposing potentially created conflicts of interest for LMB with its clients. Accordingly, Nextel

sought the opinion of University of Pennsylvania law professor Geoffrey Hazard regarding the

agreement. *See* Ex. 23.[2] Nextel allowed LMB to examine Mr. Hazard's written opinion, but did

not permit LMB to keep a copy of the opinion. Ex. 9 ¶ 15.

Following Nextel's lead, in September 2000, LMB obtained the opinion of Professor Roy

Simon of Hofstra University regarding the ethics of Nextel's payment of LMB's attorneys' fees

---

[2] Nextel has represented that it did not seek advice related to any individual Class member. *See* Ex. 24.

and the consultancy provision in the DRSA.  Ex. 9 ¶ 14.[3]  LMB did so because it recognized the

potential conflicts of interest within the DRSA.  Ex. 25, at 75:4-20.

**H.     On September 22, 2000, Nextel and LMB signed the DRSA**

Ultimately, despite their recognition of the conflicts of interest within it, Nextel and LMB

reached an agreement to resolve the claims of all 587 of LMB's Nextel clients.  On September

22, 2000, Nextel and LMB signed the DRSA.  *See* Ex. 26 (agreement without exhibits).   The

agreement had numerous key provisions:

- LMB agreed to obtain, from all of its Nextel clients, a waiver of their rights to a jury trial, to participate in a class action, or obtain punitive damages.  DRSA §§ 7(a) and 7(e).  Instead, LMB agreed to have all its clients' claims resolved exclusively through a "Dispute Resolution Procedure" ("DRP") under which the parties would first attempt to resolve claims through negotiation, then would try mediation and then would try arbitration.

- LMB agreed to have its clients' claims processed 45 weeks after the Effective Date of the DRSA.  LMB agreed that, absent "extraordinary circumstances," all of its clients' claims would be processed within 45 weeks of the effective date of the DRSA.  *Id.* § 4(b).  If LMB did not deliver all of its clients to Nextel within that time frame, Nextel could withhold LMB's attorneys' fees in the amount of $50,000 for each month of delay.  *Id.*  Indeed, in the DRSA, LMB both represented that "the timeframe for completion of the . . . DRP . . . was calculated to be as expeditious as reasonably possible for all Claimants" and admitted that, for Nextel "time is of the essence with respect to the conclusion of [*sic*] DRP for all Claimants."  *Id.* § 1(c).[4]

- LMB agreed not to represent any additional clients with claims against Nextel and not to refer any Nextel clients to other law firms.  *Id.* § 1(c) ("LMB believes that it is in the best interest of its clients that it devote its resources on this matter to the representation solely of the Claimants listed on Schedule 1 hereto and that it not undertake the representation of any additional person who believes that he/she

---

[3] LMB has stipulated that it did not seek advice related to any individual Class member.  Dkt No. 89.

[4] Thus, Nextel paid LMB for the speed at which it processed the claims of its clients.  *See* Ex. 25, at 152:13-17 (Q:  Isn't it true that the sooner the dispute resolution process ended, the sooner Leeds, Morelli & Brown's consultancy period began?  A:  Yes.).  LMB has justified resolving its clients' claims at this pace because "after a number of years of doing this, it became obvious that it was in the client's best interest to try to get those cases over with sooner rather than later and not litigate them."  Ex. 27, at 32:19-23.

may have a claim against any of the Companies.  LMB therefore represents that it does not intent to undertake any such representation . . . ”); § 2(c) (agreement not to refer additional clients so that Nextel would not be “distracted” by claims of other individuals).

- LMB’s clients had to keep confidential the DRSA, the DRP proceedings, and any settlements reached at the conclusion of those proceedings.  *See id.* § 4.  If any Claimant violated the confidentiality provision, he/she would not be eligible for any recovery under the DRSA and had to return any monies previously awarded under it.  *Id.* § 4(c).

In exchange, Nextel agreed to pay LMB a total of $7.5 million in attorneys' fees - half of the amount Nextel once claimed were “outrageous” and “exorbitant.”  $5.5 million of those fees were paid to LMB to process its clients’ claims pursuant to the DRSA.  *See* DRSA § 11.  Nextel paid LMB $2 million within three business days of the effective date of the DRSA; $1.5 million upon the resolution of the claims of half of all claimants, and the remaining $2 million upon the resolution of the remaining claims.  *Id.* § 11(a).

