USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 04, 2015

14-454
Johnson v. Nextel Communications Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: December 9, 2014        Decided: March 4, 2015)

Docket No. 14-454

_____

MICHAEL S. JOHNSON, individually and on behalf of the class, PATRICIA LONG CORREA, individually and on behalf of the class, DONNA DYMKOWSKI, individually and on behalf of the class, ANTONIO SAMUEL, individually and on behalf of the class, ANGELETTE WATERS, individually and on behalf of the class, VINCENT HALL, individually and on behalf of the class,

*Plaintiffs-Appellees,*

— v. —

NEXTEL COMMUNICATIONS INC., a Delaware Corporation,

*Defendant-Cross Claimant-Cross Defendant-Appellant,*

LEEDS, MORELLI & BROWN PC, LENARD LEEDS, STEVEN A. MORELLI, JEFFREY K. BROWN, JAMES VAGNINI, FEDERIC DAVID OSTROVE, BRYAN MAZOLLA, JOHN DOE, 1-10, a fictitious designation for presently unknown Defendants,

1

CERTIFIED COPY ISSUED ON 03/04/2015

SUSAN FITZGERALD, JANE DOE, 1-10, a fictitious designation for presently unknown Defendants,

*Defendants-Cross Claimants-Cross Defendants*.

————————————

B e f o r e :

WESLEY, HALL, and LYNCH, *Circuit Judges*.

————————————

The law firm of Leeds, Morelli & Brown PC, representing 587 plaintiffs with discrimination claims against their employer, defendant-appellant Nextel Communications, Inc., agreed with Nextel to set up a dispute resolution process whereby all of the plaintiffs' claims against Nextel would be resolved without litigation. After most of the cases were settled through the dispute resolution process, a group of Nextel employees brought suit on behalf of the entire class of the firm's Nextel clients against both the law firm and Nextel, alleging, inter alia, breach of fiduciary duty, legal malpractice, and breach of contract. A prior panel of this Court vacated a decision dismissing the case, and the district court (George B. Daniels, *Judge*) subsequently certified a class pursuant to Federal Rule of Civil Procedure 23(b)(3). In granting plaintiffs' motion for class certification,

the district court applied New York law to all of the class members' claims, even

though the class members hailed from twenty-seven different states, and held

that common issues predominated over any individual issues, even though prior

litigation in state court indicated that for class members from Colorado,

individual waivers of the law firm's conflict of interest could have vitiated

defendants' liability. We conclude that the district court erred in its choice-of-law

analysis, and that a proper analysis makes clear that the individual issues in this

case will overwhelm common issues. Plaintiffs therefore fail to meet the criteria

for a class action under Rule 23(b)(3).

VACATED and REMANDED.

_____

JENNIFER F. CONNOLLY (Steve W. Berman and Kenneth S. Thyne *on the brief*), Hagens Berman Sobol Shapiro, LLP, Washington, D.C., *for Plaintiffs-Appellees*.

MARK D. HARRIS (Lawrence R. Sandack and John E. Roberts *on the brief*), Proskauer Rose LLP, New York, NY, *for Nextel Communications, Inc.*

_____

GERARD E. LYNCH, *Circuit Judge*:

This case arises from a novel approach to aggregate litigation that

continues to provoke debate among experts in legal ethics.[1]  The law firm of

Leeds, Morelli & Brown PC ("LMB" or "the firm"), representing 587 employees

with discrimination claims against their employer, Nextel Communications, Inc.

("Nextel"), agreed with Nextel to set up a dispute resolution process whereby the

employees' claims would be resolved with Nextel without litigation.  After most

of the cases were settled through the dispute resolution process, a group of

Nextel employees brought this suit, putatively on behalf of a class comprising all

of the Nextel employees represented by LMB, against both LMB and Nextel,

alleging, inter alia, breach of fiduciary duty, legal malpractice, and breach of

contract.  In an earlier appeal, we vacated a decision dismissing the complaint

and remanded the case.  Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 135-37

(2d Cir. 2011) ("Nextel I").

The district court (George B. Daniels, *Judge*) subsequently certified a class

pursuant to Federal Rule of Civil Procedure 23(b)(3).  In granting plaintiffs'

motion for class certification, the district court applied New York law to all of the

class members' claims, even though the class members hailed from twenty-seven

_____

[1] See, e.g., William H. Simon, The Market for Bad Legal Advice: Academic Professional Responsibility Consulting as an Example, 60 Stan. L. Rev. 1555 (2008).

different states, and held that common issues predominated over the individual

issues in the case, even though a Colorado state court had held that, under

Colorado law, individual clients' waivers of the law firm's conflict of interest

eliminated LMB's liability as to those clients. Because we conclude that the

district court erred in its choice-of-law analysis, and that a proper analysis makes

clear that the individual issues in this case will predominate over the common

issues plaintiffs have identified, we VACATE the district court's class

certification order and REMAND the case for further proceedings.

## BACKGROUND[2]

I.   <u>Original discrimination complaints against Nextel</u>

In 2000, a large number of Nextel employees retained LMB to pursue

employment discrimination claims against Nextel. The firm had gathered clients

with such claims, eventually coming to represent 587 Nextel employees from

---

[2] The factual background is discussed in our previous opinion. <u>Nextel I</u>, 660 F.3d at 135-37. We recapitulate the facts here with some additional details from this case's complex procedural history (which includes four lawsuits in three different court systems) that were not relevant to our prior opinion, but relate to our decision on class certification.

twenty-seven different states.[3]  Each client entered into a separate retainer agreement with LMB, most but not all of them in writing.  Generally speaking, the agreements provided that the employee-client was retaining the firm to represent him or her in negotiating a settlement with Nextel.[4]  In the event of a settlement or monetary award, the proceeds would be split, with the client receiving two-thirds of the total settlement or award figure and LMB receiving one-third.

Rather than pursue separate settlements for each of the 587 individual claimants, however, LMB agreed with Nextel to settle the claims *en masse*.  The agreement, known as the Dispute Resolution and Settlement Agreement ("DRSA"), created a dispute resolution process whereby (1) Nextel would interview each claimant, (2) a non-binding mediation of claims would be conducted, and (3) any claims left unresolved by the mediation would be referred to binding arbitration.  The DRSA provided that Nextel would pay LMB $2 million up front to persuade its clients to drop their pending lawsuits against

---

[3] A substantial majority of the clients resided in three states: Colorado, Georgia, and New Jersey.  Six are from New York.

[4] In some cases, the retainer agreements provided that LMB would also pursue litigation, "if necessary."  Joint App'x at 201.

Nextel and sign individual agreements to participate in the dispute resolution process. The DRSA further provided that Nextel would pay another $1.5 million to the firm upon resolution of half of the claims and a final $2 million upon resolution of the remaining claims. However, the final payment came with a time limit: if LMB did not resolve all of the claims within forty-five weeks of the effective date of the DRSA, Nextel was permitted to deduct $50,000 each month until all claims were resolved. Finally, the DRSA provided that Nextel would retain LMB as a consultant for a period of two years following the resolution of all claims for a fee of $2 million, bringing the total value of the DRSA for the firm to $7.5 million. Both LMB and Nextel obtained opinion letters from experts in legal ethics who concluded that the fee arrangement and dispute resolution process proposed in the DRSA were ethical, so long as LMB provided disclosure to, and obtained consent from, the individual clients.