In addition, Nextel agreed to pay LMB $2 million, in the form of $83,333.34 per month for 24 months, to serve as a “consultant” to Nextel to provide legal advice regarding subjects that could include “the Companies’ anti-discrimination and diversity policies and programs.”  DRSA § 12.  However, LMB did not, in fact, amend or revise any anti-discrimination policies that were in effect at Nextel at the time the DRSA was signed. Ex. 28 at 18:19-19:11.  Nor did LMB amend or revise any diversity policies or programs that were in effect at Nextel at the time the DRSA was signed.  *Id.* at 19:13-22.  Instead, during the two-year consultancy Nextel gave LMB five or six legal research assignments on “employment law and benefits,” civil procedure and other related topics.  *Id.* at 25:16-26:5; 30:3-31:3; 31:5-11 and 31:13-32:9.[5]  LMB did not

---

[5] Because Nextel contends that there was an attorney-client relationship between Nextel and LMB during the consultancy, Nextel produced a privilege log for these assignments.  *See* Ex. 29. The log describes only one assignment, a legal research assignment related to a 50-state survey. Nextel has testified that they are “still looking” for the remaining memos. Ex. 28 at 38:18-40:5.

interview any Nextel employees during the consultancy and was not asked to review any documents in order to perform its work. *Id.* at 46:19-47:18.

The consultancy bore no resemblance to an agreement where Nextel was paying LMB for its expertise. Nextel did not ask that the work during the consultancy be performed by any particular person at LMB. *Id.* at 32:18-22. Except for a single assignment, Nextel did not require that the work requested be done by a lawyer with any given level of experience or expertise. *Id.* at 33:2-9. Instead, most of the work was done by a young attorney. *Id.* at 34:10-20. If Nextel were dissatisfied with the work done by LMB, the DRSA contained no provision and there was no independent agreement under which Nextel could discontinue payments to LMB. *Id.* at 51:13-52:7. There was no remedy for Nextel if LMB breached this provision in any way. *Id.* at 52:9-18.

**I.      The Parties Subsequently Signed Amendments to the DRSA That Further Ensured That LMB Had to Process Its Clients' Claims As Quickly as Possible**

In February 2001, Nextel and LMB executed a second amendment to the DRSA to account for the 14 claimants who elected not to participate in the DRP. *See* Ex. 30.[6] Under that Amendment, LMB agreed that Nextel would reduce LMB's final attorneys' fee payment from $2 million to $1,720,000, a reduction of $20,000 per non-participating claimant.

Then, in September 2001, Nextel and LMB signed a third amendment to the DRSA. *See* Ex. 31. At this point, 218 of the 587 claimants had either completed processing of their claims through the DRP or were no longer eligible to participate; 369 claimants remained. *Id.* at 15281. Under Amendment No. 3, the total eligible recovery for the remaining claimants was capped at $3,690,000 and no claimant was entitled to receive more than $25,000. *Id.* at 15282. However,

---

[6] The first amendment to the DRSA related to obtaining authorization from various government agencies to withdraw pending charges of discrimination.

the DRP was still continuing during this period and any claim paid after a client went through the

DRP was deducted from the $3,690,000 fund. *Id.* at 15283.  In addition, Nextel reduced LMB's

monthly payment under the consultancy by $20,000 per month and used that "savings" to create

a fund from which Nextel could pay the costs to defend claims against Nextel brought by

Claimants. *Id.* at 15285.   Nextel claims that this Amendment did not go into effect.[7]  *See* Ex. 32,

at 28:21-29:5 ("Amendment three was agreed upon and was made part of the DSRA, but it never

took effect . . . [b]ecause Leeds, Morelli & Brown and the claimants in the case did not meet the

conditions precedent to it taking effect.").

**J.     LMB Recovered Less Than $4 Million for Its Clients, But Received $7.5 Million in Attorneys' Fees**

After all of its clients' claims were processed through the DRP, LMB recovered

$3,868,397.33 for its clients.  *See* Ex. 33.[8]  In contrast, Nextel paid LMB a total of $7.5 million

in attorneys' fees:  $5.5 million to process its clients' claims (Ex. 26 (DRSA) § 11) and

$2 million to be a "legal consultant" to Nextel for two years.  *Id.* § 12.

**K.     LMB Agreed to Represent All of the Named Plaintiffs on a Contingency Basis**

Five of the six of the named plaintiffs had retainer agreements with LMB.  *See* Group

Ex. 34.  All of those agreements provided that, if LMB obtained a successful result for those

plaintiffs, LMB would be paid one-third of the recovery.  *Id.* ¶ 1.

---

[7] Under the terms of the Agreement, Nextel had the right to decide not to proceed under the Amendment if a certain number of claimants continued to process their claims through the DRP. *Id.* at 15283.