Following the execution of the DRSA, LMB sought agreements (the "individual agreements") from its clients to participate in the dispute resolution process and to waive any conflict of interest on the part of LMB. LMB was ultimately able to obtain individual agreements from most of its clients, and to resolve all but fourteen of the claims against Nextel through the dispute

7

resolution process, resulting in a total payout by Nextel to the employees of $3.9 million – a little more than half of the total fees LMB received from Nextel.[5]

## II.    State court malpractice litigation against LMB

In 2002, two employees who had been represented by LMB in the dispute resolution process brought a class action against LMB in Colorado state court, alleging that the firm had breached the retainer agreements and its fiduciary duty to its clients by entering into the DRSA with Nextel; Nextel was not named as a defendant.  Foster v. Leeds Morelli & Brown, P.C., No. 02-CV-1484 (Colo. Dist. Ct. Arapahoe County).  That suit ended in a classwide settlement approved by the Colorado court.  Forty-one of the 587 original claimants opted out of the Foster settlement and retained the right to bring individual suits.

Two of the class members who opted out of the Foster settlement brought a separate action, also in Colorado state court, against LMB and Nextel.  McNeil v. Leeds Morelli & Brown, P.C., No. 03-cv-893 (Colo. Dist. Ct. Denver County).  Nextel was dismissed from the case.  The claims against LMB were tried to a jury, which returned a verdict for the firm, finding that the plaintiffs had knowingly

---

[5] The firm's $2 million fee for resolution of all the claims was reduced to $1,720,000 – $20,000 for each of the fourteen claimants who did not agree to participate in the dispute resolution process.

waived any conflict of interest presented by the DRSA by signing the individual

agreements.  The Colorado Court of Appeals affirmed the jury's verdict, holding

that Nextel's payment of legal fees to LMB was fully disclosed to plaintiffs, that

plaintiffs expressly waived any conflict by signing the individual agreements,

and that plaintiffs therefore had consented to any conflict presented by the

DRSA.  McNeil v. Leeds Morelli & Brown, P.C., No 07CA2533, slip op. at 22-23

(Colo. Ct. App. May 7, 2009), cert. denied, No. 09SC523, 2009 WL 4759121 (Colo.

2009).

### III.   The instant lawsuit

This action was begun as a putative class action against LMB and Nextel

on October 23, 2006, in New Jersey state court.  The named plaintiffs, all residents

of New Jersey, were six of the Foster class opt-outs who had not been part of the

McNeil litigation.  Defendants removed the case to federal court.  On September

21, 2007, the United States District Court for the District of New Jersey

transferred the case to the United States District Court for the Southern District of

New York.  Johnson v. Nextel Commc'ns, Inc., No. 06-CV-5547 (DMC), 2007 WL

2814649, at *6 (D.N.J. Sept. 21, 2007).

Defendants then moved to dismiss the complaint for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6).  On March 31, 2009, the district

court issued a Memorandum and Order granting the motion.  Johnson v. Nextel

Commc'ns, Inc., No. 07 CV 8473(GBD), 2009 WL 928131 (S.D.N.Y. Mar. 31, 2009).

The district court specifically held that by signing the individual agreements, the

employees demonstrated that they were aware of the DRSA and expressly

waived any conflict of interest.  Id. at *3.  Consequently, the district court

dismissed the breach of fiduciary duty claim against LMB and the claims against

Nextel for aiding and abetting LMB's breach of fiduciary duty.  Id. at *3, *9.  As to

plaintiffs' claim for breach of contract based on the retainer agreements, the

district court held that "plaintiffs have failed to sufficiently plead . . . failure of

performance on the part of [LMB] . . . .  Plaintiffs contracted for, and received,

legal representation from [LMB].  Nowhere do the plaintiffs allege that the

settlement, to which they voluntarily agreed, was inadequate compensation or

disproportionate to their individual claims."  Id. at *4.  The court therefore

dismissed the breach of contract claim against LMB and the tortious interference

with contract claim against Nextel.  Id. at *4, *9.[6]

_____

[6] The district court also dismissed plaintiffs' bribery cause of action,
determining that N.Y. Penal Law § 180.03 does not provide a private cause of
action.  Id. at *5.  In addition, the district court dismissed plaintiffs' conversion

We vacated and remanded in a decision that has important ramifications for the issues here. <u>Nextel I</u>, 660 F.3d 131. First, we held that New Jersey choice-of-law rules applied to the claims because the case was originally brought in the District of New Jersey. <u>Id</u>. at 137-38. We noted that the parties agreed that there was no actual conflict between New York and New Jersey law on almost all of the claims. We therefore held that, applying New Jersey choice-of-law rules, the lower court should apply its own, that is, New York, law to the case. <u>Id</u>. at 138.

Second, we held that plaintiffs had sufficiently stated a claim for breach of fiduciary duty and malpractice. We said that the "existence of a fiduciary duty between LMB and appellants is beyond dispute" and "if there was a breach, it could not have been due to negligence but rather, given the nature of the DRSA and the complaint's allegations, had to be knowing and intentional on LMB's part." <u>Id</u>. at 138. We examined the terms of the DRSA and concluded that it created "overriding and abiding conflicts of interest for LMB and thoroughly undermined its ability to deal fairly, honestly, and with undivided loyalty to

---

claim because "plaintiffs never retained ownership over . . . the pool of money from which [LMB was] paid, and therefore, the exercise of dominion by the defendants is not alleged to be anything other than lawful and authorized." <u>Id</u>. at *7. These claims were not addressed in the prior appeal. <u>See</u> *infra* note 12.

appellants." Id. at 139 (internal quotation marks and alteration omitted).[7]

Moreover, we held that under New York law, the conflict of interest created by

the DRSA was non-consentable because (a) LMB had a duty as counsel to advise

each of its clients individually as to what was in his or her best interest – a duty

to which the DRSA was "flatly antagonistic," id. at 140 – and (b) the need to

obtain *informed* consent from clients so as to waive the conflict was undermined

by LMB's inability to give "independent advice untainted by the

counter-incentives of the DRSA such that the resulting consent would be valid."

Id. at 141.[8]  Therefore, we held that the complaint adequately stated a claim for

breach of fiduciary duty and malpractice.  Id. 135, 141-43.[9]

---

[7] We noted especially that the time limits imposed on LMB under the DRSA for resolving all the claims and the fact that the firm's fee was reduced by the number of claimants who did not participate in the dispute resolution process underscored the all-encompassing nature of the conflict.  Id. at 140.

[8] Instead, we noted, to properly waive the conflict, LMB's clients would have needed additional, unconflicted counsel to review the DRSA and explain to them what rights they were waiving.  Id. at 141.

[9] Correspondingly, we held that plaintiffs had sufficiently alleged that Nextel was liable for aiding and abetting LMB in breaching its duty to its clients. First, we concluded that both New York and New Jersey law permitted such aiding and abetting claims against a third party that knew of the breach and participated in it by providing "'substantial assistance' to the primary violator." Id. at 142, quoting Kaufman v. Cohen, 760 N.Y.S.2d 157, 170 (1st Dep't 2003).

Third, we held that the breach of contract claim was sufficiently pled. We rejected the district court's determination that LMB did not fail to perform its obligations under the retainer agreements because it had negotiated the DRSA and carried out the dispute resolution process. To the contrary, we concluded, "signing the DRSA is the very conduct that [plaintiffs] assert was a breach of contract." Id. at 143. We added, "[Plaintiffs] allege that the retainer agreements provided that LMB would represent [plaintiffs] individually but, according to the complaint, LMB simply aggregated the plaintiffs to gain a group settlement that ultimately benefitted LMB rather than the claimants. Thus, . . . LMB never provided the type of representation required by the retainer agreements." Id.