[8] This document was produced by the claims administrator for the *Foster* class action settlement and was a form document used to calculate a particular class member's recovery.  The claims administrator needed to calculate the total amount recovered by LMB for its Nextel clients because the *Foster* settlement distributions were made *pro rata* based on what LMB recovered for a given client under the DRSA.  Connolly Decl. ¶ 36.

Plaintiffs received significantly less than what LMB told them their cases were worth:

- LMB demanded $275,000, stock options and non-pecuniary relief to resolve Donna Dymkowski's claims (*see* Ex. 35), but then settled those claims for $19,500 ($10,245.13 after taxes).  Ex. 36

- Discovery has not revealed a demand made by LMB on behalf of Vincent Hall. LMB settled his claims for $4,250.00 ($2,647.54 after taxes).  Ex. 37.

- LMB demanded $300,000, stock options and non-pecuniary relief to resolve Michael Johnson's claims (*see* Ex. 38), but then settled those claims for $8,000 ($5,077.82 after taxes).  Ex. 39.

- LMB demanded $85,500 and non-pecuniary relief to resolve Patricia Long-Correa's claims (*see* Ex. 40), but then settled her claims for $7,500 ($4,831.51 after taxes).  Ex. 41.

- LMB demanded $260,000, stock options, and non-monetary relief to resolve Antonio Samuel's claims (*see* Ex. 42), but then settled them for $20,500.00 ($10,958.12 after taxes).  Ex. 43.

- LMB demanded $510,000 to resolve Angelette Waters' claims (*see* Ex. 44), but then settled them for $17,000.00 ($8,954.85 after taxes).  Ex. 45.

While Plaintiffs received between 2.6% and 8.7% of the demands LMB made on their behalf, LMB received 194% of what its clients received.  *See* Ex. 33.

## III.   PROCEDURAL HISTORY

### A.   Second Circuit opinion

On March 31, 2009 this Court dismissed the Complaint.  *See* Dkt No. 39.  On September 26, 2011, the Second Circuit reversed.  *Johnson v. Nextel Commnc'ns, Inc.*, 660 F.3d 131 (2d Cir. 2011).  First, the court held that Plaintiffs had properly stated a claim for breach of fiduciary duty.  The court held that "[t]he existence of a fiduciary duty between LMB and appellants is beyond dispute."  *Id.* at 138; *see also id.* at 141 ("[t]he existence of a fiduciary duty on LMB's part toward the claimants is undeniable.").  The court then found that, if there were a breach of fiduciary duty "it could not have been due to negligence but rather, given the nature of

the DRSA and the complaint's allegations, had to be knowing and intentional on LMB's part." *Id.*

While Defendants claimed that Plaintiffs' claims had been released, the Second Circuit concluded that the conflicts of interest in the DRSA were unconsentable because "[t]he DRSA created overriding and abiding conflicts of interest for LMB and thoroughly undermined its ability to 'deal fairly, honestly, and with undivided loyalty." *Id.* at 139.  First, because LMB was not lead counsel in a class action, the protective provisions of Rule 23 were not triggered.  *Id.* at 140.  Second, given the plain terms of the DRSA, "the opportunity for the claimants to give informed consent was so burdened that the DRSA is not consentable for that reason as well." *Id.* at 141.  In fact, the court concluded that "we express our candid opinion that the DRSA was an employment contract between Nextel and LMB designed to achieve an en masse processing and resolution of claims that LMB was obligated to pursue individually on behalf of each of its clients." *Id.* at 141.  The Court also held that Plaintiffs had "easily met that burden" of pleading a claim of aiding and abetting breach of fiduciary duty against Nextel.  *Id.* at 142.  The court further sustained Plaintiffs' claim for breach of contract, finding that "signing the DRSA is the very conduct that appellants assert was a breach of contract." *Id.* at 143.

The court also sustained Plaintiffs' claims against LMB for fraud and malpractice, and sustained Plaintiffs' claims against Nextel for aiding and abetting fraud, aiding and abetting breach of contract, aiding and abetting malpractice, and tortious interference with contract.  *Id.*

**B.      Bifurcation of Discovery**

Magistrate Judge Fox entered an order bifurcating class and merits discovery.  *See* Dkt No. 69.  Pursuant to that order, class discovery concluded on October 1.  To date, LMB's production of documents has been limited to documents, depositions and the trial testimony in *McNeil v. Leeds, Morelli & Brown, P.C.* matter, a case brought by two individuals in Colorado

state court against LMB.  Connolly Decl. ¶ 49.  In addition, LMB has produced a limited number

of documents related to *Foster v. Leeds, Morelli & Brown*, a class action in Colorado state court

that resolved claims similar to the claims made in this litigation against LMB (but not Nextel).