Having found that the complaint adequately stated claims for breach of fiduciary duty, breach of contract, and malpractice, we vacated the district court's Memorandum and Order dismissing the case, and remanded for further proceedings. Id. at 144.

On remand, plaintiffs moved for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) on ten purportedly common issues. The district

---

Next, we noted that the complaint sufficiently alleged "that Nextel negotiated and signed the DRSA with the knowledge, and intent, that it would undermine LMB's ability to fairly represent [its clients]." Id.

court granted class certification on those issues on September 30, 2013,

determining that all the prerequisites to class certification under Rule 23(a) were

met and that plaintiffs could proceed as a Rule 23(b)(3) class, because the

common issues predominated over the individual issues.  Johnson v. Nextel

Commc'ns, Inc., 293 F.R.D. 660, 676-77 (S.D.N.Y. 2013).  More specifically, the

district court concluded that "[a]ll putative Class members are similarly situated

with respect to Nextel in the context of the DRSA, and therefore the answers to

the Common Issues considered at trial will be the same for all."  Id. at 670.  The

district court emphasized that the alleged liability at issue was based entirely on

"the single act of Defendants' entering into the DRSA."  Id.  The district court

rejected defendants' argument that each class member's claim had to be

evaluated in light of the strength (or weakness) of his or her underlying

discrimination claim based on the law of the class member's state of residence.

Instead, the district court held, "at all times, the pertinent question is whether

Nextel procured and/or facilitated misconduct by LMB.  In fact, the conduct of

Nextel and LMB is the only activity relevant to the determination of Nextel's

liability to the proposed Class."  Id.   The court noted that this was so because

Nextel's liability did not change if there was "one plaintiff, fifty, or 587; or if they

14

are from New Jersey, Colorado, Georgia, or New York." Id. at 671.

Defendants argued to the district court that the court had to apply a choice-of-law analysis to the claims of each individual class member and that various differences in applicable state laws, including the law on waiver of conflicts of interest, rendered individual issues predominant over common issues, thus undermining the basis for Rule 23(b)(3) class certification. The district court noted that, in our decision, we had directed it to apply New Jersey choice-of-law rules, and that under New Jersey rules, the state with the "more significant relationship" to the parties and issues was New York, because the DRSA was negotiated and executed in New York by New York law firms, and "the relationship between Nextel and LMB is indisputably centered in New York." Id. at 674. The district court also noted that defendants had not shown that there were material substantive conflicts between the applicable law of New York and the laws of other states in order to defeat the predominance of common issues. Id. at 675.

The district court also rejected defendants' argument that individual calculation of damages made individual issues predominant, because class certification was sought only as to *liability* and defendants would have an

15

opportunity, after liability was established on a classwide basis, to raise defenses against individual recovery in the damages phase of the trial. Id. & n.18. To that end, the court approved a trial plan proposed by plaintiffs, whereby trial would proceed in three stages: In Phase I, a jury would decide the common liability issues. In Phase II, the same jury would determine the compensatory damages for the named plaintiffs. The jury would then determine if the class was entitled to punitive damages, and, if so, it would determine a punitive-to-compensatory damages "ratio" based on defendants' conduct toward the entire class. Finally, in Phase III, different juries would conduct abbreviated individualized damages trials for the class members, in which individualized defenses would be considered. After the Phase III jury determined the amount of compensatory damages for each individual class member, the court would apply the punitive-to-compensatory damages ratio set by the Phase II jury and award the resulting punitive damages, if any, while retaining the discretion to make an independent assessment of whether the total award was inappropriate for any particular class member.[10]

---

[10] In addition to these rulings, the district court rejected plaintiffs' motion to certify a subclass of the forty-one putative class members who had opted out of the Foster settlement in Colorado state court, holding that, by opting out of the

Nextel now appeals the district court's certification of the class and its approval of plaintiffs' trial plan calling for the determination of punitive damages on a classwide basis, prior to an assessment of compensatory damages. After the district court issued its decision granting class certification, and before the appeal was taken from that decision, the parties moved for stipulated voluntary dismissal of all claims against LMB and its individual attorneys, which the district court granted in an order dated December 3, 2013. LMB is therefore not a party to this appeal, or to the case pending below.

## DISCUSSION

I.   <u>Standard of Review</u>

"We apply an abuse of discretion standard both to the lower court's ultimate determination on certification of a class as well as to its rulings that the individual Rule 23 requirements have been met." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (alterations and internal quotation marks omitted). We accord greater deference to district court decisions granting class certification

---

class settlement, those employees had preserved their right to proceed only on an individual basis. <u>Nextel</u>, 296 F.R.D. at 666-67. Accordingly, those forty-one individuals are excluded from the certified class. <u>Id</u>. at 667-68. Plaintiffs have not appealed that ruling.

than to decisions declining to certify a class. See Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002). Inherent in this deferential standard of review is "a recognition of the district court's inherent power to manage and control pending litigation." Myers, 624 F.3d at 547 (alteration omitted), quoting Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 523 (5th Cir. 2007). Although we review class certifications for abuse of discretion, we review de novo "the district court's conclusions of law that informed its decision" to certify a class. Shahriar v. Smith & Wollensky Rest. Grp., 659 F.3d 234, 251 (2d Cir. 2011) (internal quotation marks omitted). The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997); Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010).

II.    The Commonality and Predominance Requirements of Rule 23

Federal Rule of Civil Procedure 23(a) permits a case to be litigated as a class action only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately

18

protect the interests of the class. In addition to meeting the requirements of Rule

23(a), to certify a class pursuant to Rule 23(b)(3), a plaintiff must establish

(1) predominance – "that the questions of law or fact common to class members

predominate over any questions affecting only individual members"; and

(2) superiority – "that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see

Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc.

Pricing Litig.), 729 F.3d 108, 117 (2d Cir. 2013).

   Nextel challenges plaintiffs' ability to meet the commonality and

predominance requirements of Rule 23. A "question[] of law or fact [is] common

to the class," Fed. R. Civ. P. 23(a)(2), if the question is "capable of classwide

resolution—which means that its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." Wal-Mart Stores,

Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). Rule 23(a)'s commonality requirement

may be satisfied if plaintiffs "demonstrate[] that the class members 'have suffered

the same injury.'" Id., quoting Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 157

(1982). The claims for relief need not be identical for them to be common; rather,

Rule 23(a)(2) simply requires that there be issues whose resolution will affect all

or a significant number of the putative class members.  See Joseph M.

McLaughlin, McLaughlin on Class Actions § 4:7 (11th ed. 2014).  "Where the

same conduct or practice by the same defendant gives rise to the same kind of

claims from all class members, there is a common question."  Suchanek v. Sturm

Foods, Inc., 764 F.3d 750, 756 (7th Cir. 2014).

Nevertheless, the Supreme Court has cautioned that "any competently

crafted class complaint literally raises common questions."  Wal-Mart Stores, 131

S. Ct. at 2551 (alteration and internal quotation marks omitted).  Accordingly, a

court must "probe behind the pleadings before coming to rest on the certification

question," satisfying itself that Rule 23 compliance may be demonstrated through

"evidentiary proof."  Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013)

(internal quotation marks omitted).  As we have recognized, this inquiry may

sometimes overlap with merits issues, though the determination as to a Rule 23

requirement is not binding on the trier of fact in its determination of the merits.