*Id.*  LMB also produced some communications with its ethics expert Professor Roy Simon after

Plaintiffs served a subpoena *duces tecum* requesting those documents.  *Id.*  In addition, after

Judge Fox entered an order denying LMB's motion for protective order on all of its client files

[*see* Dkt No. 86], LMB produced redacted documents from certain client files.  *Id.*  Nextel's

production has been limited primarily to its files regarding the named plaintiffs and a privilege

log of documents related to the LMB consultancy.  *See* Ex. 29.[9]

LMB has represented that it has produced all of the depositions taken in the *McNeil*

litigation.  In addition, in order to avoid discovery disputes with Defendants on the scope of class

certification discovery, Plaintiffs took one deposition, of Nextel's Vice President of Litigation,

Susan Z. Haller.  To date, Nextel has withheld over 15,000 pages of documents that purportedly

relate to merits discovery and not to class certification.  *See* Ex. 46 (Letter to Judge Fox), at 3.

Plaintiffs are not aware of the volume of documents LMB plans to produce during the merits

stage of discovery.  Connolly Decl. ¶ 53.

## IV.   ARGUMENT

Plaintiffs seeking class certification bear the burden of demonstrating, by a

preponderance of the evidence, that each element of Rule 23 is satisfied.[10]  A district court must

conduct a "rigorous analysis" to determine whether all the requirements of Rule 23 have been

---

[9] In her September 27, 2012 deposition, Susan Haller, the Vice President of Litigation for
Sprint Nextel Corporation, testified that Nextel's privilege log was not complete and that Nextel
was still searching for documents that should have been included on that log.  Ex. 28 at 38:18-
40:5.

[10] *Flores v. Anjost Corp.,* 11 Civ. 1531 (CM), 2012 U.S. Dist. LEXIS 85171, at *19
(S.D.N.Y. June 19, 2012) (citations omitted).

met.[11]  In doing so, however, the Court should not make any factual findings or merits

determinations that are not necessary to the Rule 23 analysis, and any factual determinations

made at the certification stage are not binding on a subsequent fact-finder and may be amended

by the Court.[12]  A motion for class certification should not become a "protracted mini-trial of

substantial portions of the underlying litigation."[13]  "[T]he Court's task at the Rule 23 stage is not

to resolve the liability question, but to decide 'whether the constituent issues that bear on

[Defendants'] ultimate liability are provable in common.'"[14]

**A.      The Proposed Class Is Not Only Ascertainable, But Is Defined by the Very Conduct Plaintiffs Challenge in This Litigation**

"[W]hile Rule 23(a) does not expressly require that a class be definite in order to be

certified, "[t]here is an implied requirement that the membership of the class is identifiable and

ascertainable."[15]  Here, Plaintiffs seek certification of the following Class against Nextel:

> All people who were represented by Leeds, Morelli & Brown, P.C. and had claims against Nextel that were resolved pursuant to the terms of the Dispute Resolution Settlement Agreement ("DRSA").

In addition, Plaintiffs seek certification of the following Class against LMB:

> All members of the Class who opted out of the settlement in *Foster v. Leeds, Morelli & Brown, P.C.*, Case No. 02-CV-1484 (District Court, Arapahoe County, Colorado) excluding those who resolved the claims alleged against Leeds, Morelli & Brown, P.C. in this action in any other proceeding.

Both the Class and the Subclass are easily ascertainable because they are the individuals who

were bound by the provisions in the DRSA, the agreement Plaintiffs challenge in this litigation.

---

[11] *Id.*, at *19 (citation omitted).

[12] *In re Initial Public Offering Secs. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006).

[13] *Id.* at 41.

[14] *Flores*, 2012 U.S. Dist. LEXIS 85171, at *20 (citation omitted).

[15] *Flores,* 2012 U.S. Dist. LEXIS 85171, at *17 (citations omitted).