See Miles v. Merrill Lynch & Co. (In re IPO Sec. Litig.), 471 F.3d 24, 41 (2d Cir.

2006).  Furthermore, in order to certify a class, the proponent of class certification

need not show that the common questions "will be answered, on the merits, in

favor of the class."  Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S.

Ct. 1184, 1991 (2013).

Rule 23(b)(3)'s predominance requirement is "more demanding than Rule

23(a)." Comcast, 133 S. Ct. at 1432.; accord, Amchem Prods., 521 U.S. at 623-24

("Even if Rule 23(a)'s commonality requirement may be satisfied . . . , the

predominance criterion is far more demanding.").  Like the commonality inquiry,

a court examining predominance must assess (1) the "elements of the claims and

defenses to be litigated"; and (2) "whether generalized evidence could be offered

to prove those elements on a class-wide basis or whether individualized proof

will be needed to establish each class member's entitlement to relief."

McLaughlin on Class Actions § 5:23.  Predominance requires a further inquiry,

however, into whether the common issues can profitably be tried on a classwide

basis, or whether they will be overwhelmed by individual issues.  "Ultimately,

the court must decide whether classwide resolution would substantially advance

the case," Suchanek, 764 F.3d at 761, examining whether certification will "reduce

the range of issues in dispute and promote judicial economy."  Robinson v.

Metro-N. Commuter R.R. Co., 267 F.3d 147, 168 (2d Cir. 2001), abrogated on other

grounds by Wal-Mart Stores, 131 S. Ct. 2541.

Common issues – such as liability – may be certified, consistent with Rule

21

23, even where other issues – such as damages – do not lend themselves to classwide proof. See Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F.3d 219, 227 (2d Cir. 2006). The same principle holds true for individual defenses – though they "may affect different class members differently," their existence "does not compel a finding that individual issues predominate over common ones." Id. at 225 (internal quotation marks omitted). Nevertheless, such individual issues are "factor[s] that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues," even though "standing alone, [they are not] sufficient to defeat class certification." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 231 (2d Cir. 2008), abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639 (2008); see also Klay v. Humana, Inc., 382 F.3d 1241, 1260 (11th Cir. 2004) ("It is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification."), abrogated in part on other grounds by Bridge, 553 U.S. 639.[11] In short, the question for certifying a Rule 23(b)(3) class is whether

_____

[11] Nextel cites the Supreme Court's decision in Comcast Corp. v. Behrend for the proposition that individual damages calculations *alone* can "overwhelm questions common to the class." 133 S. Ct. at 1433. We recently determined that

"resolution of some of the legal or factual questions that qualify each class

member's case as a genuine controversy can be achieved through generalized

proof" and whether "these particular issues are more substantial than the issues

subject only to individualized proof." In re U.S. Foodservice Inc. Pricing Litig.,

729 F.3d at 118 (internal quotation marks omitted).

III.   Common Issues

Plaintiffs have identified ten common issues that they argue would be

susceptible to generalized proof:  (1) Whether LMB breached its fiduciary duty by

entering into the DRSA; (2) Whether LMB breached a duty of care to its clients;

(3) Whether LMB breached the retainer agreements; (4) Whether Nextel procured

the breach of the retainer agreements; (5) Whether LMB appropriated or

interfered with funds that otherwise belonged to plaintiffs; (6) Whether Nextel

knew of LMB's wrongful conduct; (7) Whether Nextel knowingly and

substantially participated in the wrongdoing; (8) Whether Nextel's payments to

_____

Comcast did not alter this Circuit's Rule 23(b)(3) predominance inquiry, as set
forth in McLaughlin.  See Roach v. T.L. Cannon Corp., No. 13-3070-cv, ___ F.3d
___, ___, 2015 WL 528125, slip op. at 14, 22 (2d Cir. Feb. 10, 2015).  Moreover, as
explained below, in this case individual *liability* issues predominate over
common ones even without considering the individual issues concerning
damages.

LMB constituted a bribe; (9) Whether plaintiffs are entitled to punitive damages against LMB, and, if so, what the ratio of punitive damages to compensatory damages should be; and (10) Whether plaintiffs are entitled to punitive damages against Nextel, and, if so, what the ratio of punitive damages to compensatory damages should be.[12]

Nextel argues that none of these issues are in fact common to the class. As to any breach of LMB's duty to its clients, Nextel argues that those questions depend on how the firm performed in handling each of the class members' underlying employment discrimination cases, not on the relationship between LMB and Nextel as memorialized in the DRSA. Similarly, Nextel argues that breach of the retainer agreements is not susceptible to classwide proof, because the question of what constitutes adequate performance of the retainer agreement turns on each plaintiff's individual discrimination claim, not simply the act of signing the DRSA. Nextel argues that the various subsidiary issues, such as its

---

[12] Nextel argues that plaintiffs' causes of action for conversion (issue 5) and bribery (issue 8) were dismissed by the district court in its March 31, 2009 Memorandum and Order, and were not revived by our prior decision reversing the district court's grant of defendants' motion to dismiss. Because we vacated the March 31, 2009 decision, however, the district court remains free to revisit its determination as to those claims on remand.

knowledge of and participation in LMB's wrongful conduct, are predicated on the issues of breach of fiduciary duty and breach of contract, and are therefore no more susceptible to classwide proof than the underlying issues.[13]

Contrary to Nextel's arguments, there are undoubtedly common issues present in this case that will affect the liability determination for all members of the class. The nature of the DRSA and Nextel's role in negotiating and executing it are issues in every class member's case that apply in the same manner to all class members. Whether or not classwide proof of these aspects of plaintiffs' claims will sustain a cause of action for, say, breach of fiduciary duty, several of the issues cited by plaintiffs will be part of each class member's case, and are susceptible to classwide proof; they thus remain issues common to the class. Moreover, as the district court put it, "All putative Class members are similarly situated with respect to Nextel in the context of the DRSA." Nextel, 293 F.R.D. at 670. The issues regarding Nextel's knowledge of and participation in the conduct of LMB do not vary with respect to individual class members, and are thus susceptible to common proof. To the extent those issues could resolve questions

---

[13] Whether entitlement to punitive damages meets Rule 23's requirements is a question that we address in our discussion of plaintiffs' trial plan, *infra* pp. 47-51.

of Nextel's liability (assuming any liability on the part of LMB) "in one stroke,"

they satisfy Rule 23(a)'s commonality requirement.  Wal-Mart Stores, 131 S. Ct. at

2551.

In disputing that the issues relating to whether LMB breached its

professional obligations in entering the DRSA constitute common issues, Nextel

points to language in Wal-Mart Stores requiring that courts engage in a "rigorous

analysis" of whether common issues "can productively be litigated at once."

Nextel Br. at 21-22, quoting Wal-Mart Stores, 131 S. Ct. at 2551.  Noting that "any

competently crafted class complaint literally raises common questions," the

Supreme Court defined a common issue as one that is not simply "literally"

common to the class members' claims, but, rather, is one whose "truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one

stroke."  Wal-Mart Stores, 131 S. Ct. at 2551 (alteration and internal quotation

marks omitted).  Nextel argues that, because the ultimate issue in plaintiffs'

claims is whether LMB provided each client with competent, professional

services, the propriety of the DRSA is merely a preliminary question that may be

relevant, but is insufficiently "central" to cases that will ultimately be resolved by

individualized determinations about whether the clients were properly advised

26

about, and validly waived, any conflicts created by the DRSA, and whether the facts of each client's case were such that resolving them via the dispute resolution mechanisms established by the DRSA was in fact in the interest of that particular client.