**B.** **Rule 23(a)(4) Authorizes Certification of Issues Common to the Class and, Because All Class Members Had Discrimination Claims Against Nextel Resolved by the DRSA, There Are Many Common Issues**

Plaintiffs seek certification of the following Common Issues:

- Whether, in entering into the DRSA, LMB knowingly breached its fiduciary duty to its clients;

- Whether, in entering into the DRSA, LMB breached a duty of care to its clients;

- Whether, in entering into the DRSA, LMB breached its retainer agreements with its clients;

- Whether, in entering into the DRSA, Nextel intentionally and without justification procured LMB's breach of its retainer agreements with its clients;

- Whether, in entering into the DRSA, LMB appropriated or interfered with funds that otherwise, under the terms of LMB's retainer agreements, belonged to LMB's clients;

- Whether Nextel knew about LMB's wrongful conduct [breach of fiduciary duty, malpractice and conversion];

- Whether Nextel knew or substantially participated in the wrongdoing [breach of fiduciary duty, malpractice and conversion];

- Whether Nextel's payments to LMB of $5.5 million in attorneys' fees and $2 million to act as a "consultant" to Nextel were bribes;

- Whether Plaintiffs are entitled to punitive damages against LMB and, if so, what ratio of punitive to compensatory damages is appropriate; and

- Whether Plaintiffs are entitled to punitive damages against Nextel and, if so, what ratio of punitive to compensatory damages is appropriate.

Rule 23(c)(4) of the Federal Rules of Civil Procedure provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." As the Advisory Committee comments to the Rule explain:

> This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its 'class' character only through

- 15 -

> the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Accordingly, the Second Circuit has instructed that "[d]istrict courts should 'take full advantage of this provision' to certify separate issues 'in order to reduce the range of disputed issues' in complex litigation' and achieve judicial efficiencies."[16]  "Selectively used, this provision may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action."[17]

Issue certification is particularly appropriate for a case like this, where Plaintiffs propose to bifurcate the case into liability issues common to the Class and damages issues that are individual to each Class member.[18]  As the leading commentators on class actions explain, "[o]ne popular option in adjudicating class actions is to devise a plan for initially resolving the common issues, and then, only in the event the plaintiffs are successful, the court will turn its attention to the details of a management plan for the remaining individual issues."[19]

This case involves common facts that are identical to all members of the Class (with claims against Nextel) and Subclass (with claims against LMB).  Issues related to the

---

[16] *Robinson v. Metro-North Commuter R. R.*, 267 F.3d 147, 167-68 (2d Cir. 2001) (citations omitted) (holding district court should have considered issue certification of pattern and practice issues); *Charrons v. Pinnacle Grp. NY LLC*, 269 F.R.D. 221, 242 (S.D.N.Y. 2010) (same).

[17] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.24, at 386 (2009) ("MANUAL").

[18] *See* Fed. R. Civ. P. 42(b) (court may order separate trial of "one or more separate issues" "[f]or convenience, to avoid prejudice, or to expedite and economize."); MANUAL § 21.24 ("An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages.").

[19] William B. Rubenstein, Alba Conte and Herbert B. Newberg, 3 NEWBERG ON CLASS ACTIONS § 9.61 (4th ed. 2012) ("NEWBERG").  *See also Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 29 (E.D.N.Y. 2001) ("The language and spirit of the Federal Rules of Civil Procedure not only permit trial judges to sever issues for trial, they encourage them to employ the procedure where it would facilitate Rule 23's purpose of 'achieving economies of time, effort, and expense, and promoting uniformity of decision as to persons similarly situated' as well as Rule 1's overarching goal of ensuring a fair and efficient remedy for every wrong.").

negotiation, drafting, signing, and performance of the DRSA do not vary by Class member and are therefore appropriate for issue certification.  Indeed, resolving these issues on a classwide basis is the most efficient way to advance this litigation as a whole.

**C.     Plaintiffs Satisfy Rule 23 Factors for the Issues Sought to Certified**

The Second Circuit has held that "a court may employ Rule 23(c)(4)(A) to certify a class as to an issue *regardless of whether the claim as a whole satisfies the predominance test*."[20] Plaintiffs meet these requirements for the issues sought to be certified.

**1.     The DRSA resolved the discrimination claims of 587 LMB clients; therefore, both the Class and the Subclass are sufficiently numerous.**

Rule 23(a)(1) provides that a member of the class may sue on behalf of all class members if "the class is so numerous that joinder of all members is impracticable."  Plaintiffs need not prove the exact number of class members, only that the class is so numerous that the joinder of all potential plaintiffs would be difficult or inconvenient.[21]  Here, there are 587 members of the Class; this is more than sufficient to establish numerosity.  Moreover, the parties agree that the Subclass consists of 39 people.[22]  Courts within this Circuit have held that number to be sufficient to establish numerosity.[23]  Moreover, even if the size of the proposed Subclass is not conclusive, other pertinent factors weigh in favor of numerosity.  The Subclass is geographically

---

[20] *In re Nassau County Strip Search Cases*, 461 F.3d 219, 221 (2d Cir. 2006) (emphasis added) (holding district court abused its discretion in failing to certify liability-only class under Rules 23(b)(3) and (c)(4)(A)); *see also* NEWBERG § 18:7 ("Even cases which might not satisfy the predominance test when the case is viewed as a whole may sometimes be certified as a class limited to selected issues that are common, under the authority of Rule 23(c)(4).").