We need not decide, however, whether each of plaintiffs' ten issues are properly treated as common or individual. In the context of a Rule 23(b)(3) class certification, the issues raised by Nextel are more efficiently addressed in light of the predominance and superiority requirements of Rule 23(b)(3). Under the circumstances of this case, even assuming *arguendo* that the issues cited by plaintiffs are common and that plaintiffs therefore meet the requirements of Rule 23(a), those issues are substantially outweighed by individual issues. Accordingly, plaintiffs' case fails the predominance and superiority criteria of Rule 23(b)(3).

IV.    <u>Choice of Law</u>

Because the purported class members reside in twenty-seven different states, the district court properly recognized that, as an initial matter, a choice-of-law analysis was necessary to its determination whether common or individual issues would predominate in the litigation. When claims in a class action arise

under state law – and the class comprises multiple states – the court must

consider whether different state laws will apply to different members of the class.

The application of multiple states' laws does not in and of itself preclude

class certification. See In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d at 127.

For example, where there is no material conflict between the states' laws, the

court may apply the law of the forum state. See id.; see also Phillips Petroleum

Co. v. Shutts, 472 U.S. 797, 816 (1985) ("There can be no injury in applying Kansas

law if it is not in conflict with that of any other jurisdiction connected to this

suit.").  In addition, if the forum state's choice-of-law rules require the

application of only one state's laws to the entire class, then the representation of

multiple states within the class does not pose a barrier to class certification. See,

e.g., Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 31 (1st Cir. 1997)

(applying law of Massachusetts, as the state with the strongest interest in the

claims, to entire class).[14]

---

[14] Even where multiple states' laws apply, class certification may be
permissible if the class can be divided into subclasses within which similar legal
rules will apply.  See, e.g., Klay, 382 F.3d at 1262 ("[I]f the applicable state laws
can be sorted into a small number of groups, each containing materially identical
legal standards, then certification of subclasses embracing each of the dominant
legal standards can be appropriate.").

Courts must exercise care in conducting a choice-of-law analysis in a putative Rule 23(b)(3) class action, however, in order to determine whether any conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through classwide proof. See In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d at 127; see also Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996) (noting that application of "individualized choice of law analysis to each plaintiff's claims" may cause "the proliferation of disparate factual and legal issues [to be] compounded exponentially"), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591.

The possibility that different state laws will apply is especially relevant in this case, because we know of at least one significant conflict that would affect liability for a sizable portion of the class. While we concluded in our prior decision that any conflict of interest on the part of LMB was non-consentable under New York law, see Nextel I, 660 F.3d at 140, precisely the same conflict *is* waivable under Colorado law, see McNeil, No. 07CA2533, slip op. at 22-23. One hundred and sixty-four of the 587 plaintiffs are Colorado residents. Accordingly,

whether New York or Colorado law applies to them will determine in large part whether the common issues of defendants' entering the DRSA meaningfully advances the litigation for more than a quarter of the class.[15]

Where plaintiffs' claims rest on state law, we apply the choice-of-law rules of the state in which the federal district court sits. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In our prior decision in this matter, we held that New Jersey choice-of-law rules applied because the case was originally filed in New Jersey, and New Jersey conflicts law would have governed the case had there been no change of venue. Nextel I, 660 F.3d at 137-38, citing Van Dusen v. Barrack, 376 U.S. 612, 639 (1964). As we explained there, New Jersey's choice-of-law rules require the court to conduct a two-step test. See Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007). First, the court determines whether there is an actual conflict between the laws of the relevant states. Second, if a conflict is found, the court determines which jurisdiction has the "most significant

---

[15] Nextel argues that other issues, such as the scienter requirement for aiding and abetting, among other torts, also varies from state to state. We need not decide whether such variations are material in this case, cf. Mazza v. Am. Honda Motor Co., 666 F.3d 581, 591 (9th Cir. 2012), because the conflict that has already been established through the Colorado court's decision in McNeil is sufficient to assess the predominance and superiority criteria of Rule 23(b)(3).

relationship" to the claim, an analysis set forth in the Restatement (Second) of

Conflict of Laws.  See Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202,

206-07 (3d Cir. 2013).  The district court proceeded directly to the second step of

New Jersey's test, implicitly assuming a conflict.  Because we are aware of at least

one actual conflict – between New York and Colorado law on the issue of

waivability of the conflict of interest – we similarly proceed to step two and

apply the Restatement's "most significant relationship" analysis.[16]

---

[16] Our prior opinion accepted the parties' agreement that there was no
conflict of laws, but did so based only on a comparison of New York and New
Jersey law at the 12(b)(6) stage, which involves a decidedly less rigorous inquiry
than the certification stage into issues that will affect the viability of maintaining
an action as a class action.  See Wal-Mart Stores, 131 S. Ct. at 2551 ("Rule 23 does
not set forth a mere pleading standard."); Szabo v. Bridgeport Machs., Inc., 249
F.3d 672, 675-76 (7th Cir. 2001) (noting that motion to dismiss stage tests the legal
sufficiency of a pleading, while, by contrast, class certification stage "usually is
the district judge's last word" on the factual and legal inquiries necessary to meet
the requirements of Rule 23).  In addressing the conflicts issue, our prior opinion
was concerned with whether the individual named plaintiffs, who were citizens
of New Jersey, had stated a claim for relief.  Accordingly, there was no occasion
to consider the potential relevance of other states' rules.  Because the parties
agreed that New York and New Jersey law were in accord on the relevant
question, we had no difficulty in concluding that there was no obstacle to
applying New York law to all of the plaintiffs' claims.  Nextel I, 660 F.3d at 138.
The question before us now is quite different.  In addressing the propriety of
class certification, we must consider the law applicable to claims of residents of
states, such as Colorado, whose law conflicts with that of New York on questions
critical to liability.  We previously had no occasion to consider this issue, and
therefore our prior decision cannot bind us in addressing it.  See Bobbitt v.

31

The Restatement lists several factors that a court should consider to determine the most significant relationship for tort claims: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.  Restatement (Second) of Conflict of Laws § 145(2) (1971).  The Restatement provides different factors for contract disputes.  It states, "Issues in contract are determined by the law chosen by the parties . . . and otherwise by the law selected in accordance with the rule of § 188."  Id. § 186.  Here, the retainer agreements do not specify the governing law.  Therefore, the breach of contract claims in this case are governed by § 188, the Restatement's "most significant relationship" test for breach of contract claims.  That test instructs courts to consider the following factors:  (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of

---

Milberg, LLP, 285 F.R.D. 424, 427-28 (D. Ariz. 2012) (observing, in a nationwide class action, that the court's prior analysis of a motion to dismiss the complaint based on application of Arizona law did not control the choice of law determination at the class certification stage).

incorporation and place of business of the parties. Id. § 188(2).

The Restatement further instructs that in applying the "most significant relationship" test for both torts and breach of contract claims, courts must examine the aforementioned factors in concert with the principles of Restatement § 6(2), which are (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. Id. § 6(2).