[21] *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

[22] *See* LMB's Memo. in Supp. of Mot. for Prot. Order, Dkt No. 75, at 9.

[23] *See*, *e.g.*, *Haus v. City of New York*, 03 Civ. 4915 (RWS)(MHD), 2011 U.S. Dist. LEXIS 155735, at *297 (S.D.N.Y. Aug. 31, 2011) ("As a general matter, if the potential class exceeds forty members, the numerosity requirement will be viewed as satisfied, whereas a class of less than twenty is likely to be viewed as too small.").

dispersed:  of the 39 members of the Subclass, 1 resides in North Carolina, 1 resides in Missouri, 1 resides in Virginia, 1 resides in Michigan, 2 reside in Florida, 3 reside in Georgia, 4 reside in New Jersey and 26 reside in Colorado.  Connolly Decl. ¶ 56.  Moreover, the Subclass members lack substantial financial resources, especially when compared to the collective resources of the Defendants.  Judicial economy also favors treating the Common Issues in a class action, and it would be difficult for proposed Subclass members to file individual suits.[24]

> **2.      The issues Plaintiffs seek to certify relate to the DRSA that applied to all Class members and are therefore common to all Class members.**

Rule 23(a) requires the plaintiff to demonstrate that "there are questions of law or fact common to the class."  Commonality requires the plaintiff to demonstrate that the class members have "suffered the same injury."[25]  "Their claims must depend upon a common contention . . . [which] must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[26]  Here, all of the issues Plaintiffs seek to certify relate to Defendants' conduct in negotiating, drafting and performing the DRSA.  By definition, they relate to all Class members and are therefore common to the Class.  Once issues related to the DRSA are decided by the jury, it will resolve the validity of each Class member's claims against these defendants.

> **3.      The named plaintiffs have claims that are typical of the Class as a whole.**

Plaintiffs must likewise establish that the claims of the class representatives are typical of the claims of the Class as a whole.  To demonstrate typicality, the plaintiff must show that "each

---

[24] *See Robidoux,* 987 F.2d at 936.

[25] *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011) (citation omitted).

[26] *Id.*

class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."[27]  This requirement is easily satisfied here, as each Class member's claims arise from the conduct surrounding the DRSA.  All six of the proposed class representatives were former employees of Nextel who alleged that they were discriminated against while employed there.  All six of the representatives retained LMB to represent them in claims of discrimination and had their claims resolved pursuant to the DRP set forth in the DRSA.

### 4.    Plaintiffs are adequate representatives of the Class.

Plaintiffs are likewise adequate representatives of the Class.  The adequacy requirement has two components.  First, Plaintiffs' counsel must be qualified and experienced enough to conduct the litigation.  Second, the interests of the named plaintiffs must not be adverse to the Class as a whole.[28]

Proposed Class Counsel, Roper & Twardowsky, LLC and Hagens Berman Sobol Shapiro LLP, have extensive experience not only in litigating malpractice cases but also in litigating complex class actions of all types.  *See* Ex. 48 and Ex. 49.  Moreover, the named plaintiffs have no interests that are adverse to the Class as a whole.  Like all members of the Class, they seek recovery from Defendants for the amounts that they would have received in the settlements with Nextel had Nextel not compromised LMB's loyalty to its clients.[29]

---

[27] *In re Flag Telecom Holdings, Ltd.*, 574 F.3d 29, 35 (2d Cir. 2009).

[28] *Maneely v. City of Newburgh*, 208 F.R.D. 69, 75 (S.D.N.Y. 2002).

[29] *See Johnson*, 660 F.3d at 141 ("As for damages, the nature of the DRSA itself creates a presumption of damages.  Neither Nextel nor LMB would have entered into it unless each believed that it would profit more by that arrangement than by one in which a law firm vigorously represented claimants as individuals….  Appellants have, therefore, plausibly alleged injury in the difference between what they received with representation by LMB under the DRSA and what they would have received if represented by unconflicted counsel.").