The district court's analysis focused on the "single act" of entering into the DRSA as the exclusive conduct relevant to plaintiffs' claims. Nextel, 293 F.R.D. at 670. Because the DRSA was "negotiated and executed in New York by a number of New York law firms . . . and the relationship between Nextel and LMB is indisputably centered in New York," the district court held, all of the Restatement factors weighed "heavily in favor of applying New York law" to the common issues. Id. at 674. The district court further held that application of

33

New York law to the entire class was constitutionally permissible under the
Supreme Court's decision in <u>Shutts</u>, 472 U.S. 797, because the differences between
the substantive law of New York and that of other states did not present "so
material a conflict that they defeat predominance." <u>Nextel</u>, 293 F.R.D. at 675.

We need not reach the constitutional question because the district court
erred in its truncated analysis of the "most significant relationship" test. As to
the tort claims, the first factor is the location of the injury. The injuries for the
vast majority of class members did not occur in New York; instead they occurred
in the states where each class member resided and allegedly received inadequate
representation due to LMB's conflict of interest. <u>See</u> <u>Casa Orlando Apartments,
Ltd. v. Fed. Nat. Mortg. Ass'n</u>, 624 F.3d 185, 191 (5th Cir. 2010) (applying
Restatement § 145 to breach of fiduciary duty claim and concluding that injury
"occurred in the states where plaintiffs maintain their principal places of
business"); <u>Bobbitt v. Milberg, LLP</u>, 285 F.R.D. 424, 429 (D. Ariz. 2012) (in
malpractice action against class counsel, applying Restatement § 145 and holding
that "the injury (i.e., an economic loss) occurred where the absent class members
who suffered the economic loss were located"). For all but the six plaintiffs who
reside in New York, this factor favors states other than New York. The second

34

factor, where the conduct took place that caused the injury, favors New York: as

the district court correctly noted, the conduct that caused the injury – the signing

of the DRSA – took place entirely in New York. The third factor, where the

parties are located, favors states other than New York: most of the class members

reside outside of New York, and Nextel is a Delaware corporation with

headquarters in Virginia, though LMB is located in New York. Finally, as to the

fourth factor, the district court found that the relationship between LMB and

Nextel is centered in New York. But that is the relationship between the two

*defendants*. The relationship between the *plaintiffs* and the defendants is centered

in the states in which the class members live, where they worked for Nextel, and

where they entered into retainer agreements with LMB. See Restatement

(Second) of Conflict of Laws § 145 cmt. e ("When there is a relationship between

*the plaintiff and the defendant* and when the injury was caused by an act done in the

course of the relationship, the place where the relationship is centered is another

contact to be considered." (emphasis added)). Accordingly, three of the four

Restatement factors for tort claims favor the states where the individual class

members reside, rather than New York. These states accordingly have the most

significant relationship to their residents' tort claims.

35

The same is true for the breach of contract claims.[17]  Importantly, the contracts alleged to have been breached are the *retainer agreements* between the various clients and LMB, not the DRSA.  Those agreements were negotiated and entered into in the clients' home states, not in New York.  The first two Restatement factors therefore weigh against New York.  As to the third factor, the place of performance, at least some portions of the dispute resolution process took place in the class members' home states, while others, such as approval of settlement awards reached in mediation, took place in New York.  This factor consequently does not weigh heavily in favor of either New York or the class members' home states.  The fourth factor is the subject matter of the contracts, which, in this case, is the clients' representation by LMB in pursuing individual

---

[17] We note that no direct breach of contract claim remains at issue in the case because of the voluntary dismissal of LMB, the only party that entered into contracts with the class members, namely, the retainer agreements.  Plaintiffs' complaint, however, alleges a claim against Nextel for "conspir[ing] with . . . and in fact caus[ing]" LMB to breach the retainer agreements.  Joint App'x at 804.  We express no view about whether such an allegation makes out a claim for tortious interference with contract or some other claim under the various state laws applicable to the claims of the putative class members.  Because any claim against Nextel based on a breach of the retainer agreements will necessarily be derivative of LMB's alleged breach, it suffices to address the predominance and superiority criteria relating to that alleged breach of contract in order to resolve Nextel's appeal of the class certification of the contract claims.

settlements against Nextel. That subject matter involves New York, where LMB was located, the individual states where its clients were located, and perhaps Virginia, where Nextel is domiciled. That factor therefore does not weigh in favor of any particular state. Finally, the location of the contracting parties does not weigh in favor of any state because the class members were all domiciled in their home state while LMB was located in New York. None of the Restatement's factors for breach of contract claims therefore weigh in favor of New York as against any other state, and two of them weigh in favor of the individual states where the class members reside.

Based on the foregoing analysis, it is clear that New York is not the state with the most significant relationship to the claims here and, instead, the class members' individual home states have the more significant contacts. The district court did not engage in any of this analysis, instead assuming that New York law applied because the conduct at issue was the signing of the DRSA. Nor did the district court examine the Restatement § 6(2) principles to determine what state policies the contacts in this case implicate, or which state had a superior interest in the issues.

With regard to state interests, plaintiffs argue that New York has the

superior interest because it has an interest in regulating the conduct of attorneys licensed to practice there. They rely on Huber v. Taylor, 469 F.3d 67 (3d Cir. 2006), a case in which Texas lawyers convened a class of plaintiffs to prosecute asbestos claims and set up a fee arrangement that, like the one here, incentivized the lawyers to settle plaintiffs' claims quickly and cheaply. Id. at 70. Applying Pennsylvania choice-of-law rules, which, like New Jersey's, employ the "most significant relationship" test from the Restatement, the Third Circuit held that Texas law applied because all of the defendant attorneys' fiduciary duties to the plaintiffs arose based on their licences to practice law in Texas. Id. at 79. Like the Texas lawyers in Huber, plaintiffs' argument goes, LMB's duties to their clients arose in New York, and New York therefore has an interest in regulating the firm's behavior that is superior to the interest of any other state.

Huber is distinguishable from this case, however, because the conflict among the state laws there related solely to the plaintiffs' cause of action for disgorgement of the Texas attorneys' fees for their breach of fiduciary duty. See id. at 78.[18] As the Third Circuit explained, "Ultimately, suits for breach of

---

[18] Although the plaintiffs in Huber claimed to seek compensatory and punitive damages, as well as disgorgement, the Third Circuit noted that any compensatory damages in that case were likely to be *de minimis*. Id. at 78 n.15.

fiduciary duty that seek disgorgement as opposed to compensatory damages are focused on regulating the behavior of the fiduciary, not remedying the harm to the client." Id. at 80. Here, by contrast, the conflict of laws arises from plaintiffs' claim of Nextel's liability for an injury that occurred in their home states, based on legal relationships negotiated and entered into in their home states. We are not persuaded that New York has a superior interest in regulating relationships entered into in twenty-six other states, under twenty-six other states' substantive laws, simply because one of the parties was a New York law firm.

Our conclusion is supported by the Fifth Circuit's decision in Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000). In that case, plaintiffs sued a handgun manufacturer in a putative nationwide class action, alleging that defendant's handguns suffered from a design defect that caused the guns to jam or discharge accidentally, resulting in economic loss to plaintiffs in the diminished value of their guns. Id. at 310. The district court certified a class, basing its predominance determination on a choice-of-law analysis that held Georgia law applicable to all of the class members' claims. Id. at 311. On appeal, the Fifth Circuit applied Texas choice-of-law rules, which, like New Jersey's, employ the "most significant relationship" test of the Restatement. Id. The Fifth

Circuit noted that while "Georgia has more than a negligible relationship to the

tort issues in this case," the question was whether they were "so overwhelming

that it is clear that Georgia has the most significant relationship to those issues."