**D.     Plaintiffs Meet the Requirements of Rule 23(b) for the Issues Sought to be Certified**

Rule 23(b) provides that a class action may be maintained if the Court finds that the

questions of law or fact common to the members of the class predominate over any questions

affecting individual members and that the class action is superior to all available methods for the

fair and just adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  "As a general matter, the

Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation."[30]

**1.     Because Defendants treated all Class members identically, the issues sought to be certified predominate over individual ones.**

Here, by entering into the DRSA, Defendants created the Class that Plaintiffs seek to

certify.  By definition, the issues surrounding the DRSA predominate over any individual

questions.[31]  In addition, because the only issues for which Plaintiffs seek certification are

questions of fact, this Court is not being asked to consider variations in state laws that

Defendants could argue would undermine predominance or make trial of these issues

unmanageable.

Moreover, there are no individual defenses that would make individual issues

predominate over the Common Issues.  Defendants have indicated that one of their primary

defenses in this case will be accord and satisfaction because every claimant signed an identical

"General Release" and "Individual Agreement" under which they agreed to resolve their claims

in the DRP, acknowledged that Nextel would be paying LMB's attorneys' fees and that after the

DRP LMB would be hired by Nextel as a legal consultant.  *See* Ex. 50 (General Release (Ex. C

---

[30] *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (internal quotation marks omitted).

[31] As Nextel's counsel recently explained, "my guess is that nobody on this call disputes the fact.  The DRSA itself apply [*sic*] to every single putative class member."  Ex. 54 at 9:9-14.

to DRSA)); Ex. 51 (Individual Agreement (Ex. A to DRSA)). However, the Second Circuit's

decision essentially eliminated the availability of this defense because the court held:

> Certainly, given the conflict described above, any advice from
> LMB to its claimant clients could not possibly be independent
> advice untainted by the counter-incentives of the DRSA such that
> the resulting consent would be valid. The magnitude, and – from a
> lay client's perspective – complexity of LMB's conflict of interest
> is such that informed consent would require the hiring of an
> independent lawyer to review the twenty-nine page DRSA and to
> explain the multiple conflicts embraced by LMB, the waiver of
> multiple rights, and the important and often difficult-to-analyze
> consequences of abandoning ongoing legal or administrative
> proceedings.[32]

Similarly, Defendants have contended that Plaintiffs' claims are barred by LMB's alleged

disclosure of the complete terms of the DRSA to all Class members. This defense has likewise

been precluded by the Second Circuit's conclusion that any disclosure would have been infected

by conflicts of interest. *See Johnson*, 660 F.3d at 141 ("[W]e believe that, under the above

circumstances, the opportunity for the claimants to give informed consent was so burdened that

the DRSA is not consentable for that reason as well. Certainly, given the conflicts described

above, any advice from LMB to its claimant clients could not possibly be independent advice

untainted by the counter-incentives of the DRSA such that the resulting consent would be

valid.").[33] The Second Circuit invalidated the DRSA for this very reason.[34] Therefore, after the

---

[32] *Johnson*, 660 F.3d at 141. Moreover, Defendants have never contended that certain Class members released their claims and certain did not; they have contended that all Class member released their claims. *See, e.g.*, Nextel's Supp. Memo. in Supp. of its MTD, Dkt No. 20, at 4-5 (describing how every Class member either executed identical General Releases or received no settlement from Nextel and thereafter released their claims by virtue of signing identical Individual Agreements).

[33] Again, however, Defendants have not claimed that LMB disclosed the DRSA to some Class members but not to others; they claim the DRSA was disclosed to everyone.

[34] *See Johnson*, 660 F.3d at 143 n.6 ("Because we have invalidated the DRSA as a breach of LMB's fiduciary duty . . .").

Second Circuit's decision, Defendants no longer have any individual defenses that remain available as a matter of law.

>    **2.      An issue certification is superior to individualized determinations of the issues sought to be certified.**

Furthermore, an issue certification is far superior to litigating issues related to Defendants' conduct in signing the DRSA on an individualized basis.  In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."[35]  For this reason, Rule 23(b)(3) sets forth four factors for the Court to consider in deciding the superiority of a class action:  (1) the interests of the members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of claims in the particular forum and (4) the difficulties likely to be encountered in the management of the class action.

The members of the Class would benefit from the prosecution of these issues collectively.  Indeed, the fact that most Class members' claims against LMB (not Nextel) were litigated in a class action in Colorado state court suggests that a class action against Nextel is likewise appropriate here.  Defendants have no claim that this forum is undesirable, since they moved to transfer this action here.  In addition, members of the Class, who have limited means, hired LMB to represent them on a contingent basis because they could not individually afford to pay attorneys on an hourly basis.  It would be unjust to require those former clients to have to sue their attorneys for malpractice on an individual basis, when the basis for the alleged malpractice is that LMB herded them into signing the DRSA, treating all its clients the same.