Id. at 312. "To answer that question," the court explained, "one must compare

Georgia's contacts and the state policies those contacts implicate with those of the

50 other interested jurisdictions." Id. On the facts of Spence, the economic

injury plaintiffs complained of occurred in the states where the class members

purchased the guns and where they were domiciled, which included all fifty

states and the District of Columbia. Id. at 312, 314. The Fifth Circuit therefore

held that a proper choice-of-law analysis showed that Georgia law did not

control the tort issues for the nationwide class, because "[a]ll . . . 51 relevant

jurisdictions are likely to be interested in ensuring that their consumers are

adequately compensated in cases of economic loss, but many will have different

conceptions of what adequate compensation is." Id. at 314. Because the district

court had premised its class certification order on its determination that Georgia

law controlled all of the claims, the Fifth Circuit held the class certification to be

an abuse of discretion. Id. at 316.

Similarly here, to the extent that the DRSA caused economic loss to the

class members, each class member's home state has an interest in protecting its

citizens from such economic loss. Consequently, the state with the most

significant relationship to plaintiffs' claims is each individual state in which a

class member resides and where he or she was promised representation by LMB.

Resolution of the common issues in this case will therefore require the

application of twenty-seven different state substantive laws. Accordingly, we

conclude that the district court's determination that New York law applied to all

of the plaintiffs' claims was error, and to the extent that its class certification

decision was based on that error, the district court necessarily abused its

discretion in certifying the class.[19]

## V.    Predominance and Superiority

Once it is established that the substantive law of each class member's state

will apply to his or her claims, the case for finding the predominance of common

_____

[19] In other cases where the district court conducted an inadequate choice-of-law analysis, we have remanded for further consideration. E.g., Abdullahi v. Pfizer, Inc., 562 F.3d 163, 191 (2d Cir. 2009). We conclude here, however, based on our de novo review, that a proper choice-of-law analysis leads to the ineluctable conclusion that the substantive law of each class member's individual states applies. See Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., 426 F.3d 580, 585 (2d Cir. 2005). Remand on the choice-of-law analysis is therefore unnecessary.

41

issues and the superiority of trying this case as a class action diminishes to the vanishing point. As we have already intimated, in order to address the malpractice and breach of fiduciary duty claims for a significant fraction of the plaintiff class – the 164 LMB clients from Colorado – the trier of fact will have to determine whether the conflict of interest presented by the DRSA was knowingly waived on a case-by-case basis. That will require individualized inquiries into such questions as: What information was provided to each client about the DRSA? What information was provided with respect to each client's option not to participate in the dispute resolution process? What, if any, advice did LMB attorneys give to each client regarding the probability of success in individual settlement versus participation in the dispute resolution process? These questions are not collateral issues that could be determined in individual hearings after common questions are resolved for the class – they go to the heart of defendants' liability for each class member's alleged injury.

Nor could the class members whose home-state laws permit waiver of the conflict be sensibly segregated from the larger class by means of the creation of a subclass. Even assuming that Colorado is the only state for which waiver of the

conflict of interest will be an issue,[20] that issue is so individualized and client-specific, for the reasons discussed above, that creating a Colorado subclass would not achieve any economies of scale. See In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018-19 (7th Cir. 2002) (holding that individual issues within state subclasses would render class action impracticable, even if litigated state-by-state). Because, at a minimum, more than one quarter of the class members will require individualized trials to determine liability for the tort claims, the litigation will not be advanced by trying these issues on a classwide basis.

To be sure, Nextel's role in the negotiation and execution of the DRSA is, as the district court correctly noted, a piece of every class member's claim. But that piece, in and of itself, does not resolve the whole of any of the class members' cases without further individualized consideration of waiver of the conflict of interest. Moreover, there is no great advantage in trying the common issues in this case as a class action. A single bellwether trial that establishes Nextel's role

---

[20] The parties have not briefed, and we do not venture to decide, whether any of the other states represented in the class would permit waiver of the conflict of interest or, like New York, would hold the conflict non-consentable. Nor do we address whether a viable class could be certified involving only class members residing in states that would not permit waiver of the conflict, a question that is not before us.

43

through special interrogatories would have the same consequence as trying common issues on a classwide basis through its collateral estoppel effect on subsequent cases.  A class action that requires the application of the substantive law of twenty-seven different states to an issue at the heart of liability neither "promote[s] judicial economy" nor makes the case more manageable.  Robinson, 267 F.3d at 168; accord, In re Bridgestone/Firestone, Inc., 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").  And a class trial limited to issues affecting Nextel's role, as noted, offers no particular advantages in resolving the case.

Variations in state law similarly affect the feasibility and purported benefit of trying the contract claims on a classwide basis.  We have held that the fact that contract terms must be interpreted according to multiple different state laws does not necessarily make individual issues predominate over common ones, because state contract laws generally define breach consistently.  See In re U.S. Foodservice Inc., Pricing Litig., 729 F.3d at 127; see also Klay, 382 F.3d at 1263 ("A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey.").  Here, however, the alleged

44

breach of the retainer agreements is closely related to, and overlaps heavily with, the alleged legal malpractice. Thus, to the extent the states represented in the class recognize an independent contract claim in addition to the tort claims,[21] the factfinder will have to decide (a) whether a state that permits a client to waive a conflict of interest would hold that a lawyer breaches a standard retainer contract by seeking such a waiver; and (b) whether the individual agreements to participate in the dispute resolution here validly modified the original retainer agreements.[22] Similar to the tort claims, these questions will require individual assessments of, for example, whether individual class members knowingly agreed that their representation by LMB would be governed by the DRSA, in lieu of the firm's obligation to pursue individual settlements in the retainer agreements. Accordingly, as to liability for the contract claims, the individual

_____

[21] But see PPX Enters., Inc. v. Fredericks, 5 F. App'x 25, 28 (2d Cir. 2001) (summary order) (noting that, under New York law, claim of breach of retainer agreement is duplicative of legal malpractice claim); Oehlerich v. Llewellyn, 285 Ga. App. 738, 741 (Ga. Ct. App. 2007) (same under Georgia law).

[22] See Grizzly Bar, Inc. v. Hartman, 169 Colo. 178, 185 (1969) (en banc) (under Colorado law, proof of modification of contract requires same evidence of meeting of the minds as contract formation).

issues similarly overwhelm the common ones.[23]

The application of the different jurisdictions' laws therefore renders

individual issues predominant and undercuts the superiority of trying the

common issues on a classwide basis.  Although "the specter of having to apply

different substantive laws does not necessarily warrant refusing to certify a

class," Rodriguez v. It's Just Lunch, Int'l, 300 F.R.D. 125, 140 (S.D.N.Y. 2014)

(alterations and internal quotation marks omitted), where, as here, the variations

in state law present "insuperable obstacles" to determining liability based on

common proof, such variations defeat the predominance of common issues and

the superiority of trying the case as a class action.  In re U.S. Foodservice Inc.