---

[35] *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997).

Finally, there are no substantial difficulties that will be encountered in the management of this class action.[36] On the contrary, Plaintiffs have submitted a Trial Plan that establishes that this case can be litigated on a class basis. *See* Ex. 52.  In short, the Trial Plan provides for this case to be litigating in three phases:  Phase One will decide Common Issues of liability; Phase Two will decide whether Plaintiffs are entitled to punitive damages and, if so, what punitive-to-compensatory damage ratio is appropriate; and Phase Three will be individualized damage proceedings.  Certification of an issues class is appropriate only "if it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole."[37] Here, certification of the Common Issues would materially advance the disposition of this litigation by allowing liability to be decided on a classwide basis, but still giving Defendants the right to litigate any individual defenses during the damages proceedings.

**E.   This Court Should Appoint Hagens Berman Sobol Shapiro LLP and Roper & Twardowsky LLC as Class Counsel**

Rule 23(g) requires that, in certifying a class, the Court must appoint Class Counsel. Rule 23(g)(1)(A) provides that a court should consider:

- The work counsel has done in identifying or investigating potential claims in this action;

- Counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in this action;

- Counsel's knowledge of the applicable law; and

---

[36] *See Maneely*, 208 F.R.D. at 78 ("it would be improper to let manageability concerns overwhelm the predominance decision.  There is a common issue at the core of this case – whether defendants maintained an unconstitutional blanket strip search policy during the class period.").

[37] MANUAL § 21.24, at 387; *see also* ALI Principles Law Agg. Lit. § 2.02 (noting that ALI principles are "not expected to make for substantial change in the law of aggregate litigation but, rather, to synthesize the application of that body of law that has emerged over decades of experience with the modern class action").

- 23 -

- The resources counsel will commit to representing the class.

Here, Plaintiffs' counsel have spent significant time in identifying the potential claims in this action and in pursuing class certification discovery.  Plaintiffs' counsel have reviewed nearly 100,000 pages of documents and testimony from Defendants and third parties.  Connolly Decl. ¶ 63.  They were also successful in defeating Defendants' motions to dismiss.  Plaintiffs' counsel specialize in malpractice litigation and in complex class action litigation.  *See* Ex. 48 and 49. They have devoted substantial resources to litigating this case to date and have the resources and ability to continue to do so in the future.

## V.    CONCLUSION

This Court should certify Plaintiffs' Common Issues under Fed. R. Civ. P. 23(c)(4) because those issues – which all relate to Defendants' conduct in signing the DRSA – are the very things members of the proposed Class share in common.  Cases like this one are the very reason issue certification was provided for in the first instance and this is precisely the type of case where the Second Circuit has encouraged trial courts to use issue certification to materially advance the litigation of the case as a whole.  Plaintiffs' Motion should be granted.[38]

---

[38] If this Court certifies the Class and Subclass requested, Plaintiffs believe that, because their Trial Plan contemplates eventual individualized damages proceedings, notice to the Class should be served.  Plaintiffs have current contact information for the vast majority of the 587-member Class and can prepare a notice to serve directly on Class members.  Plaintiffs' proposed Order granting this Motion provides for Plaintiffs to submit such a proposed notice to the Court within 30 days of entering an order granting this Motion.

DATED:  October 15, 2012                    **HAGENS BERMAN SOBOL SHAPIRO LLP**


By  */s/ Jennifer Fountain Connolly*
Jennifer Fountain Connolly
1629 K St. NW, Suite 300
Washington, DC  20006
Tel: (202) 355-6435
Fax: (202) 355-6455
jenniferc@hbsslaw.com

Steve W. Berman
Nicholas J. Styant-Browne
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 8th Avenue, Suite 3300
Seattle, Washington  98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
nick@hbsslaw.com

Jason A. Zweig (JZ-8107)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Penn Plaza, 36th Floor
New York, New York 10119
Tel: (212) 752-5455
Fax: (917) 210-3980
jasonz@hbsslaw.com

Angela M Roper
Kenneth Thyne
**Roper & Twardosky, LLC**
77 Jefferson Place
Totowa, NJ 07512-2614
(973)790-4441
angela.roper@njlegalmalpractice.com
ken.thyne@njlegalmalpractice.com

Christopher Dale Watkins
Michael Howard Sussman
**Sussman & Watkins**
Post Office Box 1005
55 East Main Street
Goshen, NY 10924
(845) 294-3991
chris_sussman1@frontiernet.net
sussman1@frontiernet.net

***Counsel for Plaintiffs***