Pricing Litig., 729 F.3d at 127, quoting Walsh v. Ford Motor Co., 807 F.2d 1000,

1017 (D.C. Cir. 1986).  Rule 23(b)(3) is designed to "cover cases in which a class

action would achieve economies of time, effort, and expense, and promote

––––––––––––––––––––

[23] In addition, the parties agree that damages for the contract claims will
have to be assessed individually.  Under the law of our Circuit, see supra note 11,
if damages were the only issue requiring individualized treatment, then
bifurcation from classwide liability issues might well provide an expeditious way
to conduct the litigation.  But because many of the liability issues are not
susceptible to common proof, the individualized nature of the damages inquiry
in this case further weighs against class certification.  See McLaughlin, 522 F.3d at
231.

uniformity of decision as to persons similarly situated." <u>Amchem Prods.</u>, 521

U.S. at 615 (alteration and internal quotation marks omitted). Because liability for

a significant bloc of the class members and damages for the entire class must be

decided on an individual basis, common issues do not predominate over

individual ones and a class action is not a superior method of litigating the case.

Accordingly, we vacate the district court's certification of the class.

VI.    <u>Punitive Damages</u>

The foregoing discussion resolves Nextel's appeal of the district court's

certification of the ten common issues for the entire class of 587 employees.[24] But

because we are remanding the case for further proceedings, we tarry to express

concern about the district court's adoption of plaintiffs' trial plan, as we did in

<u>Simon II Litigation v. Philip Morris USA Inc. (In re Simon II Litigation)</u>, 407 F.3d

125 (2d Cir. 2005). In that case, the district court's trial plan called for the jury to

determine a lump sum punitive damages award for the entire class, prior to any

_____

[24] Because our review is limited to the district court's certification of this
class on the ten common issues plaintiffs identified, our decision does not
foreclose the possibility that other issues might be tried on a classwide basis. We
note, however, that plaintiffs apparently have not, to this point, identified any
such other issues.

determination of actual injury to individual plaintiffs, which would then be parceled out by the district court on a pro-rata basis based on the jury's subsequent allocation of compensatory damages. See id. at 131. We expressed concern that such a trial plan might run afoul of the Supreme Court's decision in State Farm Mutual Auto Insurance Co. v. Campbell, 538 U.S. 408 (2003), which held that punitive damages awards must be tethered to compensatory damages in order to comply with due process, id. at 419. See In re Simon II Litig., 407 F.3d at 138-39.

Plaintiffs here attempt to avoid the problem we identified in Simon II by proposing that the Phase II jury determine only a punitive damages "ratio" that would then be applied to each class member's compensatory damages award determined in individual damages trials at Phase III. Nextel argues that this plan violates the constitutional limits on punitive damages outlined in State Farm. We need not decide the constitutional question whether such a punitive damages ratio is inconsistent with due process.[25] We simply note that, under the specific

_____

[25] The question of how the Supreme Court's punitive damages precedent should be applied to class actions has engendered significant debate in the lower federal and state courts and in academic scholarship. See, e.g., EEOC v. Performance Food Grp., 16 F. Supp. 3d 576, 581-82 (D. Md. 2014); EEOC v. Sterling Jewelers Inc., 788 F. Supp. 2d 83, 91 (W.D.N.Y. 2011); Iorio v. Allianz Life

facts of this case and the trial plan proposed here, determining a punitive

damages ratio without any grounding in a compensatory damages award is

impracticable and fails to give the jury an adequate basis for determining what

measure of punitive damages is appropriate.

As the Supreme Court explained in <u>State Farm</u>, while there is no rigid

upper limit on a ratio of punitive damages to compensatory damages, the

propriety of the ratio can be meaningfully assessed only when comparing the

ratio to the amount of compensatory damages awarded.  A larger punitive-to-

compensatory ratio may be appropriate where "a particularly egregious act has

resulted in only a small amount of economic damages," and similarly, "[w]hen

compensatory damages are substantial, then a lesser ratio, perhaps only equal to

compensatory damages, can reach the outermost limit of the due process

guarantee."  <u>State Farm</u>, 538 U.S. at 425 (internal quotation marks omitted).

---

<u>Ins. Co. of N. Am.</u>, No. 05 CV 633 JLS (CAB), 2009 WL 3415703, at *5-*8 (S.D. Cal. Oct. 21, 2009); <u>EEOC v. Outback Steak House of Fla., Inc.</u>, 576 F. Supp. 2d 1202, 1206-07 (D. Colo. 2008); <u>EEOC v. Dial Corp.</u>, 259 F. Supp. 710, 713-14 (N.D. Ill. 2003); <u>Jacobsen v. Allstate Ins. Co.</u>, 371 Mont. 393, 428 (2013); <u>Engle v. Liggett Grp.</u>, 945 So. 2d. 1246, 1262 (Fla. 2006); Catherine M. Sharkey, <u>The Future of Classwide Punitive Damages</u>, 46 U. Mich. J.L. Reform 1127, 1139-40 (2013); Sheila B. Scheuerman, <u>Two Worlds Collide: How the Supreme Court's Recent Punitive Damages Decisions Affect Class Actions</u>, 60 Baylor L. Rev. 880, 906 (2008).

Under plaintiffs' trial plan, the Phase II jury will determine a punitive damages ratio based on an amalgam of the actual damages to only the *named* plaintiffs and defendants' conduct toward the entire class. Whatever considerations would go into developing the punitive damages ratio in plaintiffs' trial plan, the Phase II jury would lack any conception of the actual damages to the members of the class to whom the ratio would subsequently be applied. This one-size-fits-all punitive damages ratio would therefore be no more tethered to compensatory damages than the lump sum we disapproved of in <u>Simon II</u>.[26]

Plaintiffs' plan attempts to address this difficulty by allowing the district court to adjust the total damages award as necessary after the Phase III juries' findings regarding individual compensatory damages. But this proposed review

_____

[26] Plaintiffs point to the Fifth Circuit's decision in <u>Watson v. Shell Oil Co.</u>, 979 F.2d 1014 (5th Cir. 1992), approving the use of a punitive damages ratio like the one proposed here. <u>Watson</u> is distinguishable from this case, however; it involved a single mass tort, <u>id</u>. at 1016-17, while defendants' conduct here may have varied in its reprehensibility from plaintiff to plaintiff. Moreover, <u>Watson</u> was decided before <u>State Farm</u>, and its approach has not been replicated within the Fifth Circuit. <u>See</u> <u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402, 418 (5th Cir. 1998) (holding, in pattern or practice of discrimination case, that "punitive damages must be determined after proof of liability to individual plaintiffs at the second stage . . . , not upon the mere finding of general liability to the class at the first stage"). Consequently, we do not find <u>Watson</u> persuasive, at least in the context of this case.

of the punitive damages award in each individual case obviates any utility of

determining a ratio on a classwide basis.  Plaintiffs' trial plan therefore suggests

that, as with the liability issues, the punitive damages inquiry in this case fails to

meet the predominance and superiority requirements of Rule 23(b)(3).[27]

It is ultimately for the district court to determine how to proceed on

remand, with these considerations in mind.

## CONCLUSION

For the foregoing reasons, the class certification order of the district court is

VACATED and the case is REMANDED for further proceedings consistent with

this opinion.

---

[27] Because the trial plan as currently structured fails the predominance and
superiority criteria of Rule 23(b)(3), we need not address any potential Seventh
Amendment problem with the plan; however, we note that the Seventh
Amendment's Reexamination Clause forbids review by a second fact-finder,
whether a judge or another jury, of facts already determined by a jury.  See
Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995).  To the
extent the trial plan here contemplates that the Phase III jury (or juries) or the
district court would have to reassess the reprehensibility of Nextel's conduct in
order to determine the appropriateness of a punitive damages award, such a plan
could run afoul of the Seventh Amendment.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